No. 21-11001

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ZACKEY RAHIMI
ALSO KNOWN AS ZACHEY RAHIMI,

*Defendant-Appellant.*

---

*On Direct Appeal from the United States District
Court for the Northern District of Texas
Fort Worth Division*

---

**APPELLANT'S INITIAL BRIEF**
*Criminal Appeal*

---

**Jason Hawkins**
*Federal Public Defender*
Northern District of Texas

**Brandon Beck**
*Assistant Federal Public Defender*
Northern District of Texas
1201 Texas Ave. #507
Lubbock, Texas 79401
(806) 472-7236
(806) 472-7241 (fax)
Bar No. 24082671
brandon_beck@fd.org

*Counsel for Mr. Rahimi*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| **Appellant:** | Zackey Rahimi |
| **Defense Counsel:** | Rachel Taft (trial)<br>Brandon Beck (appellate) |
| **Appellee:** | United States |
| **Prosecution:** | U.S. Attorney's Office for the Northern District of Texas<br>U.S. Department of Justice |
| **District Judge:** | The Honorable Mark Pittman |

<u>/s/ *Brandon Beck*</u>
Brandon Beck

*Counsel for Mr. Rahimi*

## **STATEMENT REGARDING ORAL ARGUMENT**

Mr. Rahimi requests oral argument to address the district court's decision to run the sentences on pending state charges consecutively.

## **<u>TABLE OF CONTENTS</u>**

Certificate of Interested Persons ................................................................. ii

Statement Regarding Oral Argument ....................................................... iii

Table of Contents ....................................................................................... iv

Table of Authorities .................................................................................... v

Jurisdictional Statement ..............................................................................1

Issues Presented for Review ........................................................................1

Statement of the Case...................................................................................2

    I.     Facts and Proceedings Below.................................................................2

    II.    Summary of the Argument .....................................................................4

Argument.......................................................................................................5

   I.    The district court improperly found that four of Mr. Rahimi's pending state charges—each of which involved domestic violence and a firearm—were not relevant conduct to the instant offense. ...........................5

   II.   <u>18 U.S.C. § 922(g)(8)—</u>which punishes, as a felony, possession of a firearm while subject to a protective order—is a facially unconstitutional restriction on a person's Second Amendment right to bear arms. [**currently foreclosed by *United States v. McGinnis*, <u>956 F.3d 747</u> (5th Cir. 2020)**] ...........................................................9

Conclusion ..................................................................................................32

Certificate of Service .................................................................................34

Certificate of Compliance ..........................................................................35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) ...............................................................21

*Boyd v. Palmore*,
425 S.W.3d 425 (Tex. App.—Houston [1st Dist.] 2011, no pet.).....................26

*Cabellero v. Caballero*,
2017 Tex. App. LEXIS 11632 (Tex. App.—Houston [14th Dist.]
Dec. 14, 2017, no pet.) (unpub.) ..............................................................26

*Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*,
360 F.3d 1274 (11th Cir. 2004) ...........................................................18

*Citizens United v. FEC*,
558 U.S. 310 (2010)...........................................................................21

*Cleveland v. United States*,
531 U.S. 12 (2000)..............................................................................26

*Elrod v. Burns*,
427 U.S. 347 (1976).............................................................................28

*Entm't Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ...............................................................22

*Freedom Path, Inc. v. IRS*,
913 F.3d 503 (5th Cir. 2019) ...............................................................18

*Frisby v. Schultz*,
487 U.S. 474 (1988)............................................................................22

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018)..........................................................14, 22

*Heller II. Heller v. District of Columbia ("Heller II")*,
670 F.3d 1244 (Kavanaugh, J., dissenting) ................................................*passim*

*Jackson v. City & Cty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ...............................................................23

*McDonald v. City of Chicago*,
  561 U.S. 742 ...................................................................................*passim*

*NRA of Am. v. McCraw*,
  719 F.3d 338 (5th Cir. 2013) ...........................................10, 11, 13, 27

*Roper v. Jolliffe*,
  493 S.W.3d 624 (Tex. App.—Dallas 2015, pet. denied)....................25

*Setser v. United States*,
  566 U.S. 231 (2012)...............................................................................5

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994)..............................................................................13

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
  775 F.3d 308 (6th Cir. 2014) ...............................................................20

*United States v. Allen*,
  542 F.2d 630 (4th Cir. 1976) ...............................................................28

*United States v. Baker*,
  197 F.3d 211 (6th Cir. 1999) ...............................................................18

*United States v. Brummett*,
  355 F.3d 343 (5th Cir. 2003) .............................................................5, 8

*United States v. Chapman*,
  666 F.3d 220 (4th Cir. 2012) .........................................................14, 21

*United States v. DuBose*,
  598 F.3d 726 (11th Cir. 2010) .............................................................18

*United States v. Hicks*,
  389 F.3d 514 (5th Cir. 2004) ...............................................................18

*United States v. Lippman*,
  369 F.3d 1039 (8th Cir. 2004) .............................................................27

*United States v. Marzzarella*
   614 F.3d 85 (3d Cir. 2010) ............................................................13, 23

*United States v. Ocana*,
   204 F.3d 585 (5th Cir. 2000) ..............................................................7

*United States v. Ortiz*,
   613 F.3d 550 (5th Cir. 2010) ..............................................................7

*United States v. Patterson*,
   431 F.3d 832 (5th Cir. 2005) ..............................................................9

*United States v. Playboy Entm't Grp.*,
   529 U.S. 803 (2000).........................................................................22

*United States v. Rangel*,
   319 F.3d 710 (5 Cir. 2003) ................................................................9

*United States v. Reese*,
   627 F.3d 792 (10th Cir. 2010) ..................................................*passim*

*United States v. Simmons*,
   470 F.3d 1115 (5th Cir. 2006) ...........................................................9

*United States v. Skoien*,
   587 F.3d 803 (7th Cir. 2009), *vacated on other grounds by* 614
   F.3d 639 (7th Cir. 2010) (en banc) ..................................................19

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) ...............................18, 19, 31

*United States v. Tooley*,
   717 F. Supp. 2d 580 (S.D.W. Va. 2010).........................................10

