No. 21-11001

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ZACKEY RAHIMI
ALSO KNOWN AS ZACHEY RAHIMI,
*Defendant-Appellant.*

———————————————————

*On Direct Appeal from the United States District
Court for the Northern District of Texas
Fort Worth Division*

———————————————————

## APPELLANT'S PETITION FOR REHEARING EN BANC
*Criminal Appeal*

———————————————————

**Jason Hawkins**
*Federal Public Defender*
Northern District of Texas

**Brandon Beck**
*Assistant Federal Public Defender*
Northern District of Texas
1201 Texas Ave. #507
Lubbock, Texas 79401
(806) 472-7236
(806) 472-7241 (fax)
Bar No. 24082671
brandon_beck@fd.org

*Counsel for Mr. Rahimi*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| **Appellant:** | Zackey Rahimi |
| **Defense Counsel:** | Rachel Taft (trial)<br>Brandon Beck (appellate) |
| **Appellee:** | United States |
| **Prosecution:** | U.S. Attorney's Office for the Northern District of Texas<br>U.S. Department of Justice |
| **District Judge:** | The Honorable Mark Pittman |

*/s/ Brandon Beck*
Brandon Beck

*Counsel for Mr. Rahimi*

## Rule 35(b)(1) Statement

The panel decision conflicts with two decisions of the United States Supreme Court—*District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010)—because it relies on a framework for evaluating Second Amendment restrictions that looks beyond the text, history, and tradition of the Second Amendment. *United States v. Rahimi*, No. 21-11001, 2022 WL 2070392, at *1 n.1 (5th Cir. June 8, 2022) (relying on the erroneous two-step framework described in *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1397 (2021)). Consideration by the full court is therefore necessary to secure and maintain uniformity with the higher Court.

Additionally, the proceeding involves a question of exceptional importance that goes to the heart of an enumerated, fundamental right: the Second Amendment's right to bear arms for self-defense in one's home.

# TABLE OF CONTENTS

Certificate of Interested Persons.................................................................. ii

Rule 35(b)(1) Statement............................................................................. iii

Table of Contents .......................................................................................iv

Table of Authorities.....................................................................................v

Issues Meriting *En Banc* Consideration..................................................... 1

Facts, Proceedings, and Disposition ........................................................... 2

Reasons for Granting the Petition................................................................ 6

I.    A framework that focuses on the Second Amendment's text, history, and tradition is more consistent with *Heller* and *McDonald* than this Court's two-step analysis................................................................................ 6

  A.  The focus of *Heller*'s analysis was the Second Amendment's text, history, and tradition............................................................................. 7

  B.  *Heller* and *McDonald* rejected balancing tests—and implicitly intermediate scrutiny—as seen in the interplay between the majority and dissenting opinions............................................................................ 9

II.   18 U.S.C. § 922(g)(8) is unconstitutional under the text-history-tradition framework............................................................................................ 12

  A.  18 U.S.C. § 922(g)(8) regulates conduct at the core of the Second Amendment .......................................................................................... 12

  B.  There is no historical-traditional analogy for a protective-order exception to firearms possession.......................................................... 13

Conclusion................................................................................................. 15

Certificate of Service ................................................................................ 16

Certificate of Compliance ......................................................................... 17

Panel Opinion ........................................................................ Appendix A

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................................*passim*

*Heller v. District of Columbia ("Heller II"),*
  670 F.3d 1244 (D.C. Cir. 2011) .......................................................*passim*

*Mance v. Sessions,*
  896 F.3d 390 (5th Cir. 2018) ................................................................. 3

*McDonald. N.Y. State Rifle & Pistol Ass'n v. City of New York,*
  140 S. Ct. 1525 (2020) ......................................................................*passim*

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) .................................................................. 4, 6, 9, 10

*Turner Broad. Sys. v. FCC,*
  520 U.S. 180 (1997) ............................................................................... 7

*United States v. Marzzarella*
  614 F.3d 85 (3d Cir. 2010) .................................................................. 12

*United States v. McGinnis,*
  956 F.3d 747 (5th Cir. 2020), *cert. denied,* 141 S. Ct. 1397 (2021).................... 2, 3

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) ............................................................ 11

*United States v. Tooley,*
  717 F. Supp. 2d 580 (S.D.W. Va. 2010) .............................................. 5

**Statutes**

18 U.S.C. § 922(g)(8)..........................................................................*passim*

Intrafamily Offenses Act.......................................................................... 12

