No. 21-11001

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

───────────────────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ZACKEY RAHIMI,

*Defendant-Appellant.*

───────────────────────────────

*On Direct Appeal from the United States District
Court for the Northern District of Texas
Fort Worth Division*

───────────────────────────────

**APPELLANT'S SUPPLEMENTAL BRIEF**
*Criminal Appeal*

───────────────────────────────

**Jason Hawkins**
*Federal Public Defender*
Northern District of Texas

**Kevin Joel Page**
*Appellate Chief*

**James Matthew Wright**
*Asst. Fed. Pub. Defender*

**Brandon Beck**
*Assistant Federal Public Defender*
Northern District of Texas
1201 Texas Ave. #507
Lubbock, Texas 79401
(806) 472-7236
(806) 472-7241 (fax)
Bar No. 24082671
brandon_beck@fd.org

*Counsel for Mr. Rahimi*

## **STATEMENT REGARDING ORAL ARGUMENT**

This case is set for oral argument on Tuesday, August 30, 2022. Oral argument will assist this Court in navigating the complex issues involved.

# TABLE OF CONTENTS

Statement Regarding Oral Argument ........................................................ ii

Table of Contents ..................................................................................... iii

Table of Authorities ..................................................................................v

Jurisdictional Statement ............................................................................1

Issues Presented for Review ......................................................................1

Statement of the Case.................................................................................2

    I.    Facts and Proceedings Below..................................................2

    II.   Summary of the Argument ......................................................5

Argument....................................................................................................6

I.    *Bruen* unequivocally overruled *McGinnis* and *Emerson* ................6

   A.   *Bruen* replaced this Court's two-step framework for evaluating challenges to firearms laws with a historical model........................................6

   B.   *Bruen* upended this Court's Second Amendment calculus so much that the constitutionality of § 922(g)(8) is an open question that can be reached by a panel of this Court .......................................8

      1.   *Emerson* upheld § 922(g)(8) in the pre-*Heller* era ..................9

      2.   After *Heller*, this Court adopted a two-step framework and later upheld § 922(g)(8) in *United States v. McGinnis*..................10

      3.   *Bruen* presents a clean break from the past and unequivocally overrules *Emerson*, *NRA*, and *McGinnis* ................12

II.   Under *Bruen*'s historical model, § 922(g)(8) is unconstitutional on its face..................................................................................13

A. The Second Amendment's plain text covers Mr. Rahimi's conduct.............13

B. The government bears the burden of proving that § 922(g)(8) is "consistent with the Nation's historical tradition of firearm regulation"......14

C. Section 922(g)(8) is a recent intervention directed at a long-acknowledged social problem ....................................................14

D. This Court should not uphold a distinctly modern restriction based on malleable and amorphous labels like "responsible," "peaceable," "virtuous," or "dangerous" that the Framers decided not to include in the Second Amendment................................................................18

E. Section 922(g)(8) is always unconstitutional because it always prohibits a person from possessing a firearm in their own home for personal defense even when living alone....................................................20

F. This Court should not be deterred by a "parade of horribles" or other hypothetical externalities the government may suggest................................22

Conclusion ...........................................................................................23

Certificate of Service ...........................................................................24

Certificate of Compliance ....................................................................25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Class v. United States*,
　　138 S. Ct. 798 (2018)..........................................................................6

*District of Columbia v. Heller*,
　　554 U.S. 570 (2008)...........................................................8, 9, 10, 12

*Elrod v. Burns*,
　　427 U.S. 347 (1976)...........................................................................21

*Kanter v. Barr*,
　　919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting)........................20

*United States v. Rahimi*,
　　No. 21-11011, 2022 WL 2070392, 2022 U.S. App. LEXIS 15799
　　(5th Cir. June 8, 2022) ...............................................................3, 24, 25

*McGinnis v. United States*,
　　No. 20-6046 (U.S. filed Jan. 15. 2021)..............................................18

*Mercado v. Lynch*,
　　823 F.3d 276 (5th Cir. 2016) ..............................................................12

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
　　142 S. Ct. 2111 (2022).................................................................*passim*

