No. 21-11001

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ZACKEY RAHIMI,
Defendant-Appellant.

On Appeal from the United States District Court for the
Northern District of Texas, No. 4:21-CR-83
(Hon. Mark T. Pittman)

**SUPPLEMENTAL BRIEF FOR APPELLEE THE UNITED STATES**

CHAD E. MEACHAM
United States Attorney

LEIGHA A. SIMONTON
Assistant United States Attorney
Northern District of Texas

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

This case is set for oral argument on August 30, 2022.  Oral argument will be helpful to the Court in addressing the constitutional question presented.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.......................................i

TABLE OF CONTENTS ...........................................................ii

TABLE OF AUTHORITIES .......................................................iv

INTRODUCTION .................................................................1

STATEMENT OF THE CASE .....................................................1

    A.    Factual Background .....................................................1

    B.    Procedural History.....................................................3

SUMMARY OF ARGUMENT ....................................................5

ARGUMENT .....................................................................7

I.    *Bruen* Requires This Court to Take a Fresh Look at the Constitutionality of 18 U.S.C. § 922(g)(8). ............................7

    A.    Standard of review ...................................................8

    B.    This Court previously upheld § 922(g)(8) under the second step of its two-step approach......................................8

    C.    *Bruen* invalidated the second step of this Court's two-step approach. ..........................................................10

II.    Section 922(g)(8) Is Constitutional After *Bruen*. .....................13

    A.    Standard of review ...................................................13

    B.    The *Bruen* standard .................................................14

    C.    Section 922(g)(8) does not burden the Second Amendment rights of law-abiding, responsible citizens................................17

    D.    In any event, § 922(g)(8) is consistent with the historical tradition of firearm regulation...................................21

1. Section 922(g)(8) is analogous to historical laws that disarmed dangerous people. ............................................. 22

2. Section 922(g)(8) is analogous to historical surety laws. ..... 27

E. Rahimi's contrary arguments are unavailing. ............................ 31

1. Section 922(g)(8)'s recency ............................................. 31

2. The recency of protective-order statutes ............................ 34

3. The asserted malleability of the "dangerous" label............ 36

4. The prohibition's scope and duration............................... 38

CONCLUSION................................................................................. 42

CERTIFICATE OF COMPLIANCE ........................................... 43

CERTIFICATE OF SERVICE ................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019)........................................................14, 21

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984) ............................................................. 13

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...................................................... passim

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) ................................................16-17

*Folajtar v. Attorney General of the U.S.*,
    980 F.3d 897 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 2511 (2021) ............... 24

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ...................................................... 9

*Jacobs v. Nat'l Drug Intel. Ctr.*,
    548 F.3d 375 (5th Cir. 2008) .................................................... 11

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ................................................23-24, 37, 39

*King v. Lord Lee*,
    83 Eng. Rep. 482 (K.B. ca. 1675)............................................. 35

*Ladner v. United States*,
    358 U.S. 169 (1958) ............................................................. 19

*Lewis v. United States*,
    445 U.S. 55 (1980)............................................................... 41

*Lord Leigh's Case*,
    84 Eng. Rep. 807 (K.B. 1674)................................................ 35

iv

*Manby v. Scott*,
  82 Eng. Rep. 1000 (Ex. 1659) ................................................................. 35

*McDonald v. Chicago*,
  561 U.S. 742 (2010) ............................................................................. 9, 15

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms &*
  *Explosives*, 700 F.3d 185 (5th Cir. 2012) .............................................. 9, 23

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ...................................................................... passim

*Respublica v. Donagan*,
  2 Yeates 437 (Pa. 1799) .......................................................................... 29

*Sims's Case*,
  93 Eng. Rep. 1131 (K.B. 1743-44) .......................................................... 35

*Sir John Knight's Case*,
  87 Eng. Rep. 75 (K.B. 1686) .................................................................... 22

*Sir Thomas Seymor's Case*,
  72 Eng. Rep. 966 (K.B. ca. 1615) ............................................................ 35

*State v. Davis*,
  5 S.C.L. (3 Brev.) 3 (S.C. Const. Ct. App. 1811) .................................... 36

*State v. Kershaw*,
  1 Del. Cas. 218 (Del. Ct. of Quarter Sessions 1799) ............................... 29

*Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*,
  673 F.3d 399 (5th Cir. 2012) ................................................................... 11

*Thompson v. Dallas City Attorney's Office*,
  913 F.3d 464 (5th Cir. 2019) ................................................................... 41

*United States v. Bena*,
  664 F.3d 1180 (8th Cir. 2011) ................................................................. 25

*United States v. Castleman*,
  572 U.S. 157 (2014) ................................................................................ 26

*United States v. Emerson,*
  270 F.3d 203 (5th Cir. 2001) ........................................................... passim

*United States v. McGinnis,*
  956 F.3d 747 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1397 (2021) . 5, 9, 10, 12

*United States v. Penn,*
  969 F.3d 450 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2526 (2021) .............. 13

*United States v. Reese,*
  627 F.3d 792 (10th Cir. 2010) ................................................................ 39

*United States v. Salerno,*
  481 U.S. 739 (1987) ............................................................................ 13, 39

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) (en banc) .................................................. 24

*United States v. Steele,*
  670 F. App'x 368 (5th Cir. 2016) ........................................................... 8

*Young v. Hawaii,*
  992 F.3d 765 (9th Cir. 2021) (en banc), *vacated* 2022 WL 2347578
  (U.S. June 30, 2022) ......................................................................... 27, 28

## Current Statutes

18 U.S.C. § 922 ..................................................................... passim

18 U.S.C. § 924 ............................................................................. 3

Tex. Fam. Code § 71.0021 ........................................................... 18

Tex. Fam. Code § 71.004 ............................................................. 18

Tex. Fam. Code § 85.001 ............................................................. 40

Tex. Fam. Code § 85.025 ............................................................. 41

Tex. Fam. Code § 85.025 ............................................................. 41

Tex. Fam. Code § 261.001 ............................................................ 19

Tex. Gov't Code § 411.172 ........................................................... 20

Tex. Penal Code § 22.01 .............................................................. 19

Tex. Penal Code § 22.04 .............................................................. 19

Tex. Penal Code § 22.041 ............................................................ 19

Wis. Stat. Ann. § 175.60 ............................................................. 20

Wis. Stat. Ann. § 941.29 ............................................................. 20

**Historical Statutes**

1 Acts and Resolves, Public and Private, of the Province of the
    Massachusetts Bay (1869) ....................................................... 29

2 Laws of the Commonwealth of Massachusetts, from
    November 28, 1780 to February 28, 1807 (1807) ..................... 23

A Compilation of the Statutes of Tennessee of a General and
    Permanent Nature, from the Commencement of the Government
    to the Present Time (1836) ...................................................... 23

Acts and Laws of His Majesty's Province of New Hampshire in New
    England (1771) .......................................................... 23, 28, 29

