No. 21-11001

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ZACKEY RAHIMI

*Defendant-Appellant.*

*On Direct Appeal from the United States District
Court for the Northern District of Texas
Fort Worth Division*

**APPELLANT'S SUPPLEMENTAL REPLY BRIEF**
*Criminal Appeal*

**Jason Hawkins**
*Federal Public Defender*
Northern District of Texas

**Kevin Joel Page**
*Appellate Chief*

**J. Matthew Wright**
*Assistant Federal Public Defender*
Northern District of Texas
500 South Taylor Street
Suite 110
Amarillo, Texas 79101
(806) 324-2370
Texas Bar No. 24058188
Matthew_Wright@fd.org

*Counsel for Mr. Rahimi*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

SUPPLEMENTAL REPLY BRIEF ......................................................1

I.   The parties agree that *Bruen* overruled the governing Fifth Circuit
     decisions. ....................................................................................1

II.  The plain text of the Second Amendment covers the conduct
     prohibited by § 922(g)(8). ..........................................................2

     A.   The text of the Second Amendment extends its protections to all
          members of the American political community. ...........................3

     B.   The Government's proposed limitation on the Second
          Amendment's scope finds no support in constitutional text.........4

     C.   During the ratification debates, there were multiple proposals to
          protect the firearm rights of some, but not all, American citizens.
          The Founders rejected those proposals in favor of an unqualified
          right belonging to all of "the people." ..........................................6

III. The Government hasn't pointed to anything even remotely
     comparable to § 922(g)(8)............................................................12

     A.   Domestic violence has been a widely acknowledged social
          problem since before the founding; conditions have not changed
          enough to alter the constitutional calculus...................................13

     B.   Antebellum surety laws are too late in time and not nearly as
          onerous as § 922(g)(8). ................................................................15

     C.   There is no tradition of disarming members of the American
          political community just because they were deemed "dangerous." ............16

     D.   There is a historical tradition *protecting* the firearms rights of
          unvirtuous, irresponsible law-breakers. .......................................18

# TABLE OF AUTHORITIES

## Cases

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .................................................................................*passim*

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting) ....................................4, 18

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms
    & Explosives*,
    700 F.3d 185 (5th Cir. 2012) .................................................................1

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ...............................................................*passim*

*United States v. Emerson*,
    270 F.3d 203 (5th Cir. 2001). ..................................................................1

*United States v. McGinnis*,
    956 F.3d 747 (5th Cir. 2020) .....................................................................1

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) (en banc) ..................................................9, 10, 12

*United States v. Verdugo–Urquidez*,
    494 U.S. 259 (1990) .....................................................................................3

## Constitutional Provisions

Bill of Rights ...................................................................................6, 7, 8, 10

First Amendment ...............................................................................................3

Second Amendment ................................................................................*passim*

Fourth Amendment .........................................................................................3

Ninth Amendment ...........................................................................................3

Tenth Amendment ...........................................................................................3

Fourteenth Amendment ..........................................................................14, 15

**Statutes**

18 U.S.C. § 922(g)(8).........................................................................*passim*

**Other Authorities**

William Blackstone, *Commentaries* (St. George Tucker ed. 1803) .....................7, 8

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004)................18

England's Declaration of Rights, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 ......................................................................6, 7, 11, 17

*Documentary History of the First Federal Congress of the United States of America* (Bickford et al. eds. 1992) ....................................................11

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 283–84 (2020) .........................................................................................19

James Madison, Notes for a Speech in Congress, June 8, 1979, 12 The Papers of James Madison 193 (Charls F. Hobson, et al. eds. 1979) ...................7

Joyce Malcolm, *To Keep and Bear Arms* (1994) ....................................................7

City of New York, *Factsheet: 2020 Shootings & Murders* https://criminaljustice.cityofnewyork.us/wp-content/uploads/2021/01/2020-Shootings-and-Murder-factsheet_January-2021.pdf ...............................................................14