*United States v. Wescott*,
   576 F.3d 347 (7th Cir. 2009) ...........................................................17

*United States v. Young*,
   458 F.3d 998 (9th Cir. 2006) ...........................................................18

## Statutes

18 U.S.C. § 922(g)(8)...................................................................*passim*

18 U.S.C. § 922(g)(8)(B), (C)(ii) .................................................................17

18 U.S.C. § 922(g)(8)'s ..............................................................................24

18 U.S.C. § 924(a)(2) .................................................................................14

18 U.S.C. § 3231 ..........................................................................................1

28 U.S.C. § 1291 ..........................................................................................1

Conn. Gen. Stat. § 46b-15(e) ....................................................................29

Intrafamily Offenses Act ...........................................................................31

Kan. Stat. Ann. § 60-3107(e) .....................................................................29

Miss. Code Ann. § 93-21-15(2)(b) ............................................................29

Protection from Abuse Act .........................................................................31

Tex. Fam. Code Ann. § 85.001(d) .............................................................29

Tex. Pen. Code § 2.01 ................................................................................25

Tex. Pen. Code § 22.01 ..............................................................................17

Tex. Pen. Code § 42.07 ..............................................................................17

Texas Family Code Title IV ......................................................................26

USSG § 1B1.3 .........................................................................................7, 32

USSG § 1B1.3(a)(2) .................................................................................6, 32

USSG § 1B1.3 cmt. n.5(B)(ii) .....................................................................6

USSG § 5G1.3 ......................................................................................5, 9, 32

USSG § 5G1.3(a) ..........................................................................................6

USSG § 5G1.3(b) ..........................................................................................6

USSG §5G1.3(c) ...........................................................................................6

**Other Authorities**

First Amendment...............................................................................13, 21, 28

Second Amendment .....................................................................................*passim*

Fourth Amendment ...........................................................................................28

Sixth Amendment ............................................................................................28

Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257,
    1301 (2017)....................................................................................................16

5th Cir. R. 32.3 ...............................................................................................35

David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits'
    Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter
    2017) .............................................................................................................16

David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits'
    Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter
    2017) .............................................................................................................31

Fed. R. App. P. 32(a)(7)(B) ...........................................................................35

Heller*: Implementing the Right to Keep and Bear Arms for Self-
    Defense: An Analytical Framework and a Research Agenda*, 56
    UCLA L. Rev. 1443, 1504 (June 2009)..........................................................24

Justice Scalia, *Heller*'s .................................................................................15

Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J. ...............31

1970. Melvin Huang, *Keeping Stalkers at Bay in Texas* .........................31

Susan B. Sorenson & Douglas J. Wiebe, *Weapons in the Lives of
    Battered Women*...........................................................................................25

Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J.
    525, 538-44 (March 2003) ............................................................................24

## **JURISDICTIONAL STATEMENT**

The district court had original jurisdiction over this case pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291. Mr. Rahimi filed a timely notice of appeal on October 5, 2021, which was eight days after the district court entered written judgment. (ROA.95-100).

## **ISSUES PRESENTED FOR REVIEW**

I.    Did the district court err when it decided to run any sentence imposed on relevant state cases consecutively?

II.   Is 18 U.S.C. § 922(g)(8) facially unconstitutional? [foreclosed]

## **STATEMENT OF THE CASE**

### I.    **Facts and Proceedings Below**

In the course of investigating a series of five shooting incidents between December 1, 2020, and January 8, 2021, police officers obtained a search warrant for the house of Zackey Rahimi, Appellant. (ROA.210). Inside, the officers found a copy of a two-year domestic violence protective order—issued on February 5, 2020—large amounts of cash, and several firearms. (ROA.211). Mr. Rahimi, however, was not present because he was in state custody on suspicion of Aggravated Assault with a Deadly Weapon, from an incident on November 12, 2020. (ROA.210).

The government charged Mr. Rahimi with one count of Firearm Possession While Under Domestic Violence Restraining Order, in violation of 18 U.S.C. § 922(g)(8). (ROA.20-22). He pleaded guilty to the one-count indictment on May 26, 2021. (ROA.160).

Mr. Rahimi's presentence report (PSR) detailed facts concerning his offenses and associated relevant conduct, much of which was the subject of pending charges in Texas state court. (*See* ROA.217-20). Four of the pending charges are at issue here, each of which the district court found not relevant conduct to the instant offense:

***The events of December 9, 2019, resulting in the state charges described in PSR ¶¶ 50-52.***

On December 9, 2019, Mr. Rahimi physically assaulted his girlfriend, threatened her with a firearm, and fired a shot in an unknown direction. (ROA.217). His girlfriend then filed for an emergency protective order. (ROA.217). This culminated in three pending state charges:

- Terroristic Threat of a Family / Household Member, Case No. 1635415 (PSR ¶ 50)

- Discharge of a Firearm in Certain Municipalities, Case No. 1635418 (PSR ¶ 51)

- Assault Causing Bodily Injury Family Violence, Case No. 1635420 (PSR ¶ 52).

(ROA.217-18). Over objection, the district court found that none of these charges were relevant conduct and ordered them to run consecutively. (*See* ROA.96).

***The events of November 12, 2020, resulting in the state charge described in PSR ¶ 55.***

On November 12, 2020, Mr. Rahimi assaulted and threatened a woman with a firearm, resulting in another pending state charge for Aggravated Assault with a Deadly Weapon, Case No. 1678799D (PSR ¶ 55). (ROA.219). The district court also ordered this pending charge to run consecutively. (*See* ROA.96).

3

### *The Sentencing Hearing*

Mr. Rahimi filed a written objection to the PSR, arguing that the pending charge for discharge of a firearm, described in PSR ¶ 51, was relevant conduct to the instant offense and should be ordered to run concurrently. (ROA.229-32). At the sentencing hearing, Mr. Rahimi lodged an oral objection that the charges described in PSR ¶¶ 50-52 and ¶ 55 were relevant conduct to the instant offense and should be ordered to run concurrently. (ROA.176-78). The district court overruled Mr. Rahimi's objections and ordered all four disputed pending charges to run consecutively on the grounds that they were not relevant conduct to the instant offense. (ROA.181, ROA.96).