Protection from Abuse Act ................................................................. 12

**Other Authorities**

First Amendment ............................................................................... 7

Second Amendment .................................................................... *passim*

5th Cir. R. 32.3 ................................................................................. 16

David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter 2017) ......................... 13

Fed. R. App. P. 35 ............................................................................ 16

Melvin Huang, *Keeping Stalkers at Bay in Texas*, 15 Tex. J. on C.L. & C.R. 53, 68 (Fall 2009) ............................................................ 12

Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J. 525, 538-44 (March 2003) ...................................................... 12

## Issues Meriting *En Banc* Consideration

1.  Should this Court replace its two-step framework for post-*Heller* Second Amendment challenges with an approach that focuses on the Second Amendment's text, history, and tradition?

2.  If so, is 18 U.S.C. § 922(g)(8) constitutional given that it is unsupported by the Second Amendment's text, history, or tradition?

## Facts, Proceedings, and Disposition Below

In the course of investigating a series of shooting incidents between December 1, 2020, and January 8, 2021, police officers obtained a search warrant for the house of Zackey Rahimi, Appellant. (ROA.210). Inside, the officers found a copy of a two-year domestic violence protective order—issued on February 5, 2020—large amounts of cash, and several firearms. (ROA.211).

Mr. Rahimi faces many state charges related to the shooting incidents. (ROA.217-20). The federal government also charged Mr. Rahimi with one count of Firearm Possession While Under Domestic Violence Restraining Order, in violation of 18 U.S.C. § 922(g)(8). (ROA.20-22). He pleaded guilty to the one-count federal indictment on May 26, 2021. (ROA.160).

On September 23, 2021, the district court sentenced Mr. Rahimi to 73 months imprisonment—a substantial upward variance—on the federal charge. (ROA.201). Along the way, Mr. Rahimi challenged the constitutionality of § 922(g)(8) but conceded that it is currently foreclosed under this Court's decision in *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1397 (2021). (ROA.41-60).

A noteworthy aspect of the *McGinnis* opinion is that two of the three panel judges joined in a concurring opinion calling for *en banc* review to reconsider this

Court's two-step Second Amendment framework. *Id.* at 761-62 (Duncan, J., concurring, joined by Jones, J.) ("I would support *en banc* review in this case or any appropriate future case to reassess our Second Amendment analysis."). A sizable number of other judges on this Court have done so in recent years. *E.g., Mance v. Sessions*, 896 F.3d 390, 394 (5th Cir. 2018) (Elrod, J., dissenting from denial of rehearing *en banc*, joined by Jones, Smith, Willett, Ho, Duncan, and Engelhart, JJ.). Most recently, Justices Alito, Kavanaugh, Thomas, and Gorsuch have elevated the dissenting voices by expressing direct concern that some federal and state courts are misapplying *Heller* and *McDonald*. *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1527-44 (2020) (Kavanaugh, J., concurring) (Alito, J. dissenting, joined by Gorsuch, Thomas, JJ.). These voices are growing more numerous and will, with increasing likelihood, be proven correct.

This case presents a valuable opportunity for this Court to align its analysis with *Heller*, *McDonald*, and—most importantly—the text, history, and tradition of the Second Amendment.

## Reasons for Granting the Petition

*"[W] e cannot allow good intentions to trump an enumerated and 'fundamental right' deeply rooted in the history and tradition of this country." Jones v. Bonta*, 34 F.4th 704, 750 (9th Cir. 2022) (Lee, J., concurring).

**I.    A framework that focuses on the Second Amendment's text, history, and tradition is more consistent with *Heller* and *McDonald* than this Court's two-step analysis.**

In *Heller*, the Supreme Court adopted an individual-rights theory of the Second Amendment based on its text and role in our country's early history. *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008). In striking down a ban on handguns in the home, the Court held that the right to keep and bear arms for defense of self and home struck at the core of the Second Amendment. *Id.* at 629-30. The Court reiterated this view two years later in *McDonald v. City of Chicago*, emphasizing that a person's right to bear arms for self-defense is a "fundamental right[] necessary to our system of ordered liberty." 561 U.S. 742, 778 (2010).