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms
　　& Explosives*,
　　700 F.3d 185 (5th Cir. 2012) .......................................................*passim*

*United States v. Alcantar*,
　　733 F.3d 143 (5th Cir.2013) ...............................................................12

*United States v. Allen*,
　　542 F.2d 630 (4th Cir. 1976) ..............................................................22

*United States v. Emerson*,
　　270 F.3d 203 (5th Cir. 2001) ......................................................*passim*

*United States v. McGinnis,*
  956 F.3d 747 (5th Cir. 2020) ................................................................*passim*

*United States v. McGinnis,*
  No. 19-10197 (5th Cir. July 1, 2020).......................................................11

*United States v. Patterson,*
  431 F.3d 832 (5th Cir. 2005) ...................................................................6

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) ....................................................7, 13, 21

*United States v. Salerno,*
  481 U.S. 739 (1987)................................................................................20

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) (Sykes, J., dissenting) .........................16

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990).................................................................................13

**Statutes**

18 U.S.C. § 922(g)(8).........................................................................*passim*

18 U.S.C. § 3231 ........................................................................................1

28 U.S.C. § 1291 ........................................................................................1

Conn. Gen. Stat. § 46b-15(e) ................................................................13

Intrafamily Offenses Act.......................................................................16

Kan. Stat. Ann. § 60-3107(e) .................................................................13

Protection from Abuse Act ....................................................................16

Tex. Fam. Code Ann. § 85.001(d) .........................................................13

**Other Authorities**

First Amendment......................................................................................21

Second Amendment ........................................................................*passim*

Fourth Amendment ................................................................................ 21

Sixth Amendment ................................................................................. 22

Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257,
 1301 (2017) ...................................................................................... 17

Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence
 and the Failure of Intervention*, 120 Penn St. L. Rev. 337, 346-47
 (2015) ............................................................................................... 16

5th Cir. R. 32.3 ..................................................................................... 25

David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits'
 Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter
 2017) ........................................................................................... 17, 19

Fed. R. App. P. 32(a)(7)(B) .................................................................. 25

Melvin Huang, *Keeping Stalkers at Bay in Texas,* 15 Tex. J. on C.L.
 & C.R. 53, 68 (Fall 2009) ................................................................ 16

Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J.
 525, 538-44 (March 2003) ............................................................... 15

U.S. Const. amend. III ........................................................................... 22

Webster's Dictionary of the English Language (1828) ......................... 19

# JURISDICTIONAL STATEMENT

The district court had original jurisdiction over this case pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291. Mr. Rahimi filed a timely notice of appeal on October 5, 2021, which was eight days after the district court entered written judgment. (ROA.95-100).

# ISSUES PRESENTED FOR REVIEW

I.   *Generally*, what is the effect of *N.Y. State Rifle & Pistol Assoc. v. Bruen* on this case?

II.  *Specifically*, is 18 U.S.C. § 922(g)(8) constitutional, on its face, after *Bruen*?

## STATEMENT OF THE CASE

### I.    Facts and Proceedings Below

In the course of investigating a series of shooting incidents between December 1, 2020, and January 8, 2021, police officers obtained a search warrant for the house of Zackey Rahimi, Appellant. (ROA.210). Inside, the officers found a copy of an agreed domestic violence protective order that had been issued against Mr. Rahimi in February 2020, and that was not set to expire until February 2022. (ROA.68; ROA.211). Officers also located a Glock pistol and a Century Arms Rifle. (ROA.68).

The government charged Mr. Rahimi with one count of Firearm Possession While Under Domestic Violence Restraining Order, in violation of 18 U.S.C. § 922(g)(8). (ROA.19-20).

Mr. Rahimi moved to dismiss the indictment.  (ROA.41-60). He argued that 18 U.S.C. § 922(g)(8) violated the Second Amendment, under both means-ends scrutiny and a historical model, should this Court adopt one. (ROA.41-60). Mr. Rahimi acknowledged, however, that the argument was—at the time—foreclosed by this Court's intermediate-scrutiny analysis in *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020). (ROA.41). The government responded that the argument was foreclosed by *McGinnis* and *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001). (ROA.63).