Collection of All Such Acts of the General Assembly of Virginia
    (1794) ...................................................................................... 23

Mass. Rev. Stat. ch. 134, § 16 (1836) .......................................... 30

Massachusetts Body of Liberties § 80 (1641) ............................... 35

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662) .................... 22

## Other Authorities

American Bar Association, Domestic Violence Civil Protective Orders (2014) ................................................................................ 40

1 Blackstone, William, Commentaries on the Laws of England (1765) ......... 34

4 Blackstone, William, Commentaries on the Laws of England (1769) ..............................................................28, 30, 31, 39

Bureau of Justice Statistics, Homicide Trends in the United States, 1980-2008 (November 2011) ....................................................26, 33

Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, Nat'l Inst. Of Justice J., No. 250 (Nov. 2003)......................... 27

Churchill, Robert H., *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007)........................................... 23

Cornell, Saul & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004)............... 23

Feldman, David, *The King's Peace, the Royal Prerogative, and Public Order: The Roots and Early Development of Binding Over Powers*, 47 Cambridge L.J. 101 (1988)........................................................ 28

Greenlee, Joseph G.S., *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020) ............................................................................... 22

Kelly, Henry Ansgar, *Rule of the Thumb and the Folklaw of the Husband's Stick*, 44 J. Legal Educ. 341 (1994) ........................................... 35

Malcolm, Joyce Lee, To Keep and Bear Arms (1994) .................................. 23

Ramsey, Carolyn B., *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn. State L. Rev. 337 (2015)......................... 35

Rawle, William, A View of the Constitution of the United States of America (2d ed. 1829) ........................................................... 29

Reeve, Tapping, The Law of Baron and Femme; of Parent and Child;
    of Guardian and Ward; of Master and Servant; and of the Powers
    of Courts of Chancery (New Haven, Oliver Steele 1816) .......................... 36

2 Schwartz, Bernard, The Bill of Rights: A Documentary History
    (1971) ................................................................................................. 24

Webb, George, The Office and Authority of a Justice of Peace (1736) .......... 23

# INTRODUCTION

Defendant–Appellant Zackey Rahimi pleaded guilty to possessing a firearm while under a domestic violence restraining order, in violation of 18 U.S.C. § 922(g)(8).  This Court ordered supplemental briefing addressing the effect of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), on Rahimi's conviction.  As explained below, 18 U.S.C. § 922(g)(8) is consistent with the Second Amendment, even after *Bruen*.  Persons like Rahimi who are subject to protective orders are not responsible, law-abiding citizens who fall within the Second Amendment's protection.  And, even if they are, § 922(g)(8) is analogous to historical restrictions on firearm possession by those who presented a danger to others.  Rahimi cannot show, as he must to prevail on his facial challenge, that § 922(g)(8) is unconstitutional in all its applications.

# STATEMENT OF THE CASE

## A.    Factual Background

Over a six-week stretch between December 2020 and January 2021, Rahimi participated in at least five shootings.  ROA.209-210.  On December 1, 2020, he fired an AR-15 rifle into the home of an individual to whom he had recently sold Percocet.  ROA.209, 220.  On December 2, after colliding with another vehicle and causing it to roll into a wall, Rahimi exited his car, pulled

out a handgun, fired at the driver, and drove off.  ROA.209.  He soon returned

in a different car, fired a different gun at the disabled vehicle, and fled once

again.  ROA.209-210.  On December 5, while traveling down a residential

street with young children nearby, he reached out the passenger-side window

of a moving vehicle and fired several bullets into the air.  ROA.210.  On

December 22, he sped past two other vehicles on a highway; after one of them

flashed its headlights, Rahimi slammed on the breaks, swerved to follow, and

came upon the other vehicle, at which he fired several rounds.  ROA.210.

And finally, on January 7, he fired several bullets into the air after an

associate's credit card was declined at a fast-food restaurant.  ROA.210.

　　　After Rahimi was identified as a suspect in these shootings, police

officers in Arlington, Texas, obtained a warrant to search his residence.

ROA.210.  They executed the warrant on January 14, 2021, while Rahimi was

in state custody in connection with another firearm offense.  ROA.210.  Inside

Rahimi's room, officers found a .45-caliber pistol with a large-capacity

magazine, a .308-caliber rifle with a large-capacity magazine, ammunition,

and approximately $20,000.  ROA.68, 211.  Elsewhere in the house, officers

found another pistol that they later linked to Rahimi.  ROA.211.

　　　Officers also found, in Rahimi's room, a copy of a restraining order.

ROA.211; *see* ROA.12-18.  The order, which Rahimi had signed, was issued

on February 5, 2020, and was effective until February 5, 2022.  ROA.12, 15, 18, 211, 218.  It recited a Tarrant County district court's findings that Rahimi and the individual who applied for the restraining order—referred to here as "C.M."—were the biological parents of a child and thus "intimate partners" under 18 U.S.C. § 921(a)(32); that Rahimi had "committed family violence"; and that Rahimi "represent[ed] a credible threat to the physical safety of [C.M.] or other members of the family."  ROA.12-13; *see* ROA.68, 211.  The order restrained Rahimi from "[c]ommitting family violence"; from approaching, threatening, or harassing C.M. or their child; and from possessing a firearm.  ROA.13-14; *see* ROA.211.  The order further warned Rahimi that possession of a firearm or ammunition while the order was in effect could be a felony under 18 U.S.C. §§ 922(g) and 924(a)(2).  ROA.16.

## B.    Procedural History

A federal grand jury in the Northern District of Texas charged Rahimi with possessing firearms while under a domestic violence restraining order, in violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2).  ROA.19-22.  Rahimi moved to dismiss the indictment on the ground that Section 922(g)(8) on its face violates the Second Amendment, but he acknowledged that the argument was foreclosed by circuit precedent.  ROA.41-59.  The district court denied the motion.  ROA.79-81.

On May 26, 2021, Rahimi pleaded guilty.  *See* ROA.66-71. In connection with the plea, he stipulated that he knew of and was subject to the restraining order described above when he possessed the firearms listed in the indictment (*i.e.*, the firearms retrieved from his room on January 14, 2021). ROA.69.  He admitted that the restraining order prohibited the use, attempted use, or threatened use of physical force against an intimate partner, and that the order included a finding that he was a credible threat to the physical safety of an intimate partner.  ROA.68.  And he admitted that the order was issued after a hearing of which he received actual notice and at which he had an opportunity to participate.  ROA.68.

The district court sentenced Rahimi to 73 months of imprisonment. ROA.96.  The court ordered that the sentence run consecutively to any future sentence imposed in six state-court cases (relating to Rahimi's assault and threat against his girlfriend and the associated shooting, an aggravated assault against another woman, and the possession of a controlled substance) but run concurrently to any future sentence imposed in five other state-court cases (relating to the five shootings outlined above).  ROA.96; *see* ROA.217-220.