New York City Department of City Planning Population, *Total and Foreign-born Population: New York City 1790-2000* https://www1.nyc.gov/assets/planning/download/pdf/data-maps/nyc-population/historical-population/1790-2000_nyc_total_foreign_birth.pdf (...................................................14

Stephen Halbrook, *The Founders' Second Amendment* (2d ed. 2019)............*passim*

## SUPPLEMENTAL REPLY BRIEF

There is good news and bad news. The good news is that the parties agree about several important points: that the constitutionality of § 922(g)(8) is an open question for the panel in light of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); that the Court should first decide whether "the Second Amendment's plain text covers an individual's conduct"; that an affirmative answer to the first question makes § 922(g)(8) presumptively unconstitutional; and that the Government could only overcome that presumption by demonstrating that § 922(g)(8) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30. The bad news is that we disagree about the first question and the historical evidence.

## I.    The parties agree that *Bruen* overruled the governing Fifth Circuit decisions.

The parties agree that the constitutionality of 18 U.S.C. § 922(g)(8) is an open question for the panel because *Bruen* unequivocally overruled this Court's prior decisions in *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012), and *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001). (U.S. Supp. Br. 10–13). After *Bruen*, the Court's job begins and ends with "the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127.

The parties also agree about the order of operations. The Court should first decide whether "the Second Amendment's plain text covers an individual's conduct." (U.S. Br. 15) (quoting *Bruen*, 142 S. Ct. at 2129). If so, "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129. Then, if the "conduct is protected, 'the government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." (U.S. Br. at 15) (quoting *Bruen*, 142 S. Ct. at 2130).

## II. The plain text of the Second Amendment covers the conduct prohibited by § 922(g)(8).

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. The parties disagree about whether the presumption of unconstitutionality applies here. (*Compare* Rahimi Supp. Br. 13–14 *with* U.S. Supp. Br. 17–21). But there is still substantial agreement.

There is no dispute that § 922(g)(8) is a complete ban on "keep[ing] and bear[ing]" firearms. The statute prohibits the mere possession of firearms, even at the defendant's own home. *See* 18 U.S.C. § 922(g)(8) ("It shall be unlawful for any person . . . (8)who is subject to [a domestic violence protective order] . . . to . . . possess in or affecting commerce, any firearm or ammunition."). "Nor does any party dispute that" the § 922(g)(8) ban applies to "weapons 'in common use' today

2

for self-defense," like rifles and handguns. *Bruen*, 142 S. Ct. at 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).

The only dispute about coverage is over *who* has a right to keep and bear arms. The text of the Second Amendment provides the answer:

> A well regulated Militia, being necessary to the security of a free State, the right of *the people* to keep and bear Arms, shall not be infringed.

U.S. Const., amend. II (emphasis added). When the Constitution uses "the people," it means citizens and members of the political community. *Heller*, 554 U.S. at 580–81. The Government suggests that this plain-text reading is wrong, and the right to bear arms belongs only to "*law-abiding*, *responsible* citizens." (U.S. Supp. Br. 14) (emphasis added) (quoting *Heller*, 554 U.S. at 635). The Government is wrong.

## A. The text of the Second Amendment extends its protections to all members of the American political community.

The Second Amendment, along with the First, Second, Fourth, Ninth, and Tenth Amendments, refers to "the people." Within the Constitution, "the people" is a "term of art"—wherever it occurs, "the term unambiguously refers to all members of the political community, *not an unspecified subset*." *Heller*, 554 U.S. at 580–81 (emphasis added); accord *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990) (The term "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be

3

considered part of that community."). The Second Amendment right—no less than the others mentioned above—"belongs to all Americans." *Heller*, 554 U.S. at 581. The Government offers no textual argument to the contrary—or at least no argument based on the text of the Amendment that "the people" of the United States actually ratified through their elected representatives and delegates.