## II.   Summary of the Argument

The district court erred in finding that Mr. Rahimi's prior gun-related, domestic-violence conduct was not relevant conduct to the offense of conviction: possession of firearm while under a domestic-violence protective order. The sentencing guidelines instruct district courts to run concurrently pending charges that are based on relevant conduct. Relevant conduct includes offenses that are part of the same course of conduct, including an ongoing series of offenses. In determining whether a series of offenses qualifies as relevant conduct, courts are to consider the degree of similarity between the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.

4

Here, the instant offense and the pending charges were similar and happened with regularity within a short time period. Thus, the district court improperly found that Mr. Rahimi's prior offenses and the offense of conviction were not part of an ongoing series of crimes. This Court should reverse.

## <u>ARGUMENT</u>

**I. The district court improperly found that four of Mr. Rahimi's pending state charges—each of which involved domestic violence and a firearm—were not relevant conduct to the instant offense.**

### A. Standard of Review

In the district court, Mr. Rahimi argued that four of his pending charges were relevant conduct to the instant offense. (ROA.229-32) (arguing that ¶ 51 of the PSR was relevant conduct); (ROA.176-78) (arguing that ¶¶ 50, 51, 52, and 55 of the PSR were relevant conduct). Accordingly, he preserved error on the issue. This Court reviews a district court's application of the sentencing guidelines *de novo* and its factual findings for clear error. *United States v. Brummett*, 355 F.3d 343, 344 (5th Cir. 2003). A determination of relevant conduct is a finding of fact reviewed for clear error. *Id.* at 345.

### B. Discussion

A district court is entitled to order its sentences served concurrently or consecutively to anticipated state terms of imprisonment. *See Setser v. United States*, 566 U.S. 231 (2012). The Sentencing Commission has provided guidance for the exercise of such discretion in USSG § 5G1.3. When the defendant has an undischarged sentence—a sentence begun but not completed at the time of federal sentencing—the Commission recommends a consecutive sentence if the instant offense was committed while on supervision, incarceration, or escape status for the

undischarged sentence. USSG § 5G1.3(a). If not, and the sentence stems from "relevant conduct" to the instant offense, the Commission recommends a concurrent sentence. *See* USSG § 5G1.3(b). In USSG §5G1.3(c), the Commission extends this recommendation to anticipated sentences.

As described above, Mr. Rahimi accrued four charges stemming from conduct dealing with firearms and domestic violence. None of these satisfy USSG § 5G1.3(a). As will be shown, all of them are relevant conduct, and accordingly fall within USSG § 5G1.3(b). The Commission therefore recommends a concurrent sentence in each case. *See* USSG § 5G1.3(c).

The Commission defines "relevant conduct" to include, "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2). "Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." USSG § 1B1.3 cmt. n.5(B)(ii)). The five pending charges at issue here all easily pass this test. The three factors named in the

Commentary to USSG § 1B1.3—similarity, regularity, and temporal proximity—all unequivocally support a relevant conduct finding.

*Temporal proximity*. Although not a bright-line rule, this Court has generally used one year as "the benchmark" for determining temporal proximity. *See Rhine,* 583 F.3d at 886-87; *see also United States v. Ocana*, 204 F.3d 585 (5th Cir. 2000). The conduct underlying the pending state charge described in PSR ¶ 55 occurred on November 12, 2020, just two months before Mr. Rahimi was found with the firearm in the instant offense.[1] While the conduct that lead to the pending charges described in PSR ¶¶ 50-52 occurred a little more than one year prior to the instant offense— December 9, 2019—it was within a year of other events that the district court found to be relevant conduct. (*E.g.* ROA.209-12). Thus, temporal proximity favors a finding of relevant conduct.

*Regularity*. The regularity analysis turns on whether "there is evidence of a regular, i.e., repeated, pattern of similar unlawful conduct directly linking the purported relevant conduct and the offense of conviction." *See Rhine,* 583 F.3d at 888. To establish regularity, courts look to both the number of potential relevant conduct offenses and the similarities between those crimes and the offense of conviction. *See Rhine,* 583 F.3d 878, 889-90 (5th Cir. 2009); *see also United States*

_____

[1] Mr. Rahimi was found with the firearm on January 14, 2021.

8

*v. Ortiz*, 613 F.3d 550, 558 (5th Cir. 2010). In *United States v. Brummett*, this Court held that firearms possession on three separate occasions showed regularity. 355 F.3d 343, 345 (5th Cir. 2003).

The offenses that gave rise to the federal charge here, along with the pending state charges, were regularly repeated, several times, in the fourteen months preceding the instant offense. Specifically, the defendant's firearms and domestic-violence conduct occurred in December 2019, November 2020, December 2020, and January 2021.

***Similarity***. Finally, the similarity of the offenses is striking. During each of the events in December 2019 (PSR ¶¶ 50-52) and November 2020 (PSR ¶ 55), Mr. Rahimi possessed a firearm, and threatened its use, during a domestic assault. (ROA.217-19). During the instant offense, he threated another person with a firearm and was ultimately arrested and charged with possession of a firearm while under a domestic-violence restraining order. It is important to note here that the very protective order that gave rise to the instant offense was the direct result of December 2019 incidents that the district court held not to be relevant conduct. (ROA.217) (describing the issuance of the protective order). Not only is there strong similarity here but a lasting connection to earlier relevant conduct.