While the Court was clear in *Heller* that the Second Amendment was amenable to "longstanding prohibitions" and well-crafted regulations, the Court was equally clear that any limitations imposed should be consistent with "historical justifications." *See Heller*, 554 U.S. at 626-27, 635. "While courts may be free to 'presume' that many regulations (including those listed) will ultimately be declared lawful, it does not

eliminate the need to conduct a careful constitutional analysis." *United States v. Tooley*, 717 F. Supp. 2d 580, 585 (S.D.W. Va. 2010).

Stirred by Supreme Court guidance, courts evaluating Second Amendment challenges since *Heller* have taken a two-step approach. Under the first step, courts consider whether the particular restriction burdens conduct that falls within the scope of the Second Amendment. *See NRA*, 700 F.3d at 194-95. Courts, however, disagree over what the second step entails.

The majority of circuits, including this Court, have adopted a means-ends scrutiny analysis as the second step. *See id.* at 195 ("If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster ... If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny."). Other courts have considered, as the second step, a historical-traditional analysis described by then-Judge Kavanaugh in his impressive dissent in *Heller II. Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1269-96 (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.").

5

The Kavanaugh approach is more faithful to *Heller* and *McDonald* and is the approach this Court should adopt.

**A.    The focus of *Heller*'s analysis was the Second Amendment's text, history, and tradition.**

*Heller*'s gaze was on the Second Amendment's text, history, and tradition. *Heller* suggests that contemplating the full scope of the Second Amendment would require "an exhaustive historical analysis." *Heller*, 554 U.S. at 626.  When allowing for firearms regulations, *Heller* identified those which fit within this country's "historical tradition." *Id*. at 627. This approach, according to *Heller*, "accords with the historical understanding of the scope of the right." *Id*. at 625. Such rights, *Heller* continues, "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or ... judges think that scope too broad."  *Id*. at 634-35.

If *Heller* were not clear enough, *McDonald* repeatedly emphasizes that questions surrounding the Second Amendment should be pursued historically, including questions surrounding its importance and scope. *See McDonald*, 561 U.S. at 768-78. Justice Alito, who joined the majority in *Heller* and wrote the majority opinion in *McDonald*, recently reflected on *Heller*'s analysis as follows: "We based [the *Heller*] decision on the scope of the right to keep and bear arms as it was understood at the time of the adoption of the Second Amendment." *N.Y. State Rifle & Pistol Ass'n v. City*

*of New York*, 140 S. Ct. 1525, 1540 (2020) (Alito, J., dissenting). He then went on to criticize the New York City travel restriction on this basis: "History provides no support for a restriction of this type." *Id.* at 1544. Because the panel opinion here applied means-ends scrutiny rather than conducted a true historical account of the type of restriction imposed by 18 U.S.C. § 922(g)(8), it remains undetermined whether the statute is constitutional under the correct analytical framework.

**B.** ***Heller*** **and** ***McDonald*** **rejected balancing tests—and implicitly intermediate scrutiny—as seen in the interplay between the majority and dissenting opinions.**

It is telling enough that *Heller* did not apply any level of means-ends scrutiny in its majority opinion. It never examined whether the D.C. restriction was narrowly tailored to serve a compelling state interest, nor whether it was substantially related to an important governmental interest. But more can be gleaned, implicitly, by reading the majority and dissenting opinions in dialogue.

In his dissent in *Heller*, Justice Breyer proposed a Second Amendment balancing test while looking to First Amendment cases, among others. *See Heller*, 554 U.S. at 689-90, 704-05, 714 (Breyer, J., dissenting). It is noteworthy that a primary case upon which Justice Breyer relied was *Turner Broadcasting*, which itself applied a form of intermediate scrutiny. *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 189 (1997) ("We begin where the plurality ended in *Turner*, applying the standards for intermediate

scrutiny enunciated in *O'Brien*."). Although Justice Breyer did not characterize his proposed test explicitly as a form of means-ends scrutiny, the interplay between government interests, its ability to advance those interests, and reasonable alternatives are all present in his proposed test:

> The fact that important interests lie on both sides of the constitutional equation suggests that review of gun-control regulation is not a context in which a court should effectively presume either constitutionality (as in rational-basis review) or unconstitutionality (as in strict scrutiny). Rather, "where a law significantly implicates competing constitutionally protected interests in complex ways," the Court generally asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests. Any answer would take account both of the statute's effects upon the competing interests and the existence of any clearly superior less restrictive alternative.

*Heller*, 554 U.S. at 689-90 (Breyer, J., dissenting) (cleaned up).