2

On May 26, 2021—while the motion to dismiss was still pending—Mr. Rahimi appeared before a Magistrate Judge and pleaded guilty to the indictment, with no plea agreement. (ROA.111-170). The Magistrate recommended that the district court accept the guilty plea. (ROA.70–71). On June 3, 2021, the district court denied Mr. Rahimi's motion to dismiss under *McGinnis*. (ROA.79-81). The court then accepted the guilty plea. (ROA.5). On September 23, 2021, the court sentenced Mr. Rahimi to 73 months in prison, followed by three years of supervised release. (ROA.96-97).

On appeal, Mr. Rahimi renewed his facial constitutional challenge to § 922(g)(8). (Rahimi Br. at 10-33). Like the district court, a panel of this Court rejected the argument under *McGinnis*. *United States v. Rahimi*, No. 21-11011, 2022 WL 2070392, 2022 U.S. App. LEXIS 15799, at *1 n.1 (5th Cir. June 8, 2022). Believing that this Court's means-ends scrutiny analysis in *McGinnis* was misplaced, Mr. Rahimi next sought rehearing *en banc*, arguing that: (1) this Court should replace its two-step framework with a historical model; and (2) under a historical model, § 922(g)(8) is unconstitutional on its face. (Rahimi *En Banc* Pet. at 4-13).

While Mr. Rahimi's *en banc* petition was pending, the U.S. Supreme Court issued its opinion in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). *Bruen* rejected the two-step framework, particularly as it had been used to adjudicate

3

the constitutionality of firearms restrictions under intermediate scrutiny. *Id*. at 2128-30. It then enunciated a one-step historical model to decide the constitutionality of firearms restrictions under the Second Amendment. *Id*. at 2129-30. By doing so, *Bruen* unequivocally overruled *McGinnis* and lent clear and decisive support to Mr. Rahimi's arguments. This Court withdrew its panel opinion and requested supplemental briefing and oral argument on the next available calendar. (Order dated July 7, 2022).

## II.    Summary of the Argument

In *Bruen*, the U.S. Supreme Court rejected a two-step Second Amendment analysis in favor of a historical model. Under this model, the government carries the burden of establishing a historical provenance for any firearms restriction. There is simply no historical basis for disarmament based on a domestic-violence protective order. Although domestic violence is a persistent societal problem, our nation did not address it with no-contact orders until the 1970s and did not impose federal disarmament for such orders until the 1990s. As such, the government cannot justify the § 922(g)(8) regulation.

## **ARGUMENT**

The effect of *Bruen* on this case is threefold: (1) it replaces this Court's two-step framework with a historical model; (2) it upends the old framework so much that the constitutionality of § 922(g)(8) is now, effectively, an issue of first impression that can be reached by a panel; and (3) its new historical model requires reversal on the merits. In short, *Bruen* is dispositive in favor of Mr. Rahimi: this Court should now recognize 18 U.S.C. § 922(g)(8) as unconstitutional on its face.

## I.     *Bruen* unequivocally overruled *McGinnis* and *Emerson*.

### Standard of Review: *De Novo*

This court will review the constitutionality of 18 U.S.C. § 922(g)(8) *de novo*. *United States v. Patterson*, 431 F.3d 832, 835 (5th Cir. 2005). Mr. Rahimi preserved this issue in a timely motion to dismiss the indictment. (ROA.41-60). He "did not relinquish his right to appeal the District Court's constitutional determinations simply by pleading guilty." *Class v. United States*, 138 S. Ct. 798, 803 (2018).

### Discussion

### A.     *Bruen* replaced this Court's two-step framework for evaluating challenges to firearms laws with a historical model.

*Bruen* expressly rejects the two most commonplace tools that circuits have used to uphold firearms restrictions: (1) the two-step analytical framework; and (2) any form of means-ends scrutiny, especially intermediate scrutiny. 142 S. Ct. at

6

2128-30. This Court adopted both tools in *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives* ("*NRA*"), 700 F.3d 185, 195-96 (5th Cir. 2012). That two-step framework led the Court to quell most, if not all, challenges to firearms restrictions, including to § 922(g)(8). *See, e.g., McGinnis*, 956 F.3d at 757-59 (using the two-step framework and intermediate scrutiny to reject a facial constitutional challenge to § 922(g)(8)); *see also United States v. Reese*, 627 F.3d 792, 801-05 (10th Cir. 2010) (same); *Bruen*, 142 S. Ct. at 2131 (noting that courts applying the two-step framework "often defer to the determinations of legislatures").