In June 2022, a panel of this Court affirmed Rahimi's conviction and sentence in a per curiam opinion.  No. 21-11001, slip. op. 1-2 (5th Cir. June 8, 2022).  The Court held that the district court did not clearly err by running

4

Rahimi's sentence consecutively to some of the yet-to-be-imposed state-court sentences. *Id.* at 3-4.  And the Court rejected Rahimi's Second Amendment claim as "foreclosed by [the Court's] binding precedent." *Id.* at 2 n.1 (citing *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1397 (2021)).

While Rahimi's petition for rehearing en banc was pending, the panel withdrew its opinion, dismissed the rehearing petition as moot, and ordered additional briefing addressing the effect on this case of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  Order, No. 21-11001 (5th Cir. July 7, 2022).

## SUMMARY OF ARGUMENT

1. The government agrees with Rahimi that *Bruen* requires this Court to take a fresh look at § 922(g)(8)'s constitutionality.  Although this Court has twice upheld the statute against constitutional attack, it has done so by applying a means-end scrutiny that *Bruen* rejected.  The Court's prior decisions are therefore not binding on this panel, which should apply the *Bruen* standard to Rahimi's constitutional challenge.

2. Section 922(g)(8) remains constitutional after *Bruen*.  That decision clarified that, where the defendant's burdened conduct falls within the Second Amendment's plain language, the government must show that the challenged

5

regulation is consistent with the nation's historical tradition of firearm regulation. Section 922(g)(8) is constitutional under that test.

a. The conduct burdened by § 922(g)(8) does not fall within the scope of the Second Amendment right, which protects only the right of *law-abiding*, *responsible* citizens to possess firearms for self-defense. Individuals subject to § 922(g)(8) are not responsible or law-abiding because their conduct evidencing a "credible threat to the physical safety" of an intimate partner will ordinarily violate laws prohibiting assault, battery, or threats. That is certainly the case here, where Rahimi's threatening conduct to his girlfriend resulted in several criminal charges. Rahimi cannot show that § 922(g)(8) burdens conduct protected by the Second Amendment.

b. Moreover, even if § 922(g)(8) burdens some protected conduct, that burden is consistent with the historical tradition. There is a long tradition both in England and the United States of prohibiting firearm possession by those who pose a threat to the community or to others' safety. Section 922(g)(8) is analogous to those laws both in the burden it imposes and the reasons for the burden.

Section 922(g)(8) is also analogous to historical surety laws. Those laws allowed a person to obtain a "surety of the peace" when another person posed a threat to his or her safety. And the person against whom the surety was

obtained could forfeit his weapons and be imprisoned if he failed to provide adequate assurances—either in the form of money or guarantees from others—that he would keep the peace.  Because § 922(g)(8) is consistent with the historical tradition, it is not facially unconstitutional.

Rahimi's contrary arguments are unavailing.  Section 922(g)(8) is not constitutionally infirm just because it was adopted in the last 30 years or because protective-order statutes date back only 50 years.  Both section 922(g)(8) and the state protective-order statutes are analogous to laws that predated the Second Amendment.  Like § 922(g)(8), those historical laws did not depend on the existence of a criminal conviction.  And any concern about the duration of protective orders can be addressed by challenging the underlying order.  Rahimi cannot show that § 922(g)(8) is unconstitutional on its face.

## ARGUMENT

### I. *Bruen* Requires This Court to Take a Fresh Look at the Constitutionality of 18 U.S.C. § 922(g)(8).

The government agrees with Rahimi that this Court is no longer bound by its decisions that upheld § 922(g)(8) under means-end scrutiny.  *Bruen* has abrogated the reasoning (though not the ultimate conclusion) of those decisions.  This Court should therefore consider § 922(g)(8)'s constitutionality afresh under the framework set forth in *Bruen*.

**A.    Standard of review**

Whether *Bruen* abrogates this circuit's precedent is a question this Court should review de novo.  *See United States v. Steele*, 670 F. App'x 368, 369 (5th Cir. 2016) (per curiam) (unpublished).

**B.    This Court previously upheld § 922(g)(8) under the second step of its two-step approach.**

In *United States v. Emerson*, 270 F.3d 203, 221-60 (5th Cir. 2001), this Court conducted a historical inquiry to conclude that the Second Amendment protects an individual right to keep and bear arms.  When considering § 922(g)(8)'s constitutionality, however, the Court did not focus on history. Instead, it said that the individual right protected by the Second Amendment was subject to "limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable."  *Id.* at 261. After interpreting § 922(g)(8) to require, in all cases, that the protective order be based on a finding of "a real threat or danger of injury to the protected party," *id.* at 262, the Court held that "the nexus between firearm possession by the party so enjoined and the threat of lawless violence[ ] is sufficient, though likely barely so, to support the deprivation . . . of the enjoined party's Second Amendment right to keep and bear arms." *Id.* at 264.

The Supreme Court subsequently held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment protects an individual right to

possess a handgun in the home for self-defense. And in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court held that this right applies to the states through the Fourteenth Amendment.

After *Heller* and *McDonald*, this Court adopted a "two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). First, the Court asked "whether the conduct at issue f[ell] within the scope of the Second Amendment right," considering "the historical traditions associated with the Second Amendment guarantee." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) ("*NRA*"). If the burdened conduct fell within the scope of the right, the court applied strict scrutiny to laws that threatened "a right at the core of the Second Amendment" and intermediate scrutiny to laws burdening conduct outside that core. *Id.* at 195.

This Court again considered a Second Amendment challenge to § 922(g)(8) in *McGinnis*. There, the Court expressed skepticism of the defendant's argument that *Emerson* was no longer controlling. *United States v. McGinnis*, 956 F.3d 747, 755 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1397 (2021). The Court observed that, although *Emerson* "did not expressly implement a two-part inquiry á la *NRA*," it "was guided by the same concerns." *Id.* As the Court explained, "*Emerson* first considered the scope of

the Second Amendment right 'as historically understood,' and then

determined—presumably by applying some form of means-end scrutiny *sub*

*silento*—that § 922(g)(8) is 'narrowly tailored' to the goal of minimizing 'the

threat of lawless violence.'" *Id.* (quoting *Emerson*, 270 F.3d at 261, 264).

In an "abundance of caution," however, the *McGinnis* Court "re-

analyze[d] the constitutionality of § 922(g)(8) under the two-step *NRA*

framework." *McGinnis*, 956 F.3d at 756.  At the first step, the government

argued that § 922(g)(8) was consistent with "historical 'limitations on firearm

possession by individuals based on the risk they pose to others.'" *Id.*  But the

Court declined to resolve the step-one question because, "[e]ven assuming

*arguendo* that the conduct burdened by § 922(g)(8) falls within the Second

Amendment right," the defendant's facial challenge failed at step two.  *Id.*

Applying intermediate scrutiny, the Court held that the statute was

"reasonably adapted" to the government's compelling interest in "reducing

domestic gun abuse." *Id.* at 758.