### B. The Government's proposed limitation on the Second Amendment's scope finds no support in constitutional text.

To hear the Government tell it, the Second Amendment right *does not* belong to all members of the American political community. Instead, the Government argues, the Second Amendment only protects "*law-abiding, responsible* citizens." (U.S. Supp. Br. 14) (emphasis added) (quoting *Heller*, 554 U.S. at 635). Nothing in the text of the Second Amendment supports that view.[1]

*Heller* stated that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of

---

[1] As then-Judge Barrett persuasively explained, it is "analytically awkward" "to say that certain people fall outside the Amendment's scope," especially when they are Citizens who were *formerly* covered by the Amendment. *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting). This is true for concrete categories of people (e.g., convicted misdemeanants), and it is *especially* true for abstract categories of people like "responsible" and "law-abiding" citizens. This brief addresses those labels under coverage, rather than historical tradition, because that is the way the Government argued. To the extent that these abstract categories should be analyzed under history and tradition, § 922(g)(8) would still fail constitutional scrutiny for all the reasons described in Section III. The Government has not pointed to a single historical antecedent for a law completely disarming "irresponsible" citizens or those who maintained their position within the political community but failed to abide by a law other than a capital crime. In fact, the historical record shows that these categories of people *maintained* their right to arms.

4

hearth and home." 554 U.S. at 635. And *Bruen* repeatedly noted that the respondents, who were challenging New York's restrictions on carrying handguns in public, were "law-abiding citizens." 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. But both *Bruen* and *Heller* stressed that the *text* of the Second Amendment controls the outcome of these questions, not "judges' assessments" about the utility of protecting the right for any particular person. *Bruen*, 142 S. Ct. at 2129; *Heller*, 554 U.S. at 634.

Besides that, *Bruen* was very explicit that the presumption of unconstitutionality is triggered "*[w]hen the plain text of the Second Amendment covers an individual's conduct.*" 142 S. Ct. at 2129–30 (emphasis added). The Government's proposed limiting language is not found in the text of the Amendment. If there is any tension between the Supreme Court's shorthand description of what the Second Amendment protects and the actual text of the amendment, obviously the text prevails. *Compare Heller*, 554 U.S. at 635 (The Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*.") (emphasis added), *with Bruen*, 142 S. Ct. at 2134 ("Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms.").

**C. During the ratification debates, there were multiple proposals to protect the firearm rights of some, but not all, American citizens. The Founders rejected those proposals in favor of an unqualified right belonging to all of "the people."**

The Government's attempt to limit the Second Amendment to people it deems "law abiding" or "responsible" has no textual support. But even if the text were ambiguous, the recorded debates over the necessity—and then the content—of what became the Second Amendment should remove any doubt about its scope.

If the founding generation had intended to protect a right to bear arms for only *some* of the citizens, or to make that right subject to Congressional judgment about who should, and who should not, be trusted with firearms, they could have saved themselves a lot of trouble. They already had a ready-made template in England's 1689 Declaration of Rights:

> That the Subjects *which are Protestants*, may have Arms for their Defence *suitable to their Conditions*, and *as allowed by Law*.

*Heller*, 554 U.S. at 593 (emphases added) (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). That provision "has long been understood to be the predecessor to our Second Amendment." *Id.* Even 100 years after its adoption, this provision was so well known to James Madison that he mentioned its shortcomings "[i]n his notes for a speech introducing what became the Bill of Rights." Stephen Halbrook, *The Founders' Second Amendment* 251 (2d ed. 2019) (quoting Notes for a Speech in Congress, June 8, 1979, 12 *The Papers of James Madison* 193 (Charls F. Hobson, et

al. eds. 1979)). The "fallacies" of the declaration included the fact that it was only an Act of Parliament (and thus could be overcome when Parliament wanted) and it only protected the rights of *some* of the citizens—protestants. *Id.*

The "American drafters" of the Bill of Rights "adopted some English rights verbatim," but "the language of the two pronouncements on arms differs markedly and importantly." Joyce Malcolm, *To Keep and Bear Arms* 136 (1994). "The American language is much broader" than its British predecessor, in part because it "claims for 'the people'—presumably regardless of their religion, state, or condition—a right to keep and carry weapons that the government, or at least the federal government, must not breach, unless one restricts the entire right to members of a well-regulated militia." *Id.* at 137.