The clear recommendation of the Commission on these facts is for a concurrent sentence as to these four charges. A district court may depart (or,

presumably, vary) from the Commission's recommendations in USSG § 5G1.3. *See United States v. Rangel*, 319 F.3d 710, 715-716 (5 Cir. 2003). But it is not presumed to do so when it does not say that this is what it is doing. *See United States v. Simmons*, 470 F.3d 1115, 1131 (5th Cir. 2006) ("Accordingly, a district court should acknowledge such a policy statement and explain why the prohibited or discouraged factor, as it relates to the defendant, is so extraordinary that the policy statement should not apply."); *Rangel*, 319 F.3d at 715-716 (declining to presume that the district court intended to impose a consecutive sentence where Guidelines called for a concurrent sentence). The appropriate response in such a case is to remand. *See id.*

**II.    18 U.S.C. § 922(g)(8)—which punishes, as a felony, possession of a firearm while subject to a protective order—is a facially unconstitutional restriction on a person's Second Amendment right to bear arms. [currently foreclosed by *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020)]**

**A.   Standard of Review: De Novo**

Because this issue deals with the constitutionality of 18 U.S.C. § 922(g)(8) under the Second Amendment, review is *de novo*. *United States v. Patterson*, 431 F.3d 832, 835 (5th Cir. 2005). Mr. Rahimi preserved this issue in a timely motion to dismiss the indictment. (ROA.41-59).

## A. 18 U.S.C. § 922(g)(8) is facially unconstitutional under both means-ends scrutiny and an historical-traditional framework.

In *Heller*, the Supreme Court adopted an individual-rights theory of the Second Amendment based on its text and role in our country's early history. *Heller*, 554 U.S. 570, 605 (2008). In striking down a ban on handguns in the home, the Court held that the right to keep and bear arms for defense of self and home struck at the core of the Second Amendment. *Id.* at 629-30. The Court reiterated this view two years later in *McDonald v. City of Chicago*, emphasizing that a person's right to bear arms for self-defense is a "fundamental right[] necessary to our system of ordered liberty." 561 U.S. 742, 778 (2010).

While the Court was clear in *Heller* that the Second Amendment was amenable to "longstanding prohibitions" and well-crafted regulations, the Court was equally clear that any limitations imposed should be consistent with "historical justifications." *See Heller*, 554 U.S. at 626-27, 635. "While courts may be free to 'presume' that many regulations (including those listed) will ultimately be declared lawful, it does not eliminate the need to conduct a careful constitutional analysis." *United States v. Tooley*, 717 F. Supp. 2d 580, 585 (S.D.W. Va. 2010).

Stirred by Supreme Court guidance, courts evaluating Second Amendment challenges since *Heller* have taken a two-step approach. Under the first step, courts consider whether the particular restriction burdens conduct that falls within the scope

11

of the Second Amendment. *See NRA*, 700 F.3d at 194-95. Courts, however, disagree over what the second step entails. The majority of circuits, including this Court, have adopted a means-ends scrutiny analysis as the second step. *See id.* at 195 ("If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster … If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny."). Other courts have considered, as the second step, a historical-traditional analysis described by then-Judge Kavanaugh in his impressive dissent in *Heller II. Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1269-96 (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). Under either approach, 18 U.S.C. § 922(g)(8) is unconstitutional on its face.

1.   **18 U.S.C. § 922(g)(8) regulates conduct that falls within the scope of the Second Amendment, thus satisfying the first step of both post-*Heller* analytic frameworks.**

The first step of evaluating the constitutionality of a firearms-restriction asks whether the restriction regulates conduct that falls within the scope of the Second Amendment. *See NRA*, 700 F.3d at 195 ("If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny."). While the outer contours of the Second Amendment's scope

may blur, at its core, the Second Amendment protects an individual's right to possess a firearm (or ammunition) in one's home for purposes of self-defense. *McDonald v. City of Chicago*, 561 U.S. 742, 767 ("Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller,* we held that individual self-defense is 'the *central component*' of the Second Amendment right."); *id.* ("[T]he need for defense of self, family, and property is most acute in the home"). Based on *Heller* and *McDonald*, 18 U.S.C. § 922(g)(8)—which criminalizes the possession of any firearm or ammunition, including in the home— clearly burdens conduct that falls within the scope of the Second Amendment. The Tenth Circuit was correct in this conclusion:

> Applying [the two-step] approach here, there is little doubt that the challenged law, § 922(g)(8), imposes a burden on conduct, i.e., Reese's possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment. Thus, we must proceed to the second part of the analysis and "evaluate [§ 922(g)(8)] under some form of means-end scrutiny."

*United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010) (citing *United States v. Marzzarella* 614 F.3d 85, 89 (3d Cir. 2010)). The operative question then becomes, under the post-*Heller* two-step inquiry, either what degree of scrutiny to apply or whether there is a historical-traditional precedent for such a restriction.

   **2.    18 U.S.C. § 922(g)(8) cannot survive means-ends scrutiny.**

13

In *Heller*, the Supreme Court declined to adopt a universal level of means-ends scrutiny for Second Amendment restrictions, although it expressly rejected rational basis review as well as any "interest-balancing inquiry." *Heller*, 554 U.S. at 628 n.27, 633-35. The Court's reservation was appropriate, however, because different types of restrictions, depending on their nature, could trigger either strict or intermediate scrutiny. This is consistent with *Heller*'s analogy to First Amendment analysis, under which different levels of scrutiny apply depending on the type of prohibition. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 637 (1994) ("[N]ot every interference with speech triggers the same degree of scrutiny under the First Amendment."); *United States v. Marzzarella*, 614 F.3d 85, 96-97 (3d Cir. 2010) ("[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. We see no reason why the Second Amendment would be any different."). Here, strict scrutiny should apply. But § 922(g)(8) cannot survive even intermediate scrutiny.

### a. Strict scrutiny is the appropriate standard for evaluating 18 U.S.C. § 922(g)(8)'s restriction on the right to bear arms.

The appropriate level of scrutiny, under the Second Amendment, turns on how directly the challenged law burdens this core: If the law strikes the core, then strict scrutiny is required; if the law is within the scope of the Second Amendment but

misses its core, then intermediate scrutiny is more applicable. *NRA*, 700 F.3d at 195. Under no circumstances is rational basis review permitted. *Heller*, 554 U.S. at 628 n.27.