In response, the *Heller* majority rejected Justice Breyer's "interest-balancing inquiry." *Heller*, 554 U.S. at 634-35. In doing so, the Court asserted that "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis which the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. The Court further observed that the Second Amendment "is the very product of an interest balancing by the people" that courts should not "conduct for them anew." *See Heller*, 554 U.S. at 635.

Two years after *Heller*, *McDonald* underscored the centrality of *Heller*'s focus on the Second Amendment's text, history, and tradition. Not only did the Court again reject balancing tests, it went on to explicitly reject the weighing of "costs and benefits of firearms restrictions." *See McDonald*, 561 U.S. at 790-91 ("Finally, Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion."). This rejection, as Justice Kavanaugh noted in *Heller II*, "is flatly incompatible with a strict or intermediate scrutiny approach to gun regulations." *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1278 (Kavanaugh, J., dissenting).

Justice Alito, the author of the majority opinion in *McDonald*, has given more insight recently, when he directly criticized lower courts who have, in his view, misapplied the guidance of *Heller* and *McDonald*. *See N.Y. State Rifle & Pistol Ass'n*, 140 S. Ct. at 1544 (Alito, J., dissenting) ("We are told that the mode of review in this case is representative of the way *Heller* has been treated in the lower courts. If that is true, there is cause for concern."). It would appear that this Court is one of the circuits vulnerable to Justice Alito's critique. This further highlights the importance of this issue—not only in 2008 or 2010, but today.

**II.    18 U.S.C. § 922(g)(8) is unconstitutional under the text-history-tradition framework.**

**A.    18 U.S.C. § 922(g)(8) regulates conduct at the core of the Second Amendment.**

While the outer contours of the Second Amendment's scope may blur, at its core, the Second Amendment protects an individual's right to possess a firearm (or ammunition) in one's home for purposes of self-defense. *McDonald v. City of Chicago*, 561 U.S. 742, 767 ("Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller*, we held that individual self-defense is 'the *central component*' of the Second Amendment right."); *id.* ("[T]he need for defense of self, family, and property is most acute in the home"). Based on *Heller* and *McDonald*, 18 U.S.C. § 922(g)(8)—which criminalizes the possession of any firearm or ammunition, including in the home—clearly burdens conduct that falls within the scope of the Second Amendment. The Tenth Circuit was correct in this conclusion:

> Applying [the two-step] approach here, there is little doubt that the challenged law, § 922(g)(8), imposes a burden on conduct, i.e., Reese's possession of otherwise legal firearms, that generally falls within the scope of the right guaranteed by the Second Amendment. Thus, we must proceed to the second part of the analysis and "evaluate [§ 922(g)(8)] under some form of means-end scrutiny."

10

*United States v. Reese*, 627 F.3d 792, 801 (10th Cir. 2010) (citing *United States v. Marzzarella* 614 F.3d 85, 89 (3d Cir. 2010)). The operative question then becomes whether there is a historical-traditional precedent for such a restriction.

### B.   There is no historical-traditional analogy for a protective-order exception to firearms possession.

*Heller* explained that "presumptively lawful" "longstanding" prohibitions on the right to bear arms were not to be cast in doubt. *Heller*, 554 U.S. at 626-27. Based on such language, in the context of a broader reading of both *Heller* and *McDonald*, then-Judge Kavanaugh advocated for evaluating challenges to restrictions on gun ownership based solely on the Second Amendment's "text, history, and tradition." *Heller II*, 670 F.3d at 1271-75 (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). Under this historical-traditional approach, "analysis of whether ... gun regulations are permissible must be based on their historical justifications." *Id.* at 1272 (internal quotations omitted).

While Judge Kavanaugh cautioned that his approach does not require a precise weapon or restriction to have existed in 1787, 1791, or even 1868, there must, at least, be an analogous corollary. *Id.* at 1275 ("[T]he proper interpretive approach is to reason by analogy from history and tradition."). If this Court were to adopt the Kavanaugh

historical-traditional framework, § 922(g)(8) is unconstitutional because there is no historical precedent, in the historical record or by analogy, for disarming protective-order respondents.

First, § 922(g)(8) is a relatively recent invention. It originated with three bills first introduced in 1993 and—after a period of vigorous debate between political parties, policy groups, and special interests—was signed into law on September 13, 1994. Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J. 525, 538-44 (March 2003). And there was nothing like it before in federal law.