Now, under *Bruen*, the validity of firearm restrictions turns entirely on history:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S. Ct. at 2126. This model requires courts to take only one step. The inquiry is simple: does "the plain text of the Second Amendment cover an individual's conduct?" If so, "the Constitution presumptively protects that conduct." *Id.* According to the Supreme Court, if the individual is among "'the people' whom the Second Amendment protects," who wishes "to keep and bear arms" in the home or in public "in case of confrontation," then the answer is yes, the plain text of the

"unqualified command" protects that activity. *Bruen*, 142 S. Ct. at 2134-35. Because § 922(g)(8) prohibits people from keeping firearms at home—or bearing firearms in public—for self-defense, it is up to the government, to rebut the presumption of the individual's right to do so by pointing to an exception with historical provenance. *Id*. at 2129-30. Because the government cannot show a recognized, historical exception, § 922(g)(8) must fall. This is discussed further below, in Part II.

**B.** ***Bruen* upended this Court's Second Amendment calculus so much that the constitutionality of § 922(g)(8) is an open question that can be reached by a panel of this Court.**

This Court has upheld the constitutionality of § 922(g)(8) twice before: first, in *Emerson*, 270 F.3d 203, and more recently in *McGinnis*, 956 F.3d 747. Between those two decisions, the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008), and then this Court adopted the predominant two-step framework in *NRA*, 700 F.3d at 195-96. But *Emerson* and *McGinnis* are now obsolete and do not bind any post-*Bruen* panel of this Court. Because *Bruen* unequivocally overruled *Emerson* and *McGinnis*, this Court can consider the constitutionality of § 922(g)(8) as an open question.

A brief review of *Emerson*, *NRA*, and *McGinnis* illustrates why *Bruen* frees this Court to decide this issue anew.

8

### 1. *Emerson* upheld § 922(g)(8) in the pre-*Heller* era.

In 2001, a panel of this Court decided *United States v. Emerson*, which upheld 18 U.S.C. § 922(g)(8) against a facial and as-applied constitutional challenge. 270 F.3d at 265. *Emerson* was, in one respect, far ahead of its time. Prior to *Heller*, the predominant view of the Second Amendment among courts followed a collective rights theory, which held that the Second Amendment "merely recognizes the right of a state to arm its militia." *Emerson*, 270 F.3d at 219. This Court disagreed and, in *Emerson*, became the first circuit to adopt an individual rights theory, under which the Second Amendment guarantees an individual's right "to privately possess and bear their own firearms," regardless of military or militia service or training. *Id.* at 260. *Heller* later vindicated this Court's individual rights theory based on many of the same historical and textual observations described in *Emerson*. 554 U.S. at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.").

In another respect, however*, Emerson* was a product of its time. Most of the opinion focuses on a historical discussion of the Second Amendment's purpose and meaning. But there was no discussion of the history (or lack of history) regarding regulations analogous to § 922(g)(8). Indeed, the *Emerson* opinion included very little in the way of standards or analysis, at least regarding the facial challenge. Without more guidance, this Court—like every other circuit—seemed unsure about

how to analyze a facial constitutional challenge under the Second Amendment. The result was a few lines of discussion that identified the presence of a "nexus" between firearms possession and "the threat of lawless violence" that this Court found "barely" sufficient "to support the deprivation." *Emerson*, 270 F.3d at 264. *Emerson*, however, included no discussion of the historical pedigree of a protective-order exception to the protections of the Second Amendment, which is essential under *Bruen*.

> **2. After *Heller*, this Court adopted a two-step framework and later upheld § 922(g)(8) in *United States v. McGinnis*.**

*Heller* did more than ratify the individual rights theory of the Second Amendment. The majority also rejected two proposed "balancing" approaches to evaluate gun laws: rational basis review, and Justice Breyer's proposed "interest-balancing" approach. *Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *id*. at 634-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach.").