### C.    *Bruen* **invalidated the second step of this Court's two-step approach.**

In *Bruen*, the Supreme Court held that the Second Amendment protects

the right of "ordinary, law-abiding citizens" to "carry a handgun for self-

defense outside the home."  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142

S. Ct. 2111, 2122 (2022). *Bruen* observed that, after *Heller*, the courts of appeals had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 2125. *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. But *Bruen* "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27. "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

Under this Court's rule of orderliness, "one panel of [the] court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or [the] *en banc* court." *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). For a Supreme Court decision to abrogate this Court's law, the decision "must be more than merely illuminating with respect to the case before the court and must unequivocally overrule prior precedent." *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (brackets and quotations omitted).

*Bruen* "unequivocally overrule[s]" the second step of this Court's two-step Second Amendment analysis. *Bruen* held that the "predominant framework['s]" second step "is one step too many" and "is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Bruen*, 142 S. Ct. at 2127, 2129. Thus, *Bruen* abrogates the analysis in *McGinnis*, which upheld § 922(g)(8) after considering only the second step of the *NRA* framework.

*Bruen* also requires this Court to revisit *Emerson*. Although *Emerson* conducted a thorough historical analysis when holding that the Second Amendment protects an individual right, it did not explicitly analyze whether § 922(g)(8) was constitutional based on the "Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127. Instead, *Emerson* said the Second Amendment right was subject to "narrowly tailored" and "reasonable" exceptions. *Emerson*, 270 F.3d at 261. And it determined that the "nexus between firearm possession" in violation of § 922(g)(8) and "the threat of lawless violence" was "sufficient . . . to support the deprivation . . . of the enjoined party's Second Amendment right." *Id.* at 264. As *McGinnis* later explained, *Emerson* appeared to be "applying some form of means-end scrutiny." *McGinnis*, 956 F.3d at 755. Thus, this Court is no longer bound by

*McGinnis* and must re-evaluate whether § 922(g)(8) is constitutional under the test that *Bruen* articulates.

## II.    Section 922(g)(8) Is Constitutional After *Bruen*.

Although *Bruen* changes the analysis that applies to a Second Amendment claim, the *Bruen* analysis confirms that § 922(g)(8) is constitutional.  Rahimi cannot prevail on his claim that the statute is facially unconstitutional under the Second Amendment.

### A.    Standard of review

This Court "review[s] the constitutionality of a federal statue de novo." *United States v. Penn*, 969 F.3d 450, 459 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2526 (2021).  Because Rahimi argues that § 922(g)(8) is unconstitutional on its face, he "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  As the party challenging the statute's constitutionality, he bears the initial burden of showing that his conduct is protected by the Second Amendment.  *See Bruen*, 142 S. Ct. at 2130 (analogizing to the First Amendment); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even

applies."). And, even if Rahimi meets this burden and the burden shifts to the

government of showing that § 922(g)(8) is consistent with historical firearm

regulations, *see Bruen*, 142 S. Ct. at 2130, the government can defeat Rahimi's

facial challenge by showing that the statute is constitutional in any of its

applications. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (a facial

challenge requires showing that the law "is unconstitutional in all its

applications").

###### B. The *Bruen* standard

In *Heller*, the Supreme Court held that the Second Amendment protects

the right of "law-abiding, responsible citizens" to keep firearms in their homes

for self-defense. *Heller*, 554 U.S. at 635. But *Heller* clarified that, "[l]ike most

rights, the right secured by the Second Amendment is not unlimited" and is

"not a right to keep and carry any weapon whatsoever in any manner

whatsoever and for whatever purpose." *Id.* at 626. *Heller* said that "nothing in

[its] opinion should be taken to cast doubt" on certain "presumptively lawful

regulatory measures," such as "longstanding prohibitions on the possession of

firearms by felons and the mentally ill," "laws forbidding the carrying of

firearms in sensitive places," and "laws imposing conditions and qualifications

on the commercial sale of arms." *Id.* at 626-27 & n.26. In *McDonald*, a

plurality of the Court again emphasized that applying the amendment to the

states "does not imperil every law regulating firearms." *McDonald*, 561 U.S. at 786 (opinion of Alito, J.).

*Bruen* held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. And it struck down a New York license-to-carry law that "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2156. But, as Justice Kavanaugh emphasized in concurrence, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

*Bruen* clarified the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when the conduct is protected, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

The Court explained that, "[i]n some cases," the inquiry into "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" will "be fairly straightforward." *Bruen*, 142 S. Ct. at 2131. "For instance, when a challenged regulation addresses a general

societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* "Likewise," the Court said, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

*Bruen* recognized, however, that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. Thus, when considering "modern regulations that were unimaginable at the founding," the historical inquiry will "often involve reasoning by analogy." *Id.* In "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," courts must determine "whether the two regulations are relevantly similar," which will involve considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (quotations omitted).

The Court emphasized that this "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue' . . . ." *Id.* (quoting *Drummond v.*

*Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)).  "On the other hand,

analogical reasoning requires only that the government identify a well-

established and representative historical *analogue*, not a historical *twin*."  *Id.*

"[E]ven if a modern-day regulation is not a dead ringer for historical

precursors, it still may be analogous enough to pass constitutional muster."  *Id.*

### C.    Section 922(g)(8) does not burden the Second Amendment rights of law-abiding, responsible citizens.

*Heller* and *Bruen* defined the right to bear arms as belonging to "law-

abiding, responsible" citizens, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156,

or "ordinary, law-abiding citizens," *Bruen*, 142 S. Ct. at 2122, 2134.  For that

reason, *Bruen* did not question the constitutionality of "shall-issue" licensing

regimes that "require applicants to undergo a background check or pass a

firearms safety course" to ensure that "those bearing arms" are "'law-abiding,

responsible citizens.'"  *Id.* at 2138 n.9; *see id.* at 2162 (Kavanaugh, J.,

concurring) ("[S]hall-issue licensing regimes are constitutionally permissible").

Thus, *Bruen* does not cast doubt on firearms restrictions that prevent

irresponsible, non-law-abiding persons from possessing firearms.

Persons subject to domestic violence restraining orders that satisfy

§ 922(g)(8) are not law-abiding, responsible citizens who fall within the Second

Amendment's protection under *Heller* and *Bruen*.  Section 922(g)(8) applies

only to those who have been judicially determined, "after a hearing" and

"actual notice," to present a "credible threat" or "real threat" to the physical safety of another person.[1] § 922(g)(8)(A), (C)(i); *Emerson*, 270 F.3d at 262.  In most circumstances, such a person is not a "law-abiding" citizen because the conduct that led to the protective order constitutes an assault, battery, or criminal threat.  And such a person can hardly be termed "responsible."