The founding generation understood that the English Declaration gave the government *too much* power to disarm its subjects, under the pretense of combatting lawbreaking. St. George Tucker—attorney, judge, law professor, and former patriot militia officer—edited "the most important early American edition of Blackstone's Commentaries." *Heller*, 554 U.S. at 594; *see* Halbrook, *supra*, at 310. In his own notes, Tucker contrasted the expansive Second Amendment, which applied to all citizens "without any qualification as to their condition or degree," with the narrower English guarantee. Halbrook, *supra*, at 310 (quoting 1 William Blackstone, *Commentaries* 143 n.40 (St. George Tucker ed. 1803)). The English government

could seize people's guns to enforce (or on the pretense of enforcing) hunting laws. Holbrook, *supra*, at 311 (quoting page 300 of Tucker's Appendix to the Blackstone *Commentaries*). The American Bill of Rights, by contrast, did not "permit *any* prohibition of arms to the people." Holbrook, *supra*, at 312 (quoting 1 Blackstone, *supra*, at 315–16).

There were also proposals *in America* to protect some, but not all, citizens' rights to own guns. At the Pennsylvania convention to consider ratification of the unamended Constitution, 46 delegates voted to ratify it and 23 delegates voted not to ratify without a separate bill of rights. Halbrook, *supra*, at 194. Those who lost the vote published a "dissent," and that dissent included a demand for a separate bill of rights. *Id.* One of those proposed amendments would have protected the people's right to own and carry firearms, but that right could be lost "for crimes committed" or "danger of public injury":

> 7. That the people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, *unless for crimes committed, or real danger of public injury from individuals*; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers.

8

Halbrook, *supra*, at 194 (emphasis added) (internal citation omitted); *see* U.S. Supp. Br. 24 (citing the majority's discussion of this same proposal in *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc)).

In the Massachusetts ratification convention, Samuel Adams proposed a slightly different formulation of the right: "peaceable" citizens could never be disarmed:

> And that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms . . . ."

Halbrook, *supra*, at 205 (emphasis added) (internal citation omitted); (U.S. Br. 24) (discussing this proposal). Adams's proposal—like the Pennsylvania Dissenters' earlier suggestion—failed to secure majority support even within the single convention in which it was proposed. *Id.* at 205–06.

Several other state conventions *did* vote in favor of individual-rights amendments, including amendments protecting the right to weapons of self-defense. But they all suggested amendments *without* Pennsylvania's and Massachusetts's limiting language:

- New Hampshire: "Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*." Halbrook, *supra*, at 213 (emphasis added);

- Virginia: "That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained

to arms, is the proper, natural, and safe defence of a free state . . . ."
Halbrook, *supra*, at 230;

- New York: "That the people have a right to keep and bear arms; that a well regulated militia, including the body of the people capable of bearing arms, is the proper, natural, and safe defence of a free state." Halbrook, *supra*, at 239 & n.26; and

- North Carolina: That the people have a right to keep and bear arms; that a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state . . . . Halbrook, *supra*, at 246 & n.74.

The most important thing to know about the "limiting language" proposed in Pennsylvania, Massachusetts, and New Hampshire, is that it "did not find its way into the Second Amendment." *Skoien*, 614 F.3d at 648 (Sykes, J., dissenting).

After these proposals, Congress got to work on the Bill of Rights. No version of the Second Amendment introduced in Congress included the limiting language proposed in Pennsylvania, Massachusetts, or New Hampshire. There was no suggestion that the right should be limited to "peaceable," "law-abiding," or "responsible" citizens.