Heller and *McDonald* held that the core of the Second Amendment is the right to possess firearms, in the home, for purposes of self-defense. *McDonald*, 561 U.S. at 567-68; *Heller*, 554 U.S. at 628-29. Yet the imposition of a protective order, assuming it satisfies the minimum requirements of 18 U.S.C. § 922(g)(8), disarms the protective-order respondent—under penalty of a federal felony punishable by up to ten years in a penitentiary—for the duration of the civil order. *See* 18 U.S.C. § 924(a)(2). There is, moreover, no exception in § 922(g)(8) for home-defense or self-defense. *See* § 922(g)(8). Thus, the protective-order respondent is totally deprived of his right to bear arms "at its zenith." *See Gould v. Morgan*, 907 F.3d 659, 672 (1st Cir. 2018) ("[T]he right to self-defense … is at its zenith inside the home."). Accordingly, strict scrutiny is the appropriate standard of constitutional review here.

Despite *Heller* and *McDonald*'s straightforward description of the Second Amendment's core, at least two circuits have nonetheless applied intermediate scrutiny to § 922(g)(8). *United States v. Chapman*, 666 F.3d 220, 225-26 (4th Cir. 2012); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010). In order to apply this lesser standard of constitutional review, the Fourth Circuit, in *Chapman*, latched-onto *Heller*'s language about the rights of "law-abiding, responsible"

citizens to conclude that these are limiting terms that remove the burden of disarmament on protective-order respondents from the Second Amendment's core. *Chapman*, 666 F.3d at 225-26 (characterizing the defendant as "without a doubt, not a responsible citizen"). The Tenth Circuit, in *Reese*, applied intermediate scrutiny because the Seventh Circuit had done so with § 922(g)(9), concluding that § 922(g)(8) and § 922(g)(9) are "substantially similar." *Reese*, 627 F.3d at 802. Both conclusions, although plausible at first glance, are ultimately wrong.

First, the historical record contradicts any notion that protective-order respondents would not have been considered "law-abiding, responsible" citizens such that they would be deprived of their right to bear arms. Authored by Justice Scalia, *Heller*'s majority opinion is couched in the Second Amendment's early history. And in that history, there is no indication that protective-order respondents comprised members of a class subject to "longstanding prohibitions" on otherwise-lawful firearms and ammunition ownership. While there's little or no historical exposition of how the Framers understood the terms "law-abiding" and "responsible" vis-a-vis the Second Amendment, we know they did not historically exclude either domestic violence misdemeanants (which Mr. Rahimi was not) or people subject to protective orders. As David Kopel and Joseph Greenlee explain:

> It is true that the Framers and the public at large wanted gun owners to be virtuous and peaceable (except when fighting was necessary). This is one reason for the

16

preference for militias over standing armies; because the professional soldier was entirely dependent on the government, and lived a life of constant obedience to others, it was believed that moral degradation would result. It is equally true that the Framers and the American people wanted virtuous people as voters, jurors, elected officials, and so on. <u>But there is simply no tradition - from 1791 or 1866 - of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders</u>. The colonies and then the states certainly knew how to ban firearms possession for people who were considered dangerous (namely, slaves and Indians). This "tradition" cannot be extended to every person whom a modern legislature might consider dangerous. A modern ban might be upheld under heightened scrutiny, but there is no tradition that persons subject to novel modern bans have been historically considered to have no Second Amendment rights at all.

David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter 2017) (emphasis added). And although domestic violence was a crime in Puritan New England, just as today, "[h]istorical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin … Judges in this time period were more likely to confiscate a wife beater's liquor than his guns." Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017). But still, such restrictions applied to *offenders*, not those who where subject to protective orders.

The government may also argue, as it has in other cases, that, in a *modern* sense, a person subject to a protective order could not be regarded as a "law-abiding,

responsible" citizen. Not so. Section 922(g)(8) does not require any court, by any burden of proof, to have found that a protective-order respondent violated the law or is irresponsible. Section 922(g)(8) only *requires*, at a minimum, that a court order "restrains" or "prohibits" the respondent from engaging in specified law-violative activities in the future. *See* 18 U.S.C. § 922(g)(8)(B), (C)(ii). If that were enough, no citizen would be "law-abiding" or "responsible" because everyone is already restrained or prohibited from engaging in those very activities by each state's penal code. *E.g.*, Tex. Pen. Code § 42.07 (restraining from harassment); Tex. Pen. Code § 22.01 (prohibiting from causing injury).

The government may further respond by pointing to specific facts in this case that describe assaultive behavior, particularly from the civil district court's finding that there is a history of domestic violence or Ms. Thrash's testimony at trial. (*See* ROA.216,410-12). Such facts still cannot save § 922(g)(8) because it's irrelevant to the statute in that § 922(g)(8) does not require the government to prove *any* assaultive behavior, only the presence of an active order that contains certain restrictions. *See* 18 U.S.C. § 922(g)(8)(B), (C)(ii). Moreover, under every circuit's caselaw that has examined the issue, it would be no defense for Mr. Rahimi to show that he never exhibited any assaultive behavior because he is forbidden from collaterally attacking the state protective order in a federal proceeding. *See, e.g.*, *Emerson*, 270 F.3d at 264 ("[T]he party enjoined may not collaterally attack the

18

particular predicate order in the section 922(g)(8) prosecution, at least so long as the order, as here, is not so transparently invalid as to have only a frivolous pretense to validity."); *see also United States v. Wescott*, 576 F.3d 347, 354-55 (7th Cir. 2009); *United States v. DuBose*, 598 F.3d 726, 732 (11th Cir. 2010); *United States v. Young*, 458 F.3d 998, 1005 (9th Cir. 2006); *United States v. Hicks*, 389 F.3d 514, 534 (5th Cir. 2004); *United States v. Baker*, 197 F.3d 211, 216-17 (6th Cir. 1999). We must instead evaluate § 922(g)(8) by its terms, and its terms allow for a criminal conviction against a citizen who is altogether law-abiding and responsible so long as the court order prohibits and restrains certain criminal conduct. *Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019) ("[A] 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual."); *see also Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1282 (11th Cir. 2004).