Second, protective orders are a modern approach to addressing domestic violence. Although nearly every state and U.S. territory today has enacted a protective-order statute, there were no such statutes before 1970. Melvin Huang, *Keeping Stalkers at Bay in Texas*, 15 Tex. J. on C.L. & C.R. 53, 68 (Fall 2009) ("[P]rotective orders first came into existence in 1970 when the District of Columbia passed its Intrafamily Offenses Act. ... Pennsylvania became the first state to authorize orders when it passed its Protection from Abuse Act in 1976. Within four short years, forty-five states implemented similar legislation.").

Third, there is no historical analogy for disarming citizens based on no-contact orders, and thin or conflicting evidence of disarmament for domestic violence. *Skoien*, 614 F.3d at 651 (Sykes, J., dissenting) ("We simply cannot say with any certainty that

persons convicted of a domestic-violence misdemeanor are wholly excluded from the Second Amendment right as originally understood."); David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter 2017) ("[T]here is simply no tradition - from 1791 or 1866 - of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders.").

As a result, under a historical-traditional framework, disarmament of protective-order respondents is unconstitutional because it is not supported by the text, history, or tradition of the Second Amendment. Thus, under the text-history-tradition analysis, § 922(g)(8) cannot survive the demands of *Heller* and *McDonald*.

## CONCLUSION

Mr. Rahimi respectfully requests that this Court grant this Petition and vacate his conviction.

Respectfully submitted,

*/s/ Brandon Beck*
**Brandon Beck**
*Assistant Federal Public Defender*
Northern District of Texas
1201 Texas Ave. #507
Lubbock, Texas 79401
(806) 472-7236
(806) 472-7241 (fax)
Bar No. 24082671
brandon_beck@fd.org

*Counsel for Mr. Rahimi*

## <u>CERTIFICATE OF SERVICE</u>

On June 21, 2022, I filed this brief through the Court's ECF system. Opposing

Counsel has therefore been served. I will also send a paper copy to Mr. Rahimi at the

following address:

Zackey Rahimi
Reg # 40471-509
CID # 0897779
Tarrant County Jail
100 N. Lamar
Fort Worth, TX  76196

<u>/s/ Brandon Beck</u>
Brandon Beck

*Counsel for Mr. Rahimi*

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.3, the undersigned certifies this brief complies with the type-volume limitations of Fed. R. App. P. 35.

1.      Exclusive of the exempted portions, this brief contains 3,573 words.

2.      This brief has been prepared in proportionately spaced typeface using Microsoft Word in Goudy Old Style typeface and 14 point font size.

3.      The undersigned understands that any material misrepresentations in this certificate may result in striking the brief and sanctions.

*/s/ Brandon Beck*
Brandon Beck

*Counsel for Mr. Rahimi*

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 8, 2022

Lyle W. Cayce
Clerk

No. 21-11001
Summary Calendar

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

ZACKEY RAHIMI,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CR-83-1

Before KING, COSTA, and HO, *Circuit Judges.*

PER CURIAM:*

Zackey Rahimi, after being charged with various state offenses, pleaded guilty to a violation of federal law for possessing a firearm in contravention of a restraining order. The district court ordered Rahimi's federal sentence of imprisonment to run concurrently with certain state-case

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

sentences but to run consecutively with other state-case sentences because the acts involved in the latter were not "relevant conduct" for purposes of U.S.S.G. § 1B1.3. Rahimi appeals, challenging the finding that certain acts were not relevant conduct. We find no clear error and affirm.

## I.

Zackey Rahimi was suspected to have participated in a series of shootings that occurred between December 2020 and January 2021. As a result, police officers obtained a warrant to search his residence, and when they executed the warrant, they found a pistol and a restraining order issued on February 5, 2020. The order restrained Rahimi from possessing a firearm and warned him that possession of a firearm or ammunition while the order was in effect could be a felony under 18 U.S.C. § 922(g) and § 924(a)(2).

A federal grand jury indicted Rahimi for possession of firearms in violation of sections 922(g)(8) and 924(a)(2).[1] Later, Rahimi pleaded guilty. At sentencing, the presentence investigation report ("PSR") detailed Rahimi's lengthy criminal history. Relevant to this appeal are the state charges that were pending against him for offenses that occurred from December 2019 to November 2020. Three pending state charges resulted from Rahimi's use of a firearm in the physical assault of his girlfriend in December 2019,[2] and another state charge arose from an aggravated assault with a deadly weapon of a different woman in November 2020. Rahimi objected to the PSR, arguing that the pending charges described relevant

---

[1] Rahimi moved to dismiss the indictment on the ground that section 922(g)(8) on its face violates the Second Amendment and the district court denied the motion. Rahimi appeals this decision but acknowledges that it is foreclosed by our binding precedent. *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1397 (2021).