More than that, *Heller* inspired all circuits, including this Court, to rethink the analytical approach to Second Amendment challenges. In 2012, this Court

"sketch[ed] a framework" for "evaluating post-*Heller* Second Amendment challenges." *NRA*, 700 F.3d at 192. The first step was "[t]o determine whether a law impinges on the Second Amendment right," that is, "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." 700 F.3d at 194. Even if the answer was affirmative—"the law burdens conduct that falls within the Second Amendment's scope"—the Court would then engage in the second step: "apply the appropriate level of means-ends scrutiny." *Id.* at 195.

By the time this Court decided *McGinnis*, *Emerson* was no longer controlling precedent: "Much has changed in Second Amendment jurisprudence since then, and so we consider whether § 922(g)(8) still passes muster under our contemporary framework." *McGinnis*, 956 F.3d at 751. The Court thus applied the *NRA* two-step framework to evaluate § 922(g)(8). In step one, this Court assumed, without deciding, that disarming McGinnis implicated the Second Amendment. *McGinnis*, 956 F.3d at 756. In step two, this Court upheld § 922(g)(8) under intermediate scrutiny. *Id.* at 758-59. Notably, two of the three judges who decided *McGinnis* called for *en banc* rehearing to reconsider the underlying two-step framework and, by extension, the constitutionality of § 922(g)(8). *Id.* at 761-62 (Duncan, J., concurring, joined by Jones, J.) ("I would support *en banc* review in this case or any appropriate future case to reassess our Second Amendment analysis."). The Court

called for a response to McGinnis's petition for rehearing *en banc*, but ultimately denied it. Order, *United States v. McGinnis*, No. 19-10197 (5th Cir. July 1, 2020).

### 3. *Bruen* presents a clean break from the past and unequivocally overrules *Emerson*, *NRA*, and *McGinnis*.

Under this Court's rule of orderliness, a panel of this Court cannot overturn another panel's published decision unless there is an intervening change in the law, such as by: (1) a statutory amendment; (2) a decision of the Supreme Court; or (3) a decision of the *en banc* Court. *Mercado v. Lynch*, 823 F.3d 276, 279 (5th Cir. 2016). To overrule a Fifth Circuit precedent, a Supreme Court decision "must be unequivocal, not a mere 'hint' of how the Court might rule in the future." *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir.2013). Here, *Bruen* is an intervening change in the law, by the Supreme Court, that has disrupted the very foundation of nearly every Second Amendment case before or since *Heller*.

*Bruen*'s rejection of the two-step framework is a direct rebuke of the reasoning of *NRA* and *McGinnis*. *Bruen* is also directly at odds with *Emerson* because it forbids *all* balancing tests to review laws that burden Second Amendment rights. It certainly cannot support the vague, pre-*Heller* "nexus" test used in *Emerson*. As a result of *Bruen*'s intervention, *Emerson* and *McGinnis* are unequivocally overruled. The analysis needs to be done right, in this case, in the first instance.

## II.   Under *Bruen*'s historical model, § 922(g)(8) is unconstitutional on its face.

### A.   The Second Amendment's plain text covers Mr. Rahimi's conduct.

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. There can be no doubt that § 922(g)(8) prohibits the very conduct protected by the Second Amendment's "operative clause"—that is, "to possess and carry weapons in case of confrontation." *See Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592). The complete prohibition applies everywhere—at home, in public, in transit, or at rest. And it applies throughout the duration of a protective order, which might last 120 days (Conn. Gen. Stat. § 46b-15(e)), for an entire year (Kan. Stat. Ann. § 60-3107(e)), for two years (as is the case with Mr. Rahimi's agreed order, *see* Tex. Fam. Code Ann. § 85.001(d)), or even *fifty* years. *See United States v. Reese*, 627 F.3d 792, 798 (10th Cir. 2010).