In this case, for example, Rahimi's protective order was based on a judicial finding that he had "committed family violence" and "represent[ed] a credible threat to the physical safety" of C.M.  ROA.13.  As defined under Texas's protective-order scheme, "[f]amily violence" means either (1) "an act" by a household member or dating partner "that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the [person] in fear of imminent physical harm, bodily injury, assault, or sexual assault," Tex. Fam. Code §§ 71.004(1), (3), 71.0021(a), or (2) "abuse"

---

[1] Section 922(g)(8) requires a restraining order that either "includes a finding that [the] person represents a credible threat to the physical safety of [the person's] intimate partner or child," § 922(g)(8)(C)(i), or "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury," § 922(g)(8)(C)(ii).  Subsection (C)(ii) does not specifically require a finding of a credible threat.  But this Court held in *Emerson* (in analysis unaffected by *Bruen*) that "Congress in enacting section 922(g)(8)(C)(ii) proceeded on the assumption that the laws of the several states were such that court orders . . . should not embrace the prohibitions of paragraph (C)(ii) unless such either were not contested or evidence credited by the court reflected a real threat or danger of injury to the protected party by the party enjoined." *Emerson*, 270 F.3d at 262.

toward a household member as defined in Tex. Fam. Code §§ 261.001(1)(C), (E), (G), (H), (I), (J), (K), and (M); 71.0021.  Conduct satisfying the first definition would constitute assault both under Texas law, *see* Tex. Penal Code § 22.01(a), and under traditional common-law principles, *see Ladner v. United States*, 358 U.S. 169, 177 (1958).  And the types of "abuse" that satisfy the second definition are either specifically defined by reference to the Penal Code, *see* Tex. Fam. Code § 261.001(1)(E), (G), (H), (K), or would constitute other crimes such as injury to a child, Texas Penal Code § 22.04(a), or abandoning or endangering a child, *id.* § 22.041.  Thus, all (or nearly all) people subject to a domestic-violence protective order under this Texas scheme have committed a crime.

Additionally, Rahimi's conduct underlying the protective order in this case was clearly unlawful.  After an argument with his girlfriend, C.M., Rahimi grabbed her by the wrist and pulled her toward his vehicle, continuing to drag her after she fell to the ground.  ROA.217.  Rahimi lifted C.M. and pushed her into his vehicle, causing her to hit her forehead on the dashboard.  ROA.217.  Rahimi then fired a gun at another person who had seen him commit the assault.  ROA.217.  And after C.M. escaped from Rahimi's car and fled, Rahimi called her at work and "warned her that if she told anyone about what happened, he would shoot her."  ROA.217.  Rahimi's conduct led

to his being charged with terroristic threat of a household member and assault causing bodily injury (in addition to a firearm-discharge offense). ROA.217-218. Thus, he was not a "law-abiding, responsible citizen" whose firearm possession is protected by the Second Amendment.

*Bruen*'s endorsement of the "shall-issue" schemes that existed in 43 states provides further evidence that § 922(g)(8) does not infringe on Second Amendment rights. *Bruen*, 142 S. Ct. at 2138 & n.9; *id.* at 2162 (Kavanaugh, J., concurring). A number of those shall-issue schemes—including Texas's—specifically exclude from eligibility applicants who are subject to protective orders generally, *see* Tex. Gov't Code § 411.172(a)(12), or to protective orders prohibiting firearm possession, *see, e.g.*, Wis. Stat. Ann. §§ 175.60(3)(c), 941.29(1m), (g).

*Bruen* indicates that these regimes denying the right to carry to persons subject to protective orders are constitutional. The Court observed that "these shall-issue regimes, which often require applicants to undergo a background check . . . , are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). As Justice Kavanaugh explained in his concurrence (joined by the Chief Justice), the shall-issue regimes "are constitutionally permissible" even though they "may require a license

applicant to undergo fingerprinting, a background check, a mental health
records check, and training in firearms handling and in laws regarding the use
of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J.,
concurring); *see id.* ("Going forward, therefore, the 43 States that employ
objective shall-issue licensing regimes . . . may continue to do so."). *Bruen*
therefore indicates that the right to carry firearms does not extend to persons
subject to protective orders.

In sum, because the conduct that leads to a restraining order under
§ 922(g)(8) will ordinarily itself violate the law—and will always show lack of
responsibility—people subject to § 922(g)(8) are not "law-abiding, responsible
citizens" under *Heller* and *Bruen*.  Thus, Rahimi cannot succeed in his facial
challenge, which requires him to show that the statute is "unconstitutional in
all its applications." *Bucklew*, 139 S. Ct. at 1127.  This Court should uphold
the statute on that basis and need not consider whether the government can
show that the statute is consistent with historical tradition.

### D. In any event, § 922(g)(8) is consistent with the historical tradition of firearm regulation.

Even if everyone subject to § 922(g)(8) falls within the scope of the
Second Amendment right, the statute is constitutional because it is "consistent
with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct.
at 2126.  Specifically, § 922(g)(8) is analogous to two types of historical laws:

(1) those disarming dangerous persons and (2) surety laws that limited firearm

possession based on a credible threat of harm.

**1.    Section 922(g)(8) is analogous to historical laws that disarmed dangerous people.**

The right to keep and bear arms, as historically understood, did not

extend to those who posed a danger to the state or the community.  In

England, officers of the Crown could "seize all arms in the custody or

possession of any person" whom they "judge[d] dangerous to the Peace of the

Kingdom.'"  Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662).  And "the

act of 'going armed to terrify the King's subjects' was 'a great offence at the

common law,'" so long as it was committed with "evil intent or malice."

*Bruen*, 142 S. Ct. at 2141 (brackets and emphasis omitted) (quoting *Sir John

Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)).  Thus, "by the time of

American independence, England had established a well-practiced tradition of

disarming dangerous persons—violent persons and disaffected persons

perceived as threatening to the crown."  Joseph G.S. Greenlee, *The Historical

Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L.

Rev. 249, 261 (2020); *see id.* at 259-61 (detailing history).

Similarly in America, the colonies (and later the states) enacted statutes

that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among

the people."[2] *Bruen*, 142 S. Ct. at 2145. As *Bruen* observed, such statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Several colonies (or states) also passed statutes disarming classes of people deemed to be threats, including those unwilling to take an oath of allegiance (to the crown and later the states), slaves, and native Americans.[3] *See NRA*, 700 F.3d at 200; Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157-60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004); Joyce Lee Malcolm, To Keep and Bear Arms at 140-41 (1994). "In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d

---

[2] *See, e.g.*, Acts and Laws of His Majesty's Province of New Hampshire in New England 17 (1771) (statute enacted 1701); Collection of All Such Acts of the General Assembly of Virginia 33 (1794) (statute enacted 1786); 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807 p. 653 (1807) (statute enacted Jan. 29, 1795); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99-100 (1836) (statute enacted 1801).

[3] Exclusions based on race or religion would, of course, "be unconstitutional today." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting).