In fact, there is contemporaneous evidence that such a proposal would have been rejected. As *Heller* recognized, 554 U.S. at 589, James Madison's "original draft of the Second Amendment" included a "conscientious-objector clause":

The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: *but no person religiously scrupulous*

10

> *of bearing arms shall be compelled to render military service in person.*

Halbrook, *supra*, at 252 (emphasis added); *see also Heller*, 554 U.S. at 589 (quoting this same draft). Massachusetts Representative Elbridge Gerry vigorously objected to the freedom-of-conscience provision *because* it might give the Government too much power to decide who could be disarmed:

> This declaration of rights, I take it, is intended to secure the people against the mal-administration of the government; if we could suppose that, in all cases, the rights of the people would be attended to, the occasion for guards of this kind would be removed. Now, I am apprehensive, sir, that this clause would give an opportunity to the people in power to destroy the constitution itself. *They can declare who are those religiously scrupulous, and prevent them from bearing arms.*

Halbrook, *supra*, at 266 (emphasis added) (quoting 11 *Documentary History of the First Federal Congress of the United States of America* 1286 (Bickford et al. eds. 1992)). The Senate later deleted the conscientious objector clause, and both houses adopted the final version of the amendment that was ratified by the states. Halbrook, *supra*, at 274, 278.

This history shows that the Founders knew how to adopt a more limited right (if they had wanted), and even had access to language *proposing* more limited guarantees. They could have followed the English Declaration and guaranteed a right to bear arms "as allowed by Law," which would give Congress the same power that the British Parliament had to decide who should and should not be trusted with guns.

11

They could have taken Samuel Adams's suggestion and protected only "*peaceable*" citizens' right to keep guns. They even could have provided for a revocable right that could be completely lost upon conviction of a crime, presentation of danger, or participation in rebellion, as the Pennsylvania Dissenters or New Hampshire majority suggested.

None of those proposals made the final cut. *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting). The text ultimately adopted and ratified "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. The "plain text of the Second Amendment" offers protection to all of the "people," not just those deemed "law-abiding" or "responsible" by the Government. Section 922(g)(8) is presumed unconstitutional.

## III. The Government hasn't pointed to anything even remotely comparable to § 922(g)(8).

Because the conduct prohibited by § 922(g)(8) is covered by the plain text of the Second Amendment, the Government bears a heavy burden in this appeal. It "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. That burden is even heavier because § 922(g)(8) "addresses a general societal problem that has persisted since the 18th century," and yet no one attempted

to disarm domestic abusers as a class during the first two centuries of our nation's existence. *Id.* at 2131.

The founding generation utilized a variety of tools to address intimate partner violence, but none of them even resembled the complete disarmament contemplated by § 922(g)(8). The Government has instead identified several *dissimilar* regulations that say nothing about intimate partner violence and do not involve total deprivations of the right to keep firearms at home for self-defense. The Government has utterly failed to carry its burden, so this Court's task is "fairly straightforward": it should strike down § 922(g)(8) as facially unconstitutional. *Bruen*, 142 S. Ct. at 2131.

## A. Domestic violence has been a widely acknowledged social problem since before the founding; conditions have not changed enough to alter the constitutional calculus.

This Court's task is "straightforward" because § 922(g)(8) addresses a "general social problem that has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131. "[E]arlier generations" addressed the problem of domestic abuse "through materially different means." *Id.* The Government does not dispute any of that. This is "evidence" that § 922(g)(8)—a "modern regulation"—"is unconstitutional." *Id.*

Resisting this, the Government suggests that "that problem may have changed in the last two centuries." (U.S. Supp. Br. 32). Perhaps domestic "homicide" happens more often now than it did then. The Government can't say with certainty, because

"crime statistics from the founding era are hard to come by." (U.S. Supp. Br. 32). But maybe things are worse now.