In truth, *Heller* did not use "law-abiding, responsible" as a code for ensuring intermediate scrutiny review of § 922(g)(8) or any other subsection. It could easily have done so plainly. Courts should not make the same exacting demands on the wording of judicial opinions as would be appropriate with statutes. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) ("Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject

19

under consideration.") (citing *Zenith Radio Corp. v. United States*, <u>437 U.S. 443, 462</u> (1978)). As the en banc Seventh Circuit explained:

> *Heller* also observes that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 2821. People convicted of domestic violence are neither law-abiding nor responsible, the prosecutor contends.
>
> We do not think it profitable to parse these passages of *Heller* as if they contained an answer to the question whether § 922(g)(9) is valid. They are precautionary language. Instead of resolving questions such as the one we must confront, the Justices have told us that the matters have been left open. The language we have quoted warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition.

*Skoien*, <u>614 F.3d at 639-40</u>. *Heller* left the degree of scrutiny required under § 922(g)(8) open. Based on the language of § 922(g)(8), the historical record, and *Heller* and *McDonald*'s description of the Second Amendment's core, this Court should apply strict scrutiny.

Second, the analyses of § 922(g)(8) and (g)(9) should not be cross-pollinated because the statutes, in form and function, are fundamentally distinct. Courts have been clear in cases dealing constitutional challenges under enumerated rights that

20

the appropriate standard of review depends on the particular statute in question rather than a one-size-fits-all approach. *United States v. Skoien*, 587 F.3d 803, 814 (7th Cir. 2009) ("The Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right."), *vacated on other grounds by* 614 F.3d 639 (7th Cir. 2010) (en banc). To the extent that this Court would be willing to give weight to *Heller*'s language about "law-abiding, responsible" citizens, such language should apply with much greater force to domestic abusers who have been *convicted*, beyond a reasonable doubt, than persons who are *restrained*, by a civil tribunal under a relaxed burden of proof, from possible future assaultive conduct. If we are willing to say that the government has a lower constitutional burden with respect to § 922(g)(9) because domestic-violence misdemeanants are per se violent and not law-abiding, the same cannot be said categorically about § 922(g)(8). *Compare Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308, 337 (6th Cir. 2014) ("Domestic-violence misdemeanants, by definition, are violent and non-law-abiding [].")*, with id.* at 340 ("The prohibition in § 922(g)(8) targets presumptively violent, albeit law-abiding, individuals."), *reversed on other grounds by* 837 F.3d 678 (6th Cir. 2016) (en banc). Each subsection of § 922(g) must be treated individually when making a scrutiny assessment. While subsection (g)(9) may very well warrant intermediate scrutiny

(there are serious reasons to doubt this, however), subsection (g)(8) should be treated

differently, on its own terms, and reviewed under strict scrutiny.

### b. **18 U.S.C. § 922(g)(8) fails under strict scrutiny review because it is neither narrowly tailored nor the least restrictive means of achieving Congress's policy goals.**

To survive strict scrutiny analysis, a statute must: (1) serve a compelling

governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be

the least restrictive means of advancing that interest. *ACLU v. Mukasey*, 534 F.3d

181, 190 (3d Cir. 2008) (citing *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115,

126 (1989)). The government bears the burden of making these showings. *Citizens*

*United v. FEC*, 558 U.S. 310, 340 (2010) ("[S]trict scrutiny … requires the

Government to prove that the restriction 'furthers a compelling interest and is

narrowly tailored to achieve that interest.'").[2]

Mr. Rahimi concedes a compelling governmental interest in reducing

domestic gun violence, which is the interest the government identified in *Chapman*

and *Reese*. *Chapman*, 666 F.3d at 226; *Reese*, 627 F.3d at 804 n.4. That is an

important and praiseworthy policy goal. The problem with § 922(g)(8), however, is

---

[2] Mr. Rahimi cites First Amendment jurisprudence for the strict scrutiny analysis for two reasons. First *Heller* and other courts have analogized Second Amendment analysis to First Amendment cases. *See, e.g.*, *Heller* 554 U.S. at 582. Second, no court has conducted a rigorous Second Amendment analysis under strict scrutiny, leaving the need to look elsewhere for guidance.

that it is neither narrowly tailored nor the least restrictive means of achieving that goal.

The "narrowly tailored" and "least restrictive means" prongs work hand-in-hand. A statute is narrowly tailored "only if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000). Section 922(g)(8) cannot survive strict scrutiny because it "targets and eliminates" far more conduct than is necessary, which is demonstrated by the less restrictive means available to similarly address domestic gun violence. *See Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006) ("[A] statute is not narrowly tailored if 'a less restrictive alternative would serve the Government's purpose.'").

There are at least four ways in which § 922(g)(8) could be less restrictive while still advancing the policy goal of reducing domestic gun violence. First, § 922(g)(8) could contain an exception for firearms possession in the defendant's home once the defendant is no longer cohabitating with the intimate partner (or child) who is listed on the protective order. This would disincentivize any contact between an armed domestic abuser and the domestic violence survivor while, at the same time, still allow the otherwise law-abiding citizen to bear arms at the Second

Amendment's "zenith": to protect his own home and hearth. *See Gould*, 907 F.3d at 672 ("[T]he right to self-defense … is at its zenith inside the home."). Alternatively, § 922(g)(8) could contain an exception for firearm's possession in the defendant's home when the defendant is no longer cohabitating with any intimate partner (or child), irrespective of whether they are listed on the protective order. This would be more restrictive than the above alternative but still less restrictive than what § 922(g)(8) requires. Then, if a protective-order respondent were ever to cohabitate with an intimate partner (or child), they would have to disarm for the period of cohabitation. This would ensure that a firearm would never be in any potential domestic abuse situation while also allowing for a limited ability for the otherwise law-abiding citizen to defend his hearth and home. In *Jackson v. City and County of San Francisco*, the Ninth Circuit reasoned that firearms regulations that left alternative channels open for self-defense would not likely severely burden a person's Second Amendment right. *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014); *see cf. United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (applying intermediate scrutiny to a regulation which "leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number"). Not so under § 922(g)(8).