[2] The charges included terroristic threat of a family/household member, discharge of a firearm in certain municipalities, and family violence assault causing bodily injury.

conduct to the instant offense such that the sentence for the instant federal offense should be ordered to run concurrently to the state sentences. The district court overruled the objection, adopted the PSR, and ordered the federal sentence to run consecutively to the pending charges because they were not relevant conduct. Rahimi appeals, arguing that the district court clearly erred by concluding the pending charges were not relevant conduct.

## II.

A determination of relevant conduct is a finding of fact that is reviewed for clear error. *United States v. Brummett*, 355 F.3d 343, 344–45 (5th Cir. 2003). A district court has the discretion to order its sentences of imprisonment be served concurrently or consecutively to anticipated state terms of imprisonment. *Setser v. United States*, 566 U.S. 231, 236 (2012). A determination of relevant conduct is "not clearly erroneous as long as [it is] 'plausible in light of the record as a whole.'" *United States* v. *Ortiz*, 613 F.3d 550, 557 (5th Cir. 2010) (quoting *United States v. Rhine*, 583 F.3d 878, 885 (5th Cir. 2009)).

The sentencing guidelines provide that "the sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment" if another offense is "relevant conduct . . . under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3." U.S.S.G. § 5G1.3(c). "Relevant conduct is defined as 'all acts and omissions' that . . . [are] part of the 'same course of conduct' as the offense of conviction." *Ortiz*, 613 F.3d at 557 (quoting U.S.S.G. § 1B1.3(a)(2)). Two or more offenses may constitute as the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." § 1B1.3, cmt. (n.5(B)(ii)). Relevant factors include "the degree of

similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.*

## III.

Rahimi argues that the pending charges are relevant to the instant federal charge because they are all a part of a pattern of ongoing (i.e., similar) conduct involving a firearm and domestic violence. He contends that the temporal proximity favors a finding of relevant conduct because the November 2020 conduct occurred just two months before the search of his residence (resulting in the instant charge) and the December 2019 conduct was little more than a year prior to the instant offense. Last, Rahimi argues that the number of similar crimes involving firearm possession shows regularity.

However, we conclude that the record as a whole supports the district court's finding that the pending state charges are not a part of the same course of conduct as Rahimi's possession of a firearm in violation of a restraining order. First, although the record shows some regularity to Rahimi's violent use—and thus possession—of a firearm, we have previously held that a 10-month lag between a past act and the instant offense is "not strong" evidence of temporal proximity for purposes of section 1B1.3. *United States v. Davis*, 967 F.3d 441, 442 (5th Cir. 2020) (per curiam). Second, Rahimi's December 2019 conduct involved the domestic assault of his girlfriend in a public parking lot. When warned by his passenger about the presence of another witness, Rahimi fired a shot at the witness. The instant offense involves no public violence or domestic assault and so bears little resemblance to the December 2019 events.

Similarly, Rahimi's November 2020 conduct involved the violent use of a firearm in furtherance of an assault. Indeed, Rahimi's possession of a firearm in that instance was also a violation of the February 2020 restraining

No. 21-11001

order, but "[a]s we have previously cautioned . . . courts must not conduct this [similarity] analysis at such a level of generality as to render it meaningless." *United States* v. *Rhine*, 583 F.3d 878, 888 (5th Cir. 2009). Rahimi's violent use of the firearm in November is meaningfully different from merely possessing a firearm. *Cf. United States v. Horton*, 993 F.3d 370, 376 (5th Cir.), *cert. denied*, 142 S. Ct. 382 (2021) (finding meaningful differences in the location of the conduct and amount of drugs at issue on different occasions). Because the similarity and temporal-proximity factors are strained,[3] the district court's finding that these previous acts are not relevant conduct is "plausible in light of the record as a whole," and accordingly is not clearly erroneous. *Rhine*, 583 F.3d at 885.

## III.

For the foregoing reasons, we AFFIRM.

---

[3] *See Davis*, 967 F.3d at 442 (finding no relevant conduct when the temporal proximity was "not strong" and the other two factors were "arguably absent").