And the statute plainly disarms members of "the people" protected by the Second Amendment. That term "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). Mr. Rahimi—to take one salient example—is a citizen of the United States by virtue of his birth in Texas. (ROA.207). Because he is a citizen, he

is among "the people" and is entitled to the protections of the First, Second, Fourth, Ninth, and Tenth Amendments to the Constitution. "[T]he Second Amendment's plain text covers" the "conduct" prohibited by § 922(g)(8), and "the Constitution presumptively protects that conduct." *See Bruen*, 142 S. Ct. at 2129–30.

## B. The government bears the burden of proving that § 922(g)(8) is "consistent with the Nation's historical tradition of firearm regulation."

Under *Bruen*, just like under the two-step *NRA* framework, the government bears the burden of proving § 922(g)(8)'s constitutionality. *Compare Bruen*, 142 S. Ct. at 2130, *with McGinnis*, 956 F.3d at 758. But *Bruen* moved the goalposts. It is no longer enough to "demonstrate that the statute is 'reasonably adapted to an important government interest.'" *McGinnis*, 956 F.3d at 758 (quoting *NRA* at 207). Now, after *Bruen*, the government must "justify" § 922(g)(8) "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. It cannot carry that burden here.

## C. Section 922(g)(8) is a recent intervention directed at a long-acknowledged social problem.

Under *Bruen*'s historical model, disarmament laws that address persistent social problems—that is, problems present before and during the ratification of the Second Amendment—require evidence that similar provisions existed at the time of ratification:

14

> [W]hen a challenged regulation addresses a general
> societal problem that has persisted since the 18th century,
> the lack of a distinctly similar historical regulation
> addressing that problem is relevant evidence that the
> challenged regulation is inconsistent with the Second
> Amendment. Likewise, if earlier generations addressed
> the societal problem, but did so through materially
> different means, that also could be evidence that a modern
> regulation is unconstitutional. And if some jurisdictions
> actually attempted to enact analogous regulations during
> this timeframe, but those proposals were rejected on
> constitutional grounds, that rejection surely would provide
> some probative evidence of unconstitutionality.

*Bruen*, 142 S. Ct. at 2126.

Indisputably, domestic violence is a persistent social problem. And American society has taken a variety of approaches to improving that problem. Yet there is little or no historical evidence suggesting *disarmament* for those who committed domestic violence; and there is certainly no tradition of disarming people subject to a no-contact order related to domestic violence.

First, § 922(g)(8) is a recent invention. It originated with three bills first introduced in 1993 and—after a period of vigorous debate between political parties, policy groups, and special interests—was signed into law on September 13, 1994. Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J. 525, 538-44 (March 2003) (discussing the legislative history). And there was nothing like it before in federal law.

15

Second, § 922(g)(8) differs from other disarmament provisions because it is not tied to a *conviction*. Protective orders are a modern approach to addressing domestic violence. Although nearly every state and U.S. territory today has enacted a protective-order statute, no such statutes existed before 1970. Melvin Huang, *Keeping Stalkers at Bay in Texas*, 15 Tex. J. on C.L. & C.R. 53, 68 (Fall 2009) ("[P]rotective orders first came into existence in 1970 when the District of Columbia passed its Intrafamily Offenses Act. … Pennsylvania became the first state to authorize orders when it passed its Protection from Abuse Act in 1976. Within four short years, forty-five states implemented similar legislation.").

Third, American society has *long* recognized that domestic violence is a problem, and has taken various measures to address that problem. See, e.g., Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn. St. L. Rev. 337, 346-47 (2015) (describing "a variety of punishments" for abusers in colonial New England that could include shaming, corporal punishment, and financial penalties). But that toolbox did not include disarmament for two centuries after ratification.

Even for people *actually convicted* of domestic-violence crimes, there is little, if any, evidence of founding-era disarmament regulations. *See United States v. Skoien*, 614 F.3d 638, 651 (7th Cir. 2010) (Sykes, J., dissenting) ("We simply cannot say with any certainty that persons convicted of a domestic-violence misdemeanor

16

are wholly excluded from the Second Amendment right as originally understood."); David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter 2017) ("[T]here is simply no tradition—from 1791 or 1866—of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders."); Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017) ("Historical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin.").

But whatever the historical evidence supporting a conviction provision like § 922(g)(9), there is nothing similar for protective orders because protective orders are new. As a result, under the *Bruen* historical model, disarming recipients of protective orders respondents is unconstitutional.