437, 458 (7th Cir. 2019) (Barrett, J., dissenting); *but see Folajtar v. Attorney General of the U.S.*, 980 F.3d 897, 909 (3d Cir. 2020) ("[D]angerousness was one reason to restrict firearm possession, but it hardly was the only one."), *cert. denied*, 141 S. Ct. 2511 (2021).

The Second Amendment was therefore adopted against a historical backdrop that allowed disarming dangerous persons.  In what *Heller* called a "highly influential" proposal, 554 U.S. at 604, a group of Pennsylvania antifederalists advocated for an amendment guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury."  *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts ratifying convention recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms."  *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (quoting 2 Schwarz, *The Bill of Rights* 675, 681). These "Second Amendment precursors proposed in the state conventions," *Heller*, 554 U.S. at 603, reflected the well-established common-law principle that dangerous people could be disarmed.

As the Eighth Circuit explained before *Bruen*, § 922(g)(8)'s prohibition on firearm possession by those found to represent "'a credible threat to the physical safety of an intimate partner or child'" is "consistent with a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens." *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (quoting 18 U.S.C. § 922(g)(8)(C)(i)). The statute "is focused on a threat presented by a specific category of presumptively dangerous individuals" and does not "apply in perpetuity, but only so long as a person is 'subject to' a qualifying court order." *Id.* Thus, the Eighth Circuit concluded, "the Second Amendment does not preclude this type of regulatory measure." *Id.*

An analysis under *Bruen* confirms that the Eighth Circuit was correct. *Bruen* explained that "two metrics" are "central" in asking whether a modern regulation is "relevantly similar" to an asserted historical analogue: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and (2) "whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2132-33. Here, both metrics demonstrate § 922(g)(8)'s constitutionality.

Under the first metric, the question is "how . . . the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. As explained above, in most (if not all) cases, § 922(g)(8) imposes *no* burden on

a "law-abiding citizen's right" because the conduct leading to the protective order ordinarily violates the law.  But even as to non-law-abiding individuals like Rahimi, § 922(g)(8) poses a limited burden, applying only as long as the person is "subject to" the protective order.  18 U.S.C. § 922(g)(8).  It is not a lifetime ban.  In this regard, it is similar to historical statutes requiring an oath of allegiance for those deemed a threat to the political order or temporarily disarming those who terrorized the community.

As to the second metric, "why the regulation[ ]" exists, the historical and statistical data indicate that the burdens imposed by § 922(g)(8) and by historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133.  Between 1980 and 2008, 41.5% of female homicide victims in the United States were killed by their intimate partners (defined as spouse, ex-spouse, or boyfriend/girlfriend).  Bureau of Justice Statistics, Homicide Trends in the United States, 1980-2008, 10 (November 2011) (Table 6), *available at* https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf (permalink: https://perma.cc/V4ES-QVM4).  "Domestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." *United States v. Castleman*, 572 U.S. 157, 160 (2014) (citation omitted).  In fact, studies have indicated that, where a gun is in the house, a woman is six times more likely to be killed than other abused women.

*Id.* (citing Campbell et al., Assessing Risk Factors for Intimate Partner Homicide, Nat'l Inst. Of Justice J., No. 250 at 16 (Nov. 2003)). Thus, there are strong reasons to disarm those who have been judicially determined to pose a threat to their intimate partners' safety. These justifications are just as strong as those supporting the historical prohibitions on firearm possession by those who posed a threat to the community or to specific individuals. Thus, under *Bruen*'s historical analogue test, § 922(g)(8) is constitutional.

### 2. Section 922(g)(8) is analogous to historical surety laws.

In addition to the laws discussed above, historical surety laws provide another analogue that demonstrates § 922(g)(8)'s constitutionality. At a basic level, surety laws imposed protections, sometimes including a restriction on firearm possession, where a person was reasonably likely to injure another or to breach the peace. *See Bruen*, 142 S. Ct. at 2148.

In England, a "surety of the peace followed an accusation by someone that an individual would likely violate the law in the future." *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), *vacated* 2022 WL 2347578 (U.S. June 30, 2022). As Blackstone explained, "wherever any private man hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him; . . . he may demand surety of the peace against such person." 4 William Blackstone, Commentaries on the

Laws of England 252 (1769).   The surety was "either a money payment or pledge by others 'in support of his future good conduct.'"   *Young*, 992 F.3d at 791 n.12 (quoting David Feldman, *The King's Peace, the Royal Prerogative, and Public Order: The Roots and Early Development of Binding Over Powers*, 47 Cambridge L.J. 101, 104 (1988)).   And if the person against whom the accusation was made did not "find such sureties, as the justice [of the peace] in his discretion s[hould] require, he [could] immediately be committed till he [did]." 4 Blackstone at 252.   The surety was "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion, that some crime [wa]s intended or likely to happen." *Id.* at 249.

This common-law surety practice carried over to the American colonies. For example, under a 1759 New Hampshire Act, a justice of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatning speeches."   Acts and Laws of His Majesty's Province of New Hampshire in New England 1 (1759).   And upon "confession" or "legal proof" of the offense, the justice could "commit the offender to prison, until he or she find such sureties for the peace and good behaviour, as is required" and could "cause the arms or weapons so used by the offender, to be taken away,

which shall be forfeited and sold for his Majesty's use." *Id.* at 1-2; *see* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52-53 (1869) (a similarly worded 1692 statute in the Massachusetts Bay Colony).

In 1829, before the passage of the surety statutes described below, William Rawle explained that "even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace" and that "[i]f he refused he would be liable to imprisonment." William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829). And various cases from shortly after the adoption of the Second Amendment confirm that the common-law surety practice continued in the United States. *See, e.g.*, *Respublica v. Donagan*, 2 Yeates 437, 437-38 (Pa. 1799) (surety could be demanded of defendants acquitted of murder); *State v. Kershaw*, 1 Del. Cas. 218, 219 (Del. Ct. of Quarter Sessions 1799) (surety could be obtained based on "apprehension of danger" without proof of threats).

"In the mid-19th century, many jurisdictions [in the United States] began adopting surety statutes that required certain individuals to post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148; *see Heller*, 554 U.S. at 605 (considering "how the Second Amendment was interpreted from

immediately after its ratification through the end of the 19th century" as a means of determining "the public understanding" of the Amendment (emphasis omitted)). Massachusetts was the first state to adopt such a statute in 1836. *Bruen*, 142 S. Ct. at 2148. Under the Massachusetts statute, if any person was armed and could not show a special need for self-defense, he could "on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace." Mass. Rev. Stat. ch. 134, § 16 (1836). "Between 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law." *Bruen*, 142 S. Ct. at 2148.