That's not enough to carry the Government's burden. *Heller* and *Bruen* considered a comparable social problem: firearm violence in densely populated communities. *Bruen*, 142 S. Ct. at 2131. But New York City is *undoubtedly* more densely populated today than it was at the time of ratification of the Second and Fourteenth Amendments. New York City had a total population of 33,131 in 1790, and of 942,292 in 1870. New York City Department of City Planning Population, *Total and Foreign-born Population: New York City 1790-2000*.[2] Today, the population is "roughly 8.5 million people," packed into "303 square miles." *Bruen*, 142 S. Ct. at 2168 (Breyer, J., dissenting). And there is just as much evidence that shootings and murders are worse in the 21st century than they were at ratification. *See*, e.g., City of New York, *Factsheet: 2020 Shootings & Murders*.[3]

Despite the fact that "the island of Manhattan" is more "densely populated" today than it was at the Founding, and it presumably experiences a comparably higher rate of gun violence, *Bruen* struck down the licensing scheme. The same is true of *Heller*: the Court struck down "a flat ban on the possession of handguns in

---

[2] https://www1.nyc.gov/assets/planning/download/pdf/data-maps/nyc-population/historical-population/1790-2000_nyc_total_foreign_birth.pdf (accessed Aug. 17, 2020).

[3] https://criminaljustice.cityofnewyork.us/wp-content/uploads/2021/01/2020-Shootings-and-Murder-factsheet_January-2021.pdf

the home" "that the Founders themselves could have adopted to confront that problem." *Id.* Just so with domestic violence. The Founders *could have* adopted a complete ban on firearms to combat intimate-partner violence. They didn't.

### B. Antebellum surety laws are too late in time and not nearly as onerous as § 922(g)(8).

The Government must "identify a well-established and representative historical *analogue*." *Bruen*, 142 S. Ct. at 2133. As in *Bruen*, the Government here suggests that historical "surety laws" will do the necessary work. (U.S. Supp. Br. 27–31). Surety laws that burdened a right to carry firearms proliferated in "the mid-19th century." *Bruen*, 142 S. Ct. at 2148. That time period might be relevant to the original public meaning of the Fourteenth Amendment, at issue in *Bruen*, but is a long time after ratification of the Second Amendment in 1791, which is the time frame that matters here. *Id.* at 2137–38.

To whatever extent they are relevant to the Second Amendment, the surety laws were *even more* similar to the New York public-carry regulation at issue in *Bruen*, and they could not save that regulation. A comparison of § 922(g)(8) with the surety laws shows how dissimilar they are:

15

| § 922(g)(8) | Surety Laws |
|---|---|
| A ban. | Not a ban; only required a bond. *Bruen*, 142 S. Ct. at 2148. |
| Bans public carry and private possession, even at home. | Only affected carrying in public. *Id.* Person could still possess at home. |
| No exception. | Could avoid the bond if defendant could show a "special need for self-defense." |
| Can persist for years. | Cannot "exceed[ ] six months." *Id.* |
| Nationwide statute, regularly enforced. | Possibly never enforced. *Id.* |

## C. There is no tradition of disarming members of the American political community just because they were deemed "dangerous."

Without any other *specific* historical regulation to serve as an analog, the Government also relies on an alleged tradition permitting total bans on firearm possession by people the Government deems "dangerous." (U.S. Supp. Br. 22–27). As an initial matter, it is not at all clear that this is an appropriate level of generalization for *Bruen*'s purposes. One could just as easily say that there is a tradition of disarming people that the Governing authorities wanted to disarm. That "tradition" is the very practice the Second Amendment intended to curtail.

As it did in *Bruen*, the Government points to criminal laws that prohibit affray, riot, and other menacing *use of* a firearm. (U.S. Supp. Br. at 22–23). But notice the shift—these are not laws that disarm *anyone*. They punish the wrongful *use* of weapons in public. *See Bruen*, 142 S. Ct. at 2142. As with the surety laws, these are at least *marginally* similar to the New York proper-cause regulation because they

regulated someone who was carrying a gun in public. And as with the surety laws, these were not sufficiently similar to save the New York law: "Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people." *Id.* at 2143. No one here disputes the Government's authority to criminalize dangerous *conduct* with a gun. Our fight is about the Government's authority to forbid (some) American citizens who remain members of the political community from possessing the means of self-defense, even within their own homes.