Second, § 922(g)(8) could be made less restrictive by eliminating subsection (C)(ii), which would narrow the application of § 922(g)(8) to cases in which there

was an actual finding that the protective-order respondent "represents a credible threat to the physical safety of such intimate partner or child." *See* § 922(g)(8)(C)(i). As it stands now, no such finding is required for culpability under § 922(g)(8) because subsection (C)(ii) permits prosecution when only a future prohibition of law-violative conduct is listed on the order. *See* § 922(g)(8)(C)(ii); Eugene Volokh, *The Second Amendment and the Right to Bear Arms After* D.C. v. Heller*: Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1504 (June 2009) ("The use of 'or' between (C)(i) and (C)(ii) suggests that the law could bar gun possession even when there is no finding of a credible threat or of past violence, and all that is present is a prohibition on 'use, attempted use, or threatened use of physical force.'"). By eliminating (C)(ii), Congress would focus § 922(g)(8) on circumstances where violence was known to actually be at issue. Such an alternative, moreover, is not outside the realm of reason. In fact, the original draft of § 922(g)(8) did not include (C)(ii), which was only included after a lengthy and arduous process of legislative negotiation between liberal and conservative factions in Congress, with last-minute changes by the House. *See* Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J. 525, 538-44 (March 2003).

Third, § 922(g)(8) could be made less restrictive by requiring a court issuing the protective order to find that a firearm was possessed, brandished, or discharged,

or that the use of a firearm was threatened during the course of a past incident of domestic violence. This would properly separate domestic gun abusers from abusers who are prone to less-deadly means. This would not be to condone domestic abuse of any variety (it would still be equally punished under state law) but would focus § 922(g)(8)'s harsh penalties (and restrictions) on actual gun abusers rather than a broader class of people. According to a survey of domestic violence shelter residents in California, only 36.7 % reported that there was a firearm in the home at some point during the duration of the relationship with their most recent partner. Susan B. Sorenson & Douglas J. Wiebe, *Weapons in the Lives of Battered Women*, 94 Am. J. Pub. Health 1412, 1414 (2004). And only 39.1 % reported that their most recent partner even owned a firearm. *Id*. Those protective-order respondents should be the primary target of § 922(g)(8) in light of the Constitution's enumerated right to bear arms.

Fourth, the policy goal of reducing domestic gun violence could be most directly, and narrowly, addressed by eliminating § 922(g)(8) altogether on the view that § 922(g)(9), which disarms *convicted* domestic abusers, represents the outer-limit of restrictions that the Second Amendment allows. Support for this view is rooted in the certainty afforded by the due process protections of the criminal legal system versus the ultimate uncertainty involved in a civil proceeding. To be convicted of domestic abuse—"assault family violence" in Texas—requires proof

beyond a reasonable doubt. Tex. Pen. Code § 2.01 ("[N]o person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt"). To be injoined by a protective order, by contrast, requires only proof by a preponderance of the evidence. *Roper v. Jolliffe*, 493 S.W.3d 624, 638 (Tex. App.— Dallas 2015, pet. denied) ("Because Title 4 proceedings are civil in nature, the traditional standard of proof by a preponderance of the evidence applies."); *see also Cabellero v. Caballero*, 2017 Tex. App. LEXIS 11632, at *15 (Tex. App.—Houston [14th Dist.] Dec. 14, 2017, no pet.) (unpub.) ("Because the protective order does not directly infringe on appellant's parental rights, we agree with the Dallas Court of Appeals that due process did not require a burden of proof higher than the preponderance-of-the-evidence standard mandated in most civil matters.").

Similarly, the rule of lenity in criminal cases affords more certainty by limiting the breadth of how courts construe the law. *See Cleveland v. United States*, 531 U.S. 12, 25 (2000) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). Not so under the protective order statute, despite its quasi-criminal nature. *See Boyd v. Palmore*, 425 S.W.3d 425, 430 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Given the remedial nature of Title IV of the Texas Family Code … courts should broadly construe its provisions so as to effectuate its humanitarian and preventative purposes.").

As a result of these less restrictive alternatives that advance Congress's policy goal of reducing domestic gun abuse, § 922(g)(8) is not narrowly tailored and thus cannot survive strict scrutiny.

        **c.   Even under intermediate scrutiny review, <u>18 U.S.C. § 922(g)(8)</u> is not reasonably adapted to an important government interest.**

Under intermediate scrutiny, the government must show that the challenged law is "reasonably adapted" to an important government interest. *NRA*, <u>700 F.3d at 207</u>. Under this standard, the statute is not required to be the "least restrictive means" to achieve Congress's policy goal. *NRA of Am. v. McCraw*, <u>719 F.3d 338, 349</u> (5th Cir. 2013). Still, however, the government must show more than a rational basis for the restriction.

This is admittedly a closer call, but the same observations above demonstrate that § 922(g)(8) is still not "reasonably adapted" to reducing domestic gun abuse. However, since the government is not required to make a least-restrictive-means showing under intermediate scrutiny, more arguments are available to it. The best argument, for the government, which has been adopted by some courts, is that § 922(g)(8) is reasonably adapted to Congress's policy goal because the firearms ban is a temporary restriction that exists only for the life of the protective order. *E.g.*, *United States v. Lippman*, <u>369 F.3d 1039, 1044</u> (8th Cir. 2004) ("We also conclude that the restraining order issued against Lippman was narrowly tailored to restrict

his firearm possession for a limited duration and to protect the individual applicant and that Congress had a compelling government interest in enacting § 922(g)(8) to decrease domestic violence.").

Such an argument fails because any unwarranted deprivation of a fundamental right is unconstitutional, irrespective of its duration. *Rodriguez v. United States*, a Fourth Amendment case decided by the Supreme Court in 2015, provides a useful analogy. 135 S. Ct. 1609 (2015). There, a police officer prolonged the duration of a traffic stop, without reasonable suspicion, beyond the time necessary to achieve the stop's mission. *Id*. at 1612-14. The government argued that any extended seizure was *de minimis*—and therefore excusable—because of its very short (twelve minute) duration. *Id*. at 1616. The Supreme Court disagreed, holding that a constitutional violation of any length was a constitutional violation nonetheless. *See id*. ("If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' As we said in *Caballes* and reiterate today, a traffic stop 'prolonged beyond' that point is 'unlawful.'").