**D.** **This Court should not uphold a distinctly modern restriction based on malleable and amorphous labels like "responsible," "peaceable," "virtuous," or "dangerous" that the Framers decided not to include in the Second Amendment.**

Given that § 922(g)(8) has no historical provenance, the government may argue—as it did in opposition to McGinnis's cert petition—that Congress or state legislatures have the power to disarm *anyone* deemed a "threat to public safety." *See* Brief in Opposition (BIO) 7–8, *McGinnis v. United States*, No. 20-6046 (Jan. 15. 2021). This Court should not accept such arguments.

These broad concepts are *descriptions* of some of the people who were historically disarmed, and they provide *no meaningful check* on a legislature's ability to disarm citizens. Watch out for words in the government's supplemental brief like "responsible," "peaceable," "virtuous," or persons "deemed dangerous." These terms have infinitely flexible definitions, imbued with ambiguity. Are courts required to defer to legislative judgments about who is "virtuous" or "dangerous?" Can participation in (or support of) a protest or movement make someone dangerous, and does it matter whether the protest itself became violent or dangerous? And is a single bad act enough to lose the protections of the Second Amendment, even without a criminal conviction? Do these terms, for example, refer to an individual's moral character, or do they allow Congress to disarm anyone who engaged in even a single act of violence on their worst day?

18

Historically, concepts such as responsible, peaceable, and virtuous refer to a person's overall moral character. Webster's Dictionary of the English Language (1828), for example, couches "responsible" in terms of a person's ability to repay their debts, "peaceable" as free from feuds, and "virtuous" in terms of moral goodness and chastity. "Dangerous," with respect to firearms, was a designation applied to Native Americans and enslaved people, not domestic abusers. *See* Kopel, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. at 244 ("The colonies and then the states certainly knew how to ban firearms possession for people who were considered dangerous (namely, slaves and Indians). This 'tradition' cannot be extended to every person whom a modern legislature might consider dangerous."). Most strikingly, there is little or no evidence that domestic abusers were stripped of firearms and absolutely no evidence that people subject to no-contact orders were stripped of them. Thus, from a historical perspective, whatever these terms meant, they were not applied in circumstances resembling § 922(g)(8).

The government may point to proposed language for the Second Amendment in an effort to strengthen its point. In its Brief in Opposition in *McGinnis*, for example, the government cited a proposal presented at the Pennsylvania ratifying convention for disarming dangerous individuals. BIO 7–8. It also referred to a proposal by Samuel Adams at the Massachusetts ratifying convention limiting the Second Amendment to "peaceable citizens." *Id.* But here's the problem: such

language was ultimately rejected. While the Framers may have had differing views on how far the Second Amendment should reach, courts must honor the final version as it appears in the Constitution–stripped of any modifiers such as peaceable, responsible, virtuous, or non-dangerous.

### E. Section 922(g)(8) is always unconstitutional because it always prohibits a person from possessing a firearm in their own home for personal defense even when living alone.

The government may cite *United States v. Salerno*, 481 U.S. 739 (1987), in an effort to avoid a facial constitutional challenge. Mr. Rahimi, however, clears *Salerno*'s hurdle.

18 U.S.C. § 922(g)(8) is unconstitutional in all instances because: (1) it always prohibits a person from possessing a firearm, in their home or in public, for personal defense—even when living alone; and (2) it always does so without even requiring a criminal conviction or a showing that the defendant used a firearm in domestic violence. *See* § 922(g)(8). Such a broad, untailored restriction cuts to the heart of what the Second Amendment protects: the right to bear arms both in home and in public for self-defense.

The government may attempt to mitigate this infirmity by pointing to the fact that § 922(g)(8)'s restriction is temporary. As noted above, "temporary" does not mean fleeting. Mr. Rahimi entered an agreed order more than a year before his federal arrest, and he would remain subject to the order for a total of two years. And

some protective orders covered by § 922(g)(8) last much, much longer. *Reese*, 627 F.3d at 798.