There are, to be sure, some differences between § 922(g)(8) and the English and early American surety laws. Most notably, the nineteenth-century laws "did not *prohibit* public carry" so long as the bearer "posted money that would be forfeited if he breached the peace or injured others" *Bruen*, 142 S. Ct. at 2148 (brackets and quotations omitted). But, like the laws discussed above, the surety laws subjected a person to possible disarmament and prison based on his presenting a credible threat of violence to a specific person. In that way, the surety laws are analogous to § 922(g)(8). Like the prohibition in § 922(g)(8), which lasts only while a person is "subject to" a restraining order, the surety laws' restrictions lasted only for a specified time. *See* 4 Blackstone

30

249-50.  And, in fact, § 922(g)(8) has more procedural safeguards than the surety laws.  A person could be required to provide a surety based on another's oath alone, 4 Blackstone 252, whereas § 922(g)(8) requires a *court* to find a "credible threat to the physical safety" of an intimate partner or child.

Additionally, *Bruen* emphasized that the historical test that it adopted "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  142 S. Ct. at 2133.  Although not identical to the surety laws, § 922(g)(8) is "analogous enough to pass constitutional muster."  *Id.*

### E.    Rahimi's contrary arguments are unavailing.

Rahimi makes several contrary arguments, all of which lack merit.

### 1.    Section 922(g)(8)'s recency

First, Rahimi argues that "American society has *long* recognized that domestic violence is a problem," yet did not enact § 922(g)(8) until 1994, "two centuries after ratification."  Supp. Br. 15-16.  Rahimi's argument misunderstands the *Bruen* analysis.

To be sure, *Bruen* said that, where a modern regulation addresses "a general societal problem that has persisted since the 18th century," "the lack of a distinctly similar historical regulation"—or the existence of a historical regulation that addressed the problem "through materially different means"—

could be "relevant evidence" that the statute is unconstitutional. *Bruen*, 142 S.

Ct. at 2131. But *Bruen* did not suggest that a statute is unconstitutional simply

because it involves a new way to address longstanding concerns. As *Bruen*

recognized, some modern statutes implicate "unprecedented societal

concerns," and some modern regulations "were unimaginable at the

founding." *Id.* at 2132. Yet those statutes are constitutional if supported by an

appropriate "historical analogue." *Id.* at 2133 (emphasis omitted). *Bruen* gave

the example of historical laws prohibiting the carrying of firearms in "sensitive

places" and said that "courts can use analogies to those historical regulations

. . . to determine that modern regulations prohibiting the carry of firearms in

*new* and analogous sensitive places are constitutionally permissible." *Id.* Thus,

*Bruen* does not suggest that a statute is unconstitutional just because it targets a

longstanding societal problem in a new way.

Moreover, although "American society has long recognized that

domestic violence is a problem," Supp. Br. 16 (emphasis omitted), Rahimi fails

to acknowledge the ways that problem may have changed in the last two

centuries. Although crime statistics from the founding era are hard to come

by, there is reason to doubt that domestic *homicide* was as prevalent at the

founding as it is in the modern era. Between 1980 and 2008, more than 16% of

homicides in the United States—and more than 41% of homicides where the

victim was female—were committed by the victim's spouse or intimate

partner, with more than half of those homicides involving a firearm. Bureau of

Justice Statistics, Homicide Trends in the United States, 1980-2008, 10, 16-17

(Tables 6, 8) (November 2011), *available at* https://bjs.ojp.gov/content/

pub/pdf/htus8008.pdf (permalink: https://perma.cc/V4ES-QVM4). Thus,

the problem that § 922(g)(8) seeks to address may not have existed to the same

degree in 1791, meaning that little can be drawn from legislatures' failure to

enact precisely analogous laws at the time.

Most importantly, Rahimi's argument fails because § 922(g)(8) is not as

novel as he assumes. The statute targets a specific group—those found to pose

a credible danger to an intimate partner—who fall within the broader class of

dangerous persons who have *always* been within the government's power to

regulate. *See Bruen*, 142 S. Ct. at 2150 ("Under the common law, individuals

could not carry deadly weapons in a manner likely to terrorize others.").

Section 922(g)(8) is not like the regulations in *Heller* and *Bruen*, which sought to

combat the "perceived societal problem" of "firearm violence in densely

populated communities" by prohibiting most or all law-abiding citizens from

keeping or carrying firearms. *Id.* at 2131.

## 2.    The recency of protective-order statutes

Rahimi also argues that § 922(g)(8) is constitutionally infirm because "[p]rotective orders are a modern approach to addressing domestic violence," pointing out that states did not begin adopting spousal protective-order statutes until the 1970s.  Supp. Br. 16.  "[B]ecause protective orders are new," he argues, there is no "historical evidence" for prohibiting firearm possession by those subject to a protective order.  *Id.* at 17.

The fact that this specific statutory means of preventing domestic violence is a relatively recent invention does not mean that § 922(g)(8) is unconstitutional.  In fact, the history shows that other protections—most notably the common-law surety process described above—were long available to protect victims of domestic violence in much the same way as modern protective orders.

Blackstone observed that a husband "was prohibited to use any violence to his wife."  1 William Blackstone, Commentaries on the Laws of England (1765).  Thus, Blackstone said, "a wife may now have security of the peace against her husband; or, in return, a husband against his wife."  *Id.* at 433.  In one case that Blackstone cited, the wife "made oath in Court, that she went in danger of her life by [her husband]," and the court "offered to bind him with sureties," despite multiple affidavits attesting to the husband's "good usage" of

34

his wife.  *King v. Lord Lee*, 83 Eng. Rep. 482 (K.B. ca. 1675).  In another, the husband swore out the peace against his wife.  *Sims's Case*, 93 Eng. Rep. 1131 (K.B. 1743-44).  Thus, centuries before states enacted protection-order statutes, the English common-law system allowed spouses to seek protection from abuse.  *See also Lord Leigh's Case*, 84 Eng. Rep. 807 (K.B. 1674) (the wife "upon affidavit of hard usage, and that she went in fear of her life, prayed security of the peace against [her husband], which was granted"); *Manby v. Scott*, 82 Eng. Rep. 1000, 1005 (Ex. 1659) (observing that a husband "cannot kill" his wife, "nor can he beat her, for the wife can seek the peace"), *as translated by* Henry Ansgar Kelly, *Rule of the Thumb and the Folklaw of the Husband's Stick*, 44 J. Legal Educ. 341, 354 (1994); *Sir Thomas Seymor's Case*, 72 Eng. Rep. 966 (K.B. ca. 1615) ("[A] wife can have the peace against her husband for unreasonable correction."), *as translated by* Kelly, 44 J. Legal Ed. at 355.