Finally, the Government points to the country's detestable history of discriminatory laws disarming "slaves," freedmen, "native Americans," British loyalists, and even (under the English Declaration) Catholics. (U.S. Supp. Br. 23 & authorities cited). But these laws are not good enough to carry the Government's burden for two reasons. First, the targeted groups were not considered part of "the people"—they did not have the citizen's privilege of full participation in the civic life of America. Second, these groups were not targeted to avoid *private* violence. To the extent these groups presented any danger at all, it was a danger of *public* violence to the established political order.

Both points are illustrated by Massachusetts's temporary disarmament of people who participated in Shay's rebellion of 1786:

17

> Those who had taken up arms against the state were, with some exceptions, able to seek a pardon from the governor. To obtain the pardon, however, a person needed to take an oath of allegiance to the state and deliver his arms to the state for a period of three years. In addition, during the same time period, the person would be unable to serve as a juror, hold government office, or vote "for any officer, civil or military."

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 507–08 (2004).

That's why these laws are not like § 922(g)(8). While many scholars and some judges classify them as disarming "dangerous" people,[4] they did not disarm individuals who were entitled to the full benefit of citizenship. And they did not disarm individuals to avoid private violence. The founding generation understood the threat of private violence, including specifically private violence against intimate partners. It never chose to address either of those threats with a complete ban on possessing firearms like § 922(g)(8).

## D. There is a historical tradition *protecting* the firearms rights of unvirtuous, irresponsible law-breakers.

*Bruen* places the burden squarely on the Government's shoulders, and the Government has not carried that burden. That is enough. But there is more.

---

[4] Many judges and scholars of the Second Amendment agree with the Government that these laws could be classified as disarming "dangerous" individuals. E.g., *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting). Many use that label to distinguish those historical laws from modern laws banning gun possession by people convicted of nonviolent crimes. That is a dispute for another day. For now, it is enough that the *specific* laws identified the Government are not similar enough to § 922(g)(8) to carry the Government's burden under *Bruen*.

The Government has *not* cited historical examples supporting its view that a citizen loses any right to possess a firearm as soon as he does something the legislature deems irresponsible, unvirtuous, or law-breaking. But it has cited an article that affirmatively disproves that assertion. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 283–84 (2020). The laws of Massachusetts, Virginia, Maryland, and even the Federal Government described therein are much closer to the ratification of the Second Amendment in 1791 than the examples the Government cited here. And those laws all recognize the necessity of owning firearms, even for those "who were convicted of stealing tax money, imprisoned, and had nearly all their belongings confiscated." *Id.*

## CONCLUSION

This Court should hold that 18 U.S.C. § 922(g)(8) is unconstitutional on its face and vacate Mr. Rahimi's conviction and sentence.

Respectfully submitted,

Jason D. Hawkins
Federal Public Defender
Northern District of Texas

Kevin Joel Page
Appellate Supervisor

*/s/ J. Matthew Wright*
Assistant Federal Public Defender
Northern District of Texas
500 South Taylor Street
Suite 110
Amarillo, Texas 79101
(806) 324-2370
Texas Bar No. 24058188
Matthew_Wright@fd.org
*Counsel for Mr. Rahimi*

## CERTIFICATE OF SERVICE

On August 18, 2022, I filed this corrected brief through the Court's ECF system as an exhibit to the Motion for leave. Opposing Counsel has therefore been served.

*/s/ J. Matthew Wright*

# CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.3, the undersigned certifies this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

1.    Exclusive of the exempted portions, this brief contains 4,583 words.

2.    This brief has been prepared in proportionately spaced typeface using Microsoft Word in Times New Roman typeface and 14 point font size.

3.    The undersigned understands that any material misrepresentations in this certificate may result in striking the brief and sanctions.

/s/ *J. Matthew Wright*