So too with other rights. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also United States v. Allen*, 542 F.2d 630, 633 (4th Cir. 1976) ("[T]he Sixth Amendment right to counsel … is so fundamental that there should never occur any interference with it for any length of

29

time, however brief, absent some compelling reason."). And it's hard to imagine that the Third Amendment's prohibition on quartering, for example, could be disregarded because soldiers only occupied a home for a single night. *See* Const. Amend. III. The rationale for rejecting duration-exceptions to constitutional violations is obvious: to hold otherwise would mire courts in arbitrary line-drawing debates over "how long is too long." Not only is such a question impossible to answer, every court would be free to arrive at a different answer. Is Connecticut's 120-day protective order an acceptable restriction? Conn. Gen. Stat. § 46b-15(e). What about Kansas's one-year protective order? Kan. Stat. Ann. § 60-3107(e). Does Texas's two-year protective order fall within the scope of the Second Amendment? *See* Tex. Fam. Code Ann. § 85.001(d). What about in Mississippi, where the duration is not capped by statute but wholly within the discretion of the chancery or county court? Miss. Code Ann. § 93-21-15(2)(b). Or the extreme, concrete example of Mr. Reese's fifty-year protective order? *Reese*, 627 F.3d at 798. If this Court endorses such a rule, one can easily imagine the slippery slope that will follow, as courts try to determine whether three months, one year, two years, or a lifetime protective order is reasonably adapted to Congress's policy goal.

These difficulties inherent in determining "how much is too much" demonstrate why a bright-line rule for Second Amendment restrictions is warranted: any restriction that prohibits the possession of a firearm, for self-defense, in the home

goes to the core of the Second Amendment and cannot save § 922(g)(8) under intermediate scrutiny.

**3.  18 U.S.C. § 922(g)(8) is unconstitutional under the historical-traditional framework because there is no historical-traditional analogy for a protective-order exception to firearms possession.**

*Heller* explained that "presumptively lawful" "longstanding" prohibitions on the right to bear arms were not to be cast in doubt. *Heller*, 554 U.S. at 626-27. Based on such language, in the context of a broader reading of both *Heller* and *McDonald*, then-Judge Kavanaugh advocated for evaluating challenges to restrictions on gun ownership based solely on the Second Amendment's "text, history, and tradition." *Heller II*, 670 F.3d at 1271-75 (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). Under this historical-traditional approach, "analysis of whether … gun regulations are permissible must be based on their historical justifications." *Id.* at 1272 (internal quotations omitted). While Judge Kavanaugh cautioned that his approach does not require a precise weapon or restriction to have existed in 1787, 1791, or even 1868, there must, at least, be an analogous corollary. *Id.* at 1275 ("[T]he proper interpretive approach is to reason by analogy from history and tradition."). If this Court were to adopt the Kavanaugh historical-traditional

framework, § 922(g)(8) is unconstitutional because there is no historical precedent, in the historical record or by analogy, for disarming protective-order respondents.

First, § 922(g)(8) is a relatively recent invention. It originated with three bills first introduced in 1993 and—after a period of vigorous debate between political parties, policy groups, and special interests—was signed into law on September 13, 1994. Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J. at 538-44. And there was nothing like it before in federal law.

Second, protective orders are a modern approach to addressing domestic violence. Although nearly every state and U.S. territory today has enacted a protective-order statute, there were no such statutes before 1970. Melvin Huang, *Keeping Stalkers at Bay in Texas*, 15 Tex. J. on C.L. & C.R. 53, 68 (Fall 2009) ("[P]rotective orders first came into existence in 1970 when the District of Columbia passed its Intrafamily Offenses Act. … Pennsylvania became the first state to authorize orders when it passed its Protection from Abuse Act in 1976. Within four short years, forty-five states implemented similar legislation.").

Third, there is no historical analogy for disarming citizens based on no-contact orders, and thin or conflicting evidence of disarmament for domestic violence. *Skoien*, 614 F.3d at 651 (Sykes, J., dissenting) ("We simply cannot say with any certainty that persons convicted of a domestic-violence misdemeanor are wholly excluded from the Second Amendment right as originally understood."); David B.

Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter 2017) ("[T]here is simply no tradition - from 1791 or 1866 - of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders.").

As a result, under a historical-traditional framework, disarmament of protective-order respondents is unconstitutional because it is not supported by the text, history, or tradition of the Second Amendment. Thus, under either the scrutiny or the Kavanagh analysis, § 922(g)(8) cannot survive the demands of *Heller* and *McDonald*.

## CONCLUSION

The guidance of USSG §5G1.3 is clear: relevant conduct should result in a concurrent sentence unless the defendant was on supervision, incarcerated, or awaiting sentence for the instant offense. Further, the application of USSG § 1B1.3(a)(2) is clear. All three factors noted in the Commentary to USSG §1B1.3 unequivocally support a finding of relevant conduct on a "course of conduct" theory.

Respectfully submitted,

/s/ *Brandon Beck*
**Brandon Beck**
*Assistant Federal Public Defender*
Northern District of Texas
1201 Texas Ave. #507

Lubbock, Texas 79401
(806) 472-7236
(806) 472-7241 (fax)
Bar No. 24082671
brandon_beck@fd.org

*Counsel for Mr. Rahimi*

## <u>CERTIFICATE OF SERVICE</u>

On February 20, 2022, I filed this brief through the Court's ECF system.

Opposing Counsel has therefore been served. I will also send a paper copy to Zackey

Rahimi at the following address:

Zackey Rahimi
Reg # 40471-509
CID # 0897779
Tarrant County Jail
100 N. Lamar
Fort Worth, TX  76196

/s/ *Brandon Beck*
Brandon Beck

*Counsel for Mr. Rahimi*

35

## **CERTIFICATE OF COMPLIANCE**

Pursuant to 5th Cir. R. 32.3, the undersigned certifies this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

1.  Exclusive of the exempted portions, this brief contains 8,753 words.

2.  This brief has been prepared in proportionately spaced typeface using Microsoft Word in Goudy Old Style typeface and 14 point font size.

3.  The undersigned understands that any material misrepresentations in this certificate may result in striking the brief and sanctions.

/s/ *Brandon Beck*
Brandon Beck

*Counsel for Mr. Rahimi*