More importantly, this argument fails because any unwarranted deprivation of a fundamental right is unconstitutional, irrespective of its duration. *Rodriguez v. United States*, a Fourth Amendment case decided by the Supreme Court in 2015, provides a useful analogy. 135 S. Ct. 1609 (2015). There, a police officer prolonged the duration of a traffic stop, without reasonable suspicion, beyond the time necessary to achieve the stop's mission. *Id.* at 1612-1614. The government argued that any extended seizure was *de minimis*—and therefore excusable—because of its very short (twelve minute) duration. *Id.* at 1616. The Supreme Court disagreed, holding that a constitutional violation of any length was a constitutional violation nonetheless. *See id.* ("If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' … [A] traffic stop 'prolonged beyond' that point is 'unlawful.'").

So too with other enumerated rights. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *see also United States v. Allen*, 542 F.2d 630, 633 (4th Cir. 1976) ("[T]he Sixth Amendment right to counsel…is so fundamental that there should never occur any interference with it for any length of time, however brief, absent some compelling reason.") And it's hard to imagine that

21

the Third Amendment's prohibition on quartering, for example, could be disregarded because the soldiers only occupied a home for a single night or, to consider the order at issue here, for a period of only two years. *See* U.S. Const. amend. III. The rationale for rejecting duration-exceptions to constitutional violations is obvious: to hold otherwise would mire courts in arbitrary line-drawing debates over "how long is too long." Not only is such a question impossible to answer, every court would be free to arrive at a different answer.

If this Court endorses such a rule, one can easily imagine the slippery slope that will follow, as courts try to determine whether three months, one year, two years, or a lifetime protective order is consistent with the Second Amendment.

### F.   This Court should not be deterred by a "parade of horribles" or other hypothetical externalities the government may suggest.

The government may argue that the Court should not follow the *Bruen* historical analysis model because various bad consequences might follow from returning to pre-1994 law. In *Bruen*, the Supreme Court directly addressed the relevance of externalities—hypothetical or otherwise—presented by its decision. The Court characterized the Second Amendment's right to bear arms as an "unqualified command" that does not yield to "all of these statistics" and "evidence of crimes" to "justify granting States greater leeway in restricting firearm ownership and use." *Bruen*, 142 S. Ct. at 2126 n.3. "The right to bear arms," after all, "is not

the only constitutional right that has controversial public safety implications." *Id.* (quoting *McDonald v. Chicago*, 561 U.S. 742, 783 (2010)).

Although "judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here." *Bruen*, 142 S. Ct. at 2131. The analysis that *Bruen* demands is cold, calculating, and historical. It cannot be done with an eye to modern sentiments that may seek to inject a balancing test under another name. *See id.* at 2133 n.7 ("This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry.").

## <u>CONCLUSION</u>

This Court should hold that 18 U.S.C. § 922(g)(8) is unconstitutional on its face and vacate Mr. Rahimi's conviction and sentence.

Respectfully submitted,

/s/ *Brandon Beck*
**Brandon Beck**
*Assistant Federal Public Defender*
Northern District of Texas
1201 Texas Ave. #507
Lubbock, Texas 79401
(806) 472-7236
(806) 472-7241 (fax)
Bar No. 24082671
brandon_beck@fd.org

*Counsel for Mr. Rahimi*

## <u>CERTIFICATE OF SERVICE</u>

On July 25, 2022, I filed this brief through the Court's ECF system. Opposing Counsel has therefore been served. I will also send a paper copy to Zackey Rahimi at the following address:

Zackey Rahimi
Reg # 40471-509
CID # 0897779
Tarrant County Jail
100 N. Lamar
Fort Worth, TX  76196

/s/ *Brandon Beck*
Brandon Beck

*Counsel for Mr. Rahimi*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 5th Cir. R. 32.3, the undersigned certifies this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

1. Exclusive of the exempted portions, this brief contains 5,758 words.

2. This brief has been prepared in proportionately spaced typeface using Microsoft Word in Times New Roman typeface and 14 point font size.

3. The undersigned understands that any material misrepresentations in this certificate may result in striking the brief and sanctions.

<u>/s/ *Brandon Beck*</u>
Brandon Beck

*Counsel for Mr. Rahimi*