In America, "[b]oth Massachusetts Bay and Plymouth colonies had laws against spouse beating."  Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn. State L. Rev. 337, 344 (2015). For example, the Massachusetts Body of Liberties provided that "[e]verie marryed woeman shall be free from bodilie correction or stripes by her husband, unlesse it be in his owne defence upon her assalt."  Massachusetts Body of Liberties § 80 (1641).  Although other colonies did not protect spouses

by statute, America's first family law treatise observed that a husband or wife's "violation of each other's rights, by an unjustifiable violence, is a breach of the laws of society, for which they are liable *criminaliter*."  Tapping Reeve, The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery 65 (New Haven, Oliver Steele 1816).  And, the treatise explained, a husband or wife "may institute a process against each other, the object of which is to compel them to find securities for their good behaviour."  *Id.* at 65-66; *see also State v. Davis*, 5 S.C.L. (3 Brev.) 3, 4 (S.C. Const. Ct. App. 1811) ("It is clear that a wife may demand sureties of the peace against her husband, and so may her husband against her.").  Thus, although statutory protective-order schemes are a more recent invention, there were historical analogues that allowed spouses to seek protection from domestic violence.  Basing § 922(g)(8)'s prohibition on protective orders is not unconstitutional.

### 3.    The asserted malleability of the "dangerous" label

Rahimi also argues that § 922(g)(8) cannot be justified by "malleable and amorphous labels like . . . 'dangerous' that the Framers decided not to include in the Second Amendment."  Supp. Br. 18 (boldface omitted).  He argues that "[t]hese broad concepts are *descriptions* of some of the people who were

historically disarmed, and they provide *no meaningful check* on a legislature's ability to disarm citizens." *Id.* He is incorrect.

The Supreme Court has made clear that "the right secured by the Second Amendment is not unlimited," *Heller*, 554 U.S. at 626, and has recognized limits on the right that are not specifically "include[d] in the Second Amendment," Supp. Br. 18, 21 (boldface omitted). For example, *Heller* said that the Second Amendment allows a "variety" of regulations, 554 U.S. at 636, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places," and "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-27.

Moreover, contrary to Rahimi's claim that courts must read the Second Amendment "stripped of any modifiers such as peaceable, responsible, virtuous, or non-dangerous" Supp. Br. 20, the Supreme Court has used some of those very modifiers when describing the historical scope of the right. *See Heller*, 554 U.S. at 627 ("'dangerous and unusual weapons'") (quotations omitted), *id.* at 635 ("law-abiding, responsible citizens"); *Bruen*, 142 S. Ct. at 2145 ("right of the general population to peaceable public carry"), *id.* at 2152 ("right of the public to peaceably carry handguns for self-defense"), *id.* at 2156 ("law-abiding, responsible citizens"); *see also Kanter*, 919 F.3d at 464 (Barrett,

J., dissenting) (concluding that history "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous").

This is not to say that *Bruen* allows a legislature to disarm anyone it labels "irresponsible" or "dangerous." *Bruen* still requires looking at whether (a) "the Second Amendment's plain text covers an individual's conduct" and (b) the regulation "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. But when conducting this historical analysis, courts can consider whether the modern regulation is analogous to historical regulations that disarmed dangerous or non-law-abiding citizens. *See id.* at 2133. In fact, the metrics that the Court identified as part of the historical-analogue test—"how and why the regulations burden a law-abiding citizen's right to armed self-defense," *id.*—necessarily involve asking whether a modern regulation targets persons who share certain characteristics with those who historically could be disarmed.

### 4.    The prohibition's scope and duration

Finally, Rahimi contends that § 922(g)(8) is unconstitutional because it "always prohibits a person from possessing a firearm" in the person's home, "even when living alone," and "does so without even requiring a criminal conviction or a showing that the defendant used a firearm in domestic

violence." Supp. Br. 20.  And he suggests that § 922(g)(8) is problematic

because protective orders can last for years.  Supp. Br. 13, 20-21 (citing 50-year

protective order in *United States v. Reese*, 627 F.3d 792, 798 (10th Cir. 2010)).

First, the fact that § 922(g)(8)'s prohibition is not based on a criminal

conviction is of no moment.  As already explained, there is ample historical

evidence of disarming dangerous persons, including those who had not been

convicted of any offense.  *See* 4 Blackstone 249 (surety of the peace can be

required "without any crime actually committed by the party"); *Kanter*, 919

F.3d at 454 (Barrett, J., dissenting) (observing that the "historical evidence"

supported the view that "the legislature may disarm those who have

demonstrated a proclivity for violence or whose possession of guns would

otherwise threaten the public safety," including "dangerous people who have

not been convicted of felonies").  Moreover, the government can deprive

dangerous persons of their liberty for a variety of reasons, including when they

are only charged with (but not yet convicted of) crimes.  *Salerno*, 481 U.S. at

748-49.  Because section 922(g)(8) applies to those who have been judicially

determined to pose a credible threat of danger to another person, see *Emerson*,

270 F.3d at 262, it is constitutional even though it does not require a

conviction.

Second, the fact that § 922(g)(8) applies even to those who have not "used a firearm in domestic violence" does not make it constitutionally infirm. Supp. Br. 20. Nothing in our nation's history of firearm regulation suggests that a person must actually *commit* gun violence before being disarmed; a credible threat of such violence is enough.

Third, the fact that § 922(g)(8) applies to at-home possession by persons who live alone does not make it overly broad. The point of the statute is to prevent those who have threatened an intimate partner from having ready access to firearms, which can easily be used to harm people who do not live in the same house. And although this restriction applies in the home, it is consistent with the historical tradition of disarming those who posed a danger to others.

Finally, the fact that protective orders can last for years does not make § 922(g)(8) unconstitutional. In most states, protective orders are presumptively limited to a specified period, ranging from around six months to five years. *See* American Bar Association, Domestic Violence Civil Protective Orders (2014), *available at* https://www.americanbar.org/content/dam/aba/administrative/domestic_violence1/Resources/statutorysummarycharts/2014%20CPO%20Availability%20Chart.authcheckdam.pdf (permalink: https://perma.cc/LFU2-PBJJ); *see, e.g.*, Tex. Fam. Code §§ 85.001(d),

85.025(a), (a-1).  And protective orders are not, like the "law of the Medes and the Persians," unalterable.  *Thompson v. Dallas City Attorney's Office*, 913 F.3d 464, 466 (5th Cir. 2019) (quotations omitted).  A person subject to an order can seek to have it dissolved.  *See, e.g.*, Tex. Fam. Code § 85.025(b).  As the Supreme Court has observed in the felon-in-possession context, a prohibited person "may challenge the validity of a prior conviction, or otherwise remove his disability, before obtaining a firearm."  *Lewis v. United States*, 445 U.S. 55, 67 (1980).  The possibility of protective orders outliving the threats on which they were based provides no basis to strike down § 922(g)(8) on its face.

# CONCLUSION

This Court should affirm the judgment of the district court.[4]

Respectfully submitted,

CHAD E. MEACHAM
United States Attorney

LEIGHA A. SIMONTON
Assistant United States Attorney
Northern District of Texas

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

s/William A. Glaser
WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Ste. 1264
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

---

[4] Rahimi's sentence should be affirmed for the reasons stated in government's response brief and the withdrawn panel opinion.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7)(B) because this brief contains 9,191 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in Calisto MT 14-point type.

s/William A. Glaser<br>
WILLIAM A. GLASER

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/William A. Glaser<br>
WILLIAM A. GLASER