# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 2, 2023

Lyle W. Cayce
Clerk

No. 21-11001

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

ZACKEY RAHIMI,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CR-83-1

Before JONES, HO, and WILSON, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

Our prior panel opinion, *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023), is WITHDRAWN and the following opinion is SUBSTITUTED therefor:

The question presented in this case is *not* whether prohibiting the possession of firearms by someone subject to a domestic violence restraining order is a laudable policy goal. The question is whether 18 U.S.C. § 922(g)(8), a specific statute that does so, is constitutional under the Second

No. 21-11001

Amendment of the United States Constitution. In the light of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), it is not.

Zackey Rahimi levies a facial challenge to § 922(g)(8). The district court and a prior panel upheld the statute, applying this court's pre-*Bruen* precedent. *See United States v. Rahimi*, No. 21-11001, 2022 WL 2070392 at *1 n.1 (5th Cir. June 8, 2022). Rahimi filed a petition for rehearing en banc; while that petition was pending, the Supreme Court decided *Bruen*. The prior panel withdrew its opinion and requested supplemental briefing on the impact of that case on this one. Considering the issue afresh, we conclude that *Bruen* requires us to re-evaluate our Second Amendment jurisprudence and that under *Bruen*, § 922(g)(8) fails to pass constitutional muster. We therefore reverse the district court's ruling to the contrary and vacate Rahimi's conviction.

## I.

Between December 2020 and January 2021, Rahimi was involved in five shootings in and around Arlington, Texas.[1] On December 1, after selling narcotics to an individual, he fired multiple shots into that individual's residence. The following day, Rahimi was involved in a car accident. He exited his vehicle, shot at the other driver, and fled the scene. He returned to the scene in a different vehicle and shot at the other driver's car. On December 22, Rahimi shot at a constable's vehicle. On January 7, Rahimi fired multiple shots in the air after his friend's credit card was declined at a Whataburger restaurant.

Officers in the Arlington Police Department identified Rahimi as a suspect in the shootings and obtained a warrant to search his home. Officers

---

[1] The facts are drawn from the Pre-Sentence Report, which the district court adopted, and the factual resume, to which Rahimi stipulated.

No. 21-11001

executed the warrant and found a rifle and a pistol. Rahimi admitted that he possessed the firearms. He also admitted that he was subject to an agreed civil protective order entered February 5, 2020, by a Tarrant County state district court after Rahimi's alleged assault of his ex-girlfriend. The protective order prohibited Rahimi from, *inter alia*, "[c]ommitting family violence," "[g]oing to or within 200 yards of the residence or place of employment" of his ex-girlfriend, and "[e]ngaging in conduct . . . including following the person, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass" either his ex-girlfriend or a member of her family or household. The order also expressly prohibited Rahimi from possessing a firearm.[2]

A federal grand jury indicted Rahimi for possessing a firearm while under a domestic violence restraining order in violation of 18 U.S.C. § 922(g)(8), which provides:

> It shall be unlawful for any person[] who is subject to a court order that[:] (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use,

---

[2] The validity of the underlying protective order, and Rahimi's breach of it, are not before us, though the order's underlying prohibitions, e.g., restraining Rahimi from committing family violence, from using or threatening use of physical force, from following, harassing, annoying, abusing, or tormenting his ex-girlfriend, and from going within 200 yards of his ex-girlfriend or her family (including their child), are plainly lawful and enforceable.

No. 21-11001

or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . .

Rahimi moved to dismiss the indictment on the ground that § 922(g)(8) is unconstitutional, but he acknowledged that *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), foreclosed his argument.[3] The district court denied Rahimi's motion, and he pled guilty.

On appeal, Rahimi renewed his constitutional challenge to § 922(g)(8).[4] Rahimi again acknowledged that his argument was foreclosed, and a prior panel of this court agreed. *See Rahimi*, 2022 WL 2070392 at *1 n.1. But after *Bruen*, the prior panel withdrew its opinion, ordered supplemental briefing, and ordered the clerk to expedite this case for oral argument before another panel of the court. Rahimi now contends that *Bruen* overrules our precedent and that under *Bruen*, § 922(g)(8) is unconstitutional. We agree on both points.

## II.

Under the rule of orderliness, one panel of the Fifth Circuit "'may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.'" *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)

---

[3] The Government urged Rahimi's argument was also foreclosed by *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).

[4] Rahimi also asserted that the district court erred when it ordered his federal sentence to run consecutively to sentences for his state crimes because the underlying conduct of the state sentences was relevant conduct for the purposes of U.S.S.G. § 1B1.3. The prior panel affirmed the district court. Because we conclude that § 922(g)(8) is unconstitutional and vacate Rahimi's sentence, we do not further address the sentencing issue here.

No. 21-11001

(quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). The Supreme Court need not expressly overrule our precedent. "Rather, a latter panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law." *Id.* "One situation in which this may naturally occur is where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis." *Id.* (internal quotation marks and alterations omitted). That is the case here, as the Government concedes.

In *Emerson*, we held that the Second Amendment guarantees an individual right to keep and bear arms—the first circuit expressly to do so. 270 F.3d at 260. But we also concluded that § 922(g)(8) was constitutional as applied to the defendant there. *Id.* at 263. "*Emerson* first considered the scope of the Second Amendment right 'as historically understood,' and then determined—presumably by applying some form of means-end scrutiny *sub silentio*—that § 922(g)(8) [was] 'narrowly tailored' to the goal of minimizing 'the threat of lawless violence.'" *McGinnis*, 956 F.3d at 755 (quoting *Emerson*, 270 F.3d at 264).

After *D.C. v. Heller*, 554 U.S. 570 (2008), courts coalesced around a similar "two-step inquiry for analyzing laws that might impact the Second Amendment." *McGinnis*, 956 F.3d at 753 (internal quotation marks omitted). First, we "ask[ed] whether the conduct at issue [fell] within the scope of the Second Amendment right." *Id.* at 754 (internal quotation marks omitted). If the conduct fell outside the scope of the Second Amendment right, then the challenged law was constitutional. *Id.* But if the conduct fell within the scope of the right, then we proceeded to the second step of the analysis, which applied either intermediate or strict scrutiny. *Id.* at 754, 757 (expressly applying means-end scrutiny). In *McGinnis*, this court upheld § 922(g)(8) using this two-step framework. The initial panel in this case did likewise, citing *McGinnis*. *Rahimi*, 2022 WL 2070392 at *1 n.1.

No. 21-11001

Enter *Bruen*. Expounding on *Heller*, the Supreme Court held that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. In that context, the Government bears the burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Put another way, "the [G]overnment must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. In the course of its explication, the Court expressly repudiated the circuit courts' means-end scrutiny—the second step embodied in *Emerson* and applied in *McGinnis*. *Id.* at 2128–30. To the extent that the Court did not overtly overrule *Emerson* and *McGinnis*—it did not cite those cases but discussed other circuits' similar precedent—*Bruen* clearly "fundamentally change[d]" our analysis of laws that implicate the Second Amendment, *Bonvillian Marine*, 19 F.4th at 792, rendering our prior precedent obsolete.

## III.

Our review of Rahimi's facial challenge to § 922(g)(8) is de novo. *See United States v. Bailey*, 115 F.3d 1222, 1225 (5th Cir. 1997). First, the court addresses the Government's argument that Rahimi is not among those citizens entitled to the Second Amendment's protections. Concluding he is, we then turn to whether § 922(g)(8) passes muster under *Bruen*'s standard.[5]

---

[5] The Government also argues that because *Bruen* endorsed "shall-issue" licensing schemes, and Texas's shall-issue licensing scheme (since modified to allow "constitutional carry," *see* 2021 Tex. Sess. Law Serv. Ch. 809 (West)) included the requirement that an applicant not be under a domestic violence restraining order, it follows that § 922(g)(8) is constitutional. Of course, the *Bruen* Court did not rule on the constitutionality of 43 specific state licensing regimes because that was not the issue before the Court. *See Bruen*,

No. 21-11001

## A.

According to the Government, *Heller* and *Bruen* add a gloss on the Second Amendment that restricts its applicability to only "law-abiding, responsible citizens," *Heller*, 554 U.S. at 635, and "ordinary, law-abiding citizens," *Bruen*, 142 S. Ct. at 2122. Because Rahimi is neither responsible nor law-abiding, as evidenced by his conduct and by the domestic violence restraining order issued against him, he falls outside the ambit of the Second Amendment. Therefore, argues the Government, § 922(g)(8) is constitutional as applied to Rahimi.

The Second Amendment provides, simply enough:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. *Heller* explained that the words "the people" in the Second Amendment have been interpreted throughout the Constitution to "unambiguously refer[] to all members of the political community, not an unspecified subset." 554 U.S. at 580. Further, "the people" "refer[] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). For those reasons, the *Heller* Court began its analysis with the "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans," *id.* at 581, and then confirmed that presumption, *id.* at 595. *Heller*'s exposition of "the people" strongly

---

142 S. Ct. at 2138 n.9.   Rather, the Court merely blessed the general concept of shall-issue regimes. *Id.*

No. 21-11001

indicates that Rahimi is included in "the people" and thus within the Second Amendment's scope.

To be sure, as the Government argues, *Heller* and *Bruen* also refer to "law-abiding, responsible citizens" in discussing the amendment's scope (*Bruen* adds "ordinary, law-abiding citizens"). And there is some debate over the extent to which the Court's "law-abiding" qualifier constricts the Second Amendment's reach. *Compare Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J. dissenting), *abrogated by Bruen*, 142 S. Ct. 2111, *with Binderup v. Att'y Gen.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments). As summarized by now-Justice Barrett, "one [approach] uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). The Government's argument that Rahimi falls outside the community covered by the Second Amendment rests on the first approach. But it runs headlong into *Heller* and *Bruen*, which we read to espouse the second one.

That reading, in turn, leads us to conclude that, in context, *Heller* simply uses "law-abiding, responsible citizens" as shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." 554 U.S. at 626–27; *accord Range v. Attorney Gen.*, 53 F.4th 262, 266 (3d Cir. 2022) (upholding 18 U.S.C. § 922(g)(1), which prohibits firearm possession by convicted felons, because "the people" categorically "excludes those who have demonstrated disregard for the rule of law through the commission of felony and felony-equivalent offenses"), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023). In other words, *Heller*'s

No. 21-11001

reference to "law-abiding, responsible" citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders "presumptively" tolerated or would have tolerated. *See* 554 U.S. at 627, n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."). *Bruen*'s reference to "ordinary, law-abiding" citizens is no different. *See* 142 S. Ct. at 2134.

From the record before us, Rahimi did not fall into any such group at the time he was charged with violating § 922(g)(8), so the "strong presumption" that he remained among "the people" protected by the amendment holds. When he was charged, Rahimi was subject to an agreed domestic violence restraining order that was entered in a civil proceeding. That alone does not suffice to remove him from the political community within the amendment's scope. And, while he was *suspected* of other criminal conduct at the time, Rahimi was not a convicted felon or otherwise subject to another "longstanding prohibition[] on the possession of firearms" that would have excluded him. *Heller*, 554 U.S. at 626–27; *see Range*, 53 F.4th at 273 (concluding that *Heller*, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), and *Bruen* support that criminals, as a group, "fall[] outside 'the people' . . . and that § 922(g)(1) is well-rooted in the nation's history and tradition of firearm regulation").[6]

---

[6] This discussion is not to cast doubt on firearm restrictions that attach during criminal proceedings prior to conviction. *E.g.*, 18 U.S.C. § 922(n) (prohibiting person under indictment from shipping, transporting, or receiving any firearm); 18 U.S.C. § 3142(c)(B)(viii) (allowing judicial officer to require person released on pretrial bond to "refrain from possessing a firearm, destructive device, or other dangerous weapon"). Those restrictions are not before us. We simply hew carefully to the Supreme Court's delineation of who falls within, and without, the overarching class of "law-abiding, responsible citizens" covered by the Second Amendment.

No. 21-11001

Indeed, the upshot of the Government's argument is that the Second Amendment right can be readily divested, such that "a person could be in one day and out the next: . . . his rights would be stripped as a self-executing consequence of his new status." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). But this turns the typical way of conceptualizing constitutional rights on its head. And the Government's argument reads the Supreme Court's "law-abiding" gloss so expansively that it risks swallowing the text of the amendment. *Cf. Bruen*, 142 S. Ct. at 2156 ("The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" (quoting *McDonald*, 561 U.S. at 780).

Further, the Government's proffered interpretation of "law-abiding" admits to no true limiting principle. Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "non-law-abiding" people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans," *Heller*, 554 U.S. at 581. Rahimi, while hardly a model citizen, is nonetheless among "the people" entitled to the Second Amendment's guarantees, all other things equal.

## B.

Which brings us to the question of whether Rahimi's right to keep and bear arms may be constitutionally restricted by operation of § 922(g)(8). The parties dispute Rahimi's burden necessary to sustain his facial challenge to

No. 21-11001

the statute.  The Government contends that Rahimi "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Rahimi contests that assertion, asserting during oral argument that the Government's interpretation of *Salerno* has fallen out of favor, though he contends that in any event, he has satisfied *Salerno*'s standard.

*Bruen* instructs how to proceed.  The plaintiffs there levied a facial challenge to New York's public carry licensing regime. 142 S. Ct. at 2122. To evaluate the challenged law, the Supreme Court employed a historical analysis, aimed at "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.  Construing *Heller*, the Court flatly rejected any means-end scrutiny as part of this analysis, *id.* at 2129, such that if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances. *Cf. Salerno*, 481 U.S. at 745; *Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019) ("A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." (cleaned up)).

*Bruen* articulated two analytical steps:  First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct[.]"  142 S. Ct. at 2129–30.  If so, then the "Constitution presumptively protects that conduct," and the Government "must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.  "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

No. 21-11001

To carry its burden, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131–32 (internal quotation marks omitted). "[W]e are not obliged to sift the historical materials for evidence to sustain [§ 922(g)(8)]. That is [the Government's] burden." *Id.* at 2150.

The Government need not identify a "historical *twin*"; rather, a "well-established and representative historical *analogue*" suffices. *Id.* at 2133. The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right. *Id.* (citing *McDonald*, 561 U.S. at 767, and *Heller*, 544 U.S. at 599). "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (internal quotation marks and emphasis omitted).

As to the degree of similarity required, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* (internal quotation marks, alterations, and citations omitted). On the other hand, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* The core question is whether the challenged law and proffered analogue are "relevantly similar." *Id.* at 2132.

When the challenged regulation addresses a "general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the

No. 21-11001

challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Moreover, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

## C.

Rahimi's possession of a pistol and a rifle easily falls within the purview of the Second Amendment. The amendment grants him the right "to keep" firearms, and "possession" is included within the meaning of "keep." *See id.* at 2134–35. And it is undisputed that the types of firearms that Rahimi possessed are "in common use," such that they fall within the scope of the amendment. *See id.* at 2143 ("[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'") (quoting *Heller*, 554 U.S. at 627)). Thus, *Bruen*'s first step is met, and the Second Amendment presumptively protects Rahimi's right to keep the weapons officers discovered in his home. *See id.* at 2126.

But Rahimi, like any other citizen, may have forfeited his Second Amendment rights if his conduct ran afoul of a "lawful regulatory measure[]" "prohibiting . . . the possession of firearms," *Heller*, 554 U.S. at 626–27 & 627 n.26, that is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127. The question turns on whether § 922(g)(8) falls within that historical tradition, or outside of it.

To reiterate, the statute makes it unlawful

for any person[] who is subject to a court order that[:] (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking,

No. 21-11001

> or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . .

§ 922(g)(8); *see McGinnis*, 956 F.3d at 758 (stating that § 922(g)(8)'s purpose is to reduce "domestic gun abuse"). Distilled to its essence, the provision operates to deprive an individual of his right to possess (i.e., "to keep") firearms once a court enters an order, after notice and a hearing, that restrains the individual "from harassing, stalking, or threatening an intimate partner" or the partner's child. The order can rest on a specific finding that the restrained individual poses a "credible threat" to an intimate partner or her child. Or it may simply include a general prohibition on the use, attempted use, or threatened use of physical force reasonably expected to cause bodily injury. The covered individual forfeits his Second Amendment right for the duration of the court's order. This is so even when the individual has not been criminally convicted or accused of any offense and when the underlying proceeding is merely civil in nature.

These characteristics crystallize "how" and "why" § 922(g)(8) "burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. In particular, we focus on these key features of the statute: (1) forfeiture of the right to possess weapons (2) after a civil proceeding[7]

---

[7] The distinction between a criminal and civil proceeding is important because criminal proceedings have afforded the accused substantial protections throughout our Nation's history. In crafting the Bill of Rights, the Founders were plainly attuned to

No. 21-11001

(3) in which a court enters a protective order based on a finding of a "credible threat" to another specific person, or that includes a blanket prohibition on the use, of threatened use, of physical force, (4) in order to protect that person from "domestic gun abuse." The first three aspects go to *how* the statute accomplishes its goal; the fourth is the statute's goal, the *why*.

To sustain § 922(g)(8)'s burden on Rahimi's Second Amendment right, the Government bears the burden of proffering "relevantly similar" historical regulations that imposed "a comparable burden on the right of armed self-defense" that were also "comparably justified." *Id.* at 2132–33. And "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (internal quotation marks omitted). We thus afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification.

The Government offers potential historical analogues to § 922(g)(8) that fall generally into three categories: (1) English and American laws (and sundry unadopted proposals to modify the Second Amendment) providing for disarmament of "dangerous" people, (2) English and American "going armed" laws, and (3) colonial and early state surety laws. We discuss in turn why each of these historical regulations falters as "relevantly similar" precursors to § 922(g)(8).

---

preservation of these protections. *See* U.S. CONST. amend. IV; U.S. CONST. amend. V; U.S. CONST. amend. VI; U.S. CONST. amend. VIII. It is therefore significant that § 922(g)(8) works to eliminate the Second Amendment right of individuals subject merely to civil process.

No. 21-11001

### 1.

The Government relies on laws of varying antiquity as evidence of its "dangerousness" analogues.  We sketch these chronologically, mindful that greater weight attaches to laws nearer in time to the Second Amendment's ratification.

Under the English Militia Act of 1662, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom."  13 & 14 Car. 2, c.3, § 13 (1662).  Citing scholarship, the Government thus posits that "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown."  Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020).

But the Militia Act's provenance demonstrates that it is not a forerunner of our Nation's historical tradition of firearm regulation.  Under Charles I (who reigned 1625–1649), the Crown and Parliament contested for control of the militia.  Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 Ga. L. Rev. 1, 8 (1996).  After the resulting civil war and Oliver Cromwell's interregnum, the monarchy was restored in 1660 when Charles II took the throne.  Charles II began using the militia to disarm his political opponents.  *Id.* (citing J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right (1994) 35–38 (1994).  The Militia Act of 1662 facilitated this disarmament, which escalated under the Catholic James II once he took the throne in 1685.  *Id.*; *see Heller*, 554 U.S. at 593 (noting that the disarmaments "caused Englishmen . . . to be jealous of their arms").  After the Glorious Revolution, which enthroned Protestants William and Mary, the Declaration of Rights,

No. 21-11001

codified as the 1689 English Bill of Rights, qualified the Militia Act by guaranteeing "[t]hat the subjects which are Protestants may have arms for their defence suitable to their Conditions and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. "This right," which *restricted* the Militia Act's reach in order to prevent the kind of politically motivated disarmaments pursued by Charles II and James II, "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. This understanding, and the history behind it, defeats any utility of the Militia Act of 1662 as a historical analogue for § 922(g)(8).

The Government next points to laws in several colonies and states that disarmed classes of people considered to be dangerous, specifically including those unwilling to take an oath of allegiance, slaves, and Native Americans. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157–60 (2007). These laws disarmed people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200–01 (5th Cir. 2012) (discussing relevant scholarship), *abrogated by Bruen*, 142 S. Ct. at 2126–30. "While public safety was a concern, most disarmament efforts were meant to prevent armed rebellions. The early Americans adopted much of that tradition in the colonies." Greenlee, *supra*, at 261.

But we question at a threshold level whether colonial and state laws disarming categories of "disloyal" or "unacceptable" people present tenable analogues to § 922(g)(8). Laws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—i.e., written out of "the people" altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious, at best. In any

event, these laws fail on substance as analogues to § 922(g)(8), because out of the gate, *why* they disarmed people was different.  The purpose of laws disarming "disloyal" or "unacceptable" groups was ostensibly the preservation of political and social order, not the protection of an identified person from the threat of "domestic gun abuse," *McGinnis*, 956 F.3d at 758, posed by another individual.  Thus, laws disarming "dangerous" classes of people are not "relevantly similar" to § 922(g)(8) such that they can serve as historical analogues.

Finally, the Government offers two proposals that emerged in state ratification conventions considering the proposed Constitution.  A minority of Pennsylvania's convention authored a report in which they contended that citizens have a right to bear arms "unless for crimes committed, *or real danger of public injury*."  2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971) (emphasis added).  And at the Massachusetts convention, Samuel Adams proposed a qualifier to the Second Amendment that limited the scope of the right to "peaceable citizens."  *Id.* at 681.

But these proposed amendments are not reflective of the Nation's early understanding of the scope of the Second Amendment right.  While they were influential proposals, *see Heller*, 554 U.S. at 604, neither became part of the Second Amendment as ratified.  Thus, the proposals might somewhat illuminate the scope of firearm rights at the time of ratification, but they cannot counter the Second Amendment's text, or serve as an analogue for § 922(g)(8) because, *inter alia*, they were not enacted.  *Cf. Bruen*, 142 S. Ct. at 2137 ("[T]o the extent later history contradicts what the text [of the Second Amendment] says, the text controls.").

No. 21-11001

**2.**

The Government also relies on the ancient criminal offense of "going armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (alteration and emphasis omitted). This common law offense persisted in America and was in some cases codified. *Id.* at 2144. The Government offers four exemplars codified in the Massachusetts Bay Colony, the state of Virginia, and the colonies of New Hampshire and North Carolina.

The Massachusetts law provided "[t]hat every justice of the peace . . . may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison . . . and seize and take away his armor or weapons . . . ." 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute) (cleaned up). Similarly, the New Hampshire statute authorized justices of the peace "upon view of such justice, confession of the party, or legal proof of any such offense . . . [to] cause the [offender's] arms or weapons to be taken away . . . ." Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament, 17 (1771) (1701 statute); *see Bruen*, 142 S. Ct. at 2142–43 (noting that Massachusetts and New Hampshire laws "were substantively identical"). Virginia's law differed slightly: "[N]o man . . . [shall] go []or ride armed by night or by day, in fairs or markets, or in other places, in terror of the country, upon pain of being arrested and committed to prison by any justice on his view, or proof of others, there to a time for so long a time as a jury, to be sworn for that purpose by the said justice, shall direct, and in like manner to forfeit his armour to the Commonwealth . . . ." Revised Code of the State of Virginia: Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force, 554 (1819) (1786

No. 21-11001

statute). North Carolina's colonial law was contained within its constable's oath, which required constables to "arrest all such persons as, in your sight, shall ride or go armed offensively, or shall commit or make any riot, affray, or other breach of his Majesty's peace . . . ." Collection of All of the Public Acts of Assembly of the Province of North-Carolina: Now in Force and Use, 131 (1751) (1741 statute) (cleaned up). While similarly aimed at curbing "going armed offensively," the North Carolina law did not provide for forfeiture.

These proffered analogues fall short for several reasons. An overarching one is that it is doubtful these "going armed" laws are reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of firearms. *See Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public carry regulation."). North Carolina's law did not provide for forfeiture, so it quickly falls out of the mix. And fairly early on, Massachusetts and Virginia dropped forfeiture as a penalty, going the way of North Carolina and thereby undercutting the Government's reliance on those laws. Indeed, Massachusetts amended its law to remove the forfeiture provision in 1795, just four years after the ratification of the Second Amendment. 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807, 653 (1807) (statute enacted Jan. 29, 1795). Virginia had done so by 1847, shortly before the Commonwealth re-codified its laws in 1849. *See* Code of Virginia: With the Declaration of Independence and Constitution of the United States and the Declaration of Rights and Constitution of Virginia, 756 (1849).[8] It is unclear how long New Hampshire's "going armed" law preserved its forfeiture provision, but assuming *arguendo* it persisted longer

---

[8] By the 1849 code, Virginia's going armed law had evolved into its anti-riot law (chapter 195) and surety law (chapter 201). *See id.* Neither chapter provided for forfeiture of an offender's weapons.

No. 21-11001

than the others, one outlier is not enough "to show a tradition of public carry regulation." *Bruen*, 142 S. Ct. at 2142.

And on substance, the early "going armed" laws that led to weapons forfeiture are not relevantly similar to § 922(g)(8). First, those laws only disarmed an offender after criminal proceedings and conviction. By contrast, § 922(g)(8) disarms people who have merely been civilly adjudicated to be a threat to another person—or, who are simply governed by a civil order that "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force," § 922(g)(8)(C)(ii), whether or not there is a "credible threat to the physical safety" of anyone else, § 922(g)(8)(C)(i). Rahimi's domestic violence restraining order satisfied both conditions; but it bears emphasis that the order at issue here was entered by agreement, in a civil proceeding, after Rahimi apparently waived hearing (the order states no formal hearing was held, and no record was created), and without counsel or other safeguards that would be afforded him in the criminal context. These distinctions alone defeat the "going armed" laws as useful analogues for § 922(g)(8).

Moreover, the "going armed" laws, like the "dangerousness" laws discussed above, appear to have been aimed at curbing terroristic or riotous behavior, i.e., disarming those who had been adjudicated to be a threat to society generally, rather than to identified individuals. And § 922(g)(8) works to disarm not only individuals who are threats to other individuals but also every party to a domestic proceeding (think: divorce court) who, with no history of violence whatever, becomes subject to a domestic restraining order that contains boilerplate language that tracks § 922(g)(8)(C)(ii). In other words, where "going armed" laws were tied to violent or riotous conduct and threats to society, § 922(g)(8) implicates a much wider swath of conduct, not inherently dependent on any actual violence or threat. Thus, these "going armed" laws are not viable historical analogues for § 922(g)(8).

No. 21-11001

**3.**

Lastly, the Government points to historical surety laws. At common law, an individual who could show that he had "just cause to fear" that another would injure him or destroy his property could "demand surety of the peace against such person." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 252 (1769). The surety "was intended merely for prevention, without any crime actually committed by the party; but arising only from probable suspicion, that some crime [wa]s intended or likely to happen." *Id.* at 249. If the party of whom surety was demanded refused to post surety, he would be forbidden from carrying a weapon in public absent special need. *See Bruen*, 142 S. Ct. at 2148–49 (discussing operation of historical surety laws). Many jurisdictions codified this tradition, either before ratification of the Bill of Rights or in early decades thereafter.[9]

The surety laws come closer to being "relevantly similar" to § 922(g)(8) than the "dangerousness" and "going armed" laws discussed *supra*. First, they are more clearly a part of our tradition of firearm regulation. And they were "comparably justified," *id.* at 2133, in that they were meant to protect an identified person (who sought surety) from the risk of harm posed by another identified individual (who had to post surety to carry arms).

---

[9] *E.g.*, 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament, 17 (1771) (1701 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801, pg. 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven, pg. 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 statute); *see also Bruen*, 142 S. Ct. at 2148 (stating that at least ten jurisdictions enacted surety laws between 1836 and 1871).

No. 21-11001

Put simply, the *why* behind historical surety laws analogously aligns with that underlying § 922(g)(8).[10]

Aspects of *how* the surety laws worked resemble certain of the mechanics of § 922(g)(8) as well. The surety laws required only a civil proceeding, not a criminal conviction. The "credible threat" finding required to trigger § 922(g)(8)(C)(i)'s prohibition on possession of weapons echoes the showing that was required to justify posting of surety to avoid forfeiture. But that is where the analogy breaks down: As the Government acknowledges, historical surety laws did not prohibit public carry, much less possession of weapons, so long as the offender posted surety. *See also id.* at 2149 (noting that there is "little evidence that authorities ever enforced surety laws"). Where the surety laws imposed a conditional, partial restriction on the Second Amendment right, § 922(g)(8) works an absolute deprivation of the right, not only publicly to carry, but to *possess* any firearm, upon entry of a sufficient protective order. And, as discussed *supra*, § 922(g)(8)(C)(ii) works that deprivation based on an order that "prohibits the use, attempted use, or threatened use of physical force," whether there is a "just cause to fear" any harm, or not. At bottom, the historical surety

---

[10] The parties spar somewhat over the required granularity of the underlying problem in comparing § 922(g)(8) to proffered analogues. Rahimi contends more generally that domestic violence was, and remains, a persistent social ill that society has taken numerous actions against—though not disarmament. The Government counters that "crime statistics from the founding era are hard to come by," but that "there is reason to doubt that domestic *homicide* was as prevalent at the founding as it is in the modern era." To be sure, historical surety laws were not targeted to domestic violence or even more specifically to domestic homicide. But somewhat abstracting the laws' justifications, as we do above the line, strikes us as consistent with *Bruen*'s instruction that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133.

No. 21-11001

laws did not impose "a comparable burden on the right of armed self-defense," *id.* at 2133, as § 922(g)(8).

\* \* \*

The Government fails to demonstrate that § 922(g)(8)'s restriction of the Second Amendment right fits within our Nation's historical tradition of firearm regulation. The Government's proffered analogues falter under one or both of the metrics the Supreme Court articulated in *Bruen* as the baseline for measuring "relevantly similar" analogues: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.*[11] As a result, § 922(g)(8) falls outside the class of firearm regulations countenanced by the Second Amendment.

---

[11] *Accord* David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (2017) ("[T]here is simply no tradition—from 1791 or 1866—of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders."); Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017) ("Historical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin."); Keateon G. Hille, The *Second Amendment: From* Miller *to* Chovan*, and Why the* Marzzarella *Framework is the Best Shot Courts Have*, 50 Gonz. L. Rev. 377, 392 (2015) (acknowledging that the "prohibition on firearms possession by domestic violence misdemeanants is not longstanding" and advocating for a means-ends test); Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 741 (2012) ("If longstanding tradition is the key common characteristic of the items on the *Heller* list, modern legal innovations like the ban on guns for domestic violence misdemeanants, however much they may reduce risks and benefit society, do not qualify.").

No. 21-11001

## IV.

Doubtless, 18 U.S.C. § 922(g)(8) embodies salutary policy goals meant to protect vulnerable people in our society. Weighing those policy goals' merits through the sort of means-end scrutiny our prior precedent indulged, we previously concluded that the societal benefits of § 922(g)(8) outweighed its burden on Rahimi's Second Amendment rights. But *Bruen* forecloses any such analysis in favor of a historical analogical inquiry into the scope of the allowable burden on the Second Amendment right. Through that lens, we conclude that § 922(g)(8)'s ban on possession of firearms is an "outlier[] that our ancestors would never have accepted." *Id.* Therefore, the statute is unconstitutional, and Rahimi's conviction under that statute must be vacated.

REVERSED; CONVICTION VACATED.

No. 21-11001

James C. Ho, *Circuit Judge*, concurring:

The right to keep and bear arms has long been recognized as a fundamental civil right. Blackstone saw it as an essential component of "'the natural right'" to "'self-preservation and defence.'" *District of Columbia v. Heller*, 554 U.S. 570, 593–94 (2008) (quoting 1 William Blackstone, Commentaries on the Laws of England 139–40 (1765)). And the Supreme Court has repeatedly analogized the Second Amendment to other constitutional rights guaranteed to every American. *See, e.g.*, *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (describing the First, Second, Fourth, Fifth, and Sixth Amendments as the "civil-rights Amendments"); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 n.10 (1961) (comparing "the commands of the First Amendment" to "the equally unqualified command of the Second Amendment"); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126, 2130 (2022) (quoting *Konigsberg*).

But lower courts have routinely ignored these principles, treating the Second Amendment as "a second-class right." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion). So the Supreme Court has now commanded lower courts to be more forceful guardians of the right to keep and bear arms, by establishing a new framework for lower courts to apply under the Second Amendment.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "[T]his historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm

No. 21-11001

regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* at 2132. This framework "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. It requires the government to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

Our court's decision today dutifully applies *Bruen*, and I join it in full. I write separately to explain how respect for the Second Amendment is entirely compatible with respect for our profound societal interest in protecting citizens from violent criminals. Our Founders firmly believed in both the fundamental right to keep and bear arms and the fundamental role of government in combating violent crime.

## I.

"[T]he right to keep and bear arms . . . has controversial public safety implications." *Bruen*, 142 S. Ct. at 2126 n.3 (quotations omitted). But it's hardly "the *only* constitutional right" that does. *Id.* (quotations omitted, emphasis added). To the contrary, "[a]ll of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 783 (plurality opinion).

So any legal framework that involves any of these constitutional provisions can have significant and controversial public safety consequences. A framework that under-protects a right unduly deprives citizens of liberty. But a framework that over-protects a right unduly deprives citizens of competing interests like public safety.

Take, for example, the exclusionary rule. *See Mapp v. Ohio*, 367 U.S. 643 (1961). Since its inception, the rule has been sharply criticized for over-protecting the accused and releasing dangerous criminals into our neighborhoods. It's often said that nothing in the Constitution requires the criminal to "go free because the constable has blundered." *Herring v. United*

No. 21-11001

*States*, 555 U.S. 135, 148 (2009) (quoting *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926)). "The exclusionary rule generates substantial social costs" by "setting the guilty free and the dangerous at large." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (cleaned up).

The same can be said about *Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court has "repeatedly referred to the *Miranda* warnings as 'prophylactic' and 'not themselves rights protected by the Constitution.'" *Dickerson v. United States*, 530 U.S. 428, 437–38 (2000) (citations omitted). What's more, "[i]n some unknown number of cases the Court's rule will return a killer, a rapist or other criminal to the streets and to the environment which produced him, to repeat his crime whenever it pleases him." *Miranda*, 384 U.S. at 542 (White, J., dissenting).

So it's easy to see why decisions like *Mapp* and *Miranda* have been criticized for over-protecting constitutional rights and harming public safety.

But there's a big difference between the first criticism and the second, at least as far as the judiciary is concerned. It's our duty as judges to interpret the Constitution based on the text and original understanding of the relevant provision—not on public policy considerations, or worse, fear of public opprobrium or criticism from the political branches. *See, e.g., McDonald*, 561 U.S. at 783 (plurality opinion) (finding "no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications"); *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2278 (2022) ("[W]e cannot allow our decisions to be affected by any extraneous influences such as concern about the public's reaction to our work."); *Mance v. Sessions*, 896 F.3d 390, 405 (5th Cir. 2018) (Ho, J., dissenting from denial of rehearing en banc) ("Constitutional rights must not give way to hoplophobia.").

No. 21-11001

And that's precisely the problem here: Members of the Supreme Court have repeatedly criticized lower courts for disfavoring the Second Amendment.[1] The Supreme Court has now responded by setting forth a new legal framework in *Bruen*. It is incumbent on lower courts to implement *Bruen* in good faith and to the best of our ability.

*Bruen* calls on us to examine our Nation's history and traditions to determine the meaning and scope of the Second Amendment. It's hardly the first time that the Supreme Court has looked to history and tradition to interpret constitutional provisions.[2] And it surely won't be the last.

---

[1] *See, e.g.*, *Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari) (bemoaning "lower courts' general failure to afford the Second Amendment the respect due an enumerated constitutional right"); *Peruta v. California*, 137 S. Ct. 1995, 1999 (2017) (Thomas, J., joined by Gorsuch, J., dissenting from denial of certiorari) (lamenting "distressing trend" of "the treatment of the Second Amendment as a disfavored right"); *Friedman v. City of Highland Park*, 136 S. Ct. 447, 447 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) (criticizing "noncompliance with our Second Amendment precedents" by "several Courts of Appeals"); *Jackson v. City & Cty. of San Francisco*, 135 S. Ct. 2799, 2799 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) ("lower courts, including the ones here, have failed to protect [the Second Amendment right]"); *id.* at 2802 ("'A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.'") (quoting *Heller*, 554 U.S. at 634).

[2] *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 109–76 (1926) (noting that "the power of removal of executive officers . . . was presented early in the first session of the First Congress," known as the "decision of 1789," and also surveying English and colonial history and subsequent Congressional and Executive practice); *Marsh v. Chambers*, 463 U.S. 783, 786–92 (1983) (noting that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country" and surveying colonial history, the deliberations of the First Congress, and "unambiguous and unbroken history of more than 200 years"); *Crawford v. Washington*, 541 U.S. 36, 43–50 (2004) (examining the "historical background" of the Confrontation Clause, noting that "[t]he right to confront one's accusers is a concept that dates back to Roman times," and surveying English history and colonial and early state practice); *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (reviewing "historic and traditional categories" of speech that government has been allowed to regulate "[f]rom 1791 to the

No. 21-11001

## II.

Those who commit violence, including domestic violence, shouldn't just be disarmed—they should be detained, prosecuted, convicted, and incarcerated. And that's exactly why we have a criminal justice system—to punish criminals and disable them from engaging in further crimes.

The Constitution presumes the existence of a criminal justice system. *See, e.g.*, U.S. Const. amends. V, VI (setting forth various rights of the accused in criminal proceedings); U.S. Const. amend. VIII (prohibiting cruel and unusual punishments). That system allows the government to deny convicted criminals a wide range of liberties that it could not deny to innocent, law-abiding citizens. For example, the government cannot deprive innocent citizens of their liberty of movement. *See, e.g.*, *Williams v. Fears*, 179 U.S. 270, 274 (1900); *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999). But it can certainly arrest and incarcerate violent criminals.

Arrest and incarceration naturally entail the loss of a wide range of liberties—including the loss of access to weapons. *See, e.g.*, *Chimel v. California*, 395 U.S. 752, 762–63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."); *State v. Buzzard*, 4 Ark. 18, 21 (1842) (Ringo, C.J.) ("Persons accused of crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned.").

The Supreme Court has also made clear that our Nation's history and traditions include "longstanding prohibitions on the possession of firearms

---

present"); *Timbs v. Indiana*, 139 S. Ct. 682, 687–89 (2019) (observing that "[t]he Excessive Fines Clause traces its venerable lineage back to at least 1215" and surveying authorities from English history and colonial practice).

No. 21-11001

by felons"—and that such measures are "presumptively lawful." *Heller*, 554 U.S. at 626 & n.26. *See also McDonald*, 561 U.S. at 786 (plurality opinion) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons,'" and "[w]e repeat those assurances here. . . . [I]ncorporation does not imperil every law regulating firearms."). So the government can presumably disarm dangerous convicted felons, whether they're incarcerated or not, without violating the Second Amendment.

The Second Amendment is not "a second-class right." *Bruen*, 142 S. Ct. at 2156. It is not "subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* That principle guides us here: The government can impose various restrictions on the rights of dangerous convicted felons, consistent with our Nation's history and traditions—and that includes the right to keep and bear arms.

## III.

The power to incarcerate violent criminals is not just constitutionally permissible—it's imperative to protecting victims. After all, anyone who's willing to break the law when it comes to domestic violence is presumably willing to break the law when it comes to guns as well. The only way to protect the victim may be to detain as well as disarm the violent criminal.

For example, the government can detain and disarm, not just after conviction, but also before trial. Pre-trial detention is presumed by the Excessive Bail Clause and the Speedy Trial Clause. And it plays a significant role in protecting citizens from violence, including domestic violence. *See*, *e.g.*, *United States v. Salerno*, 481 U.S. 739, 755 (1987) (permitting "the detention prior to trial of arrestees charged with serious felonies who . . . pose a threat to the safety of individuals or to the community").

No. 21-11001

In addition, the government can detain and disarm, based not just on acts of violence, but criminal threats of violence as well. *See*, *e.g.*, *United States v. Ackell*, 907 F.3d 67 (1st Cir. 2018) (upholding criminal stalking law); *United States v. Gonzalez*, 905 F.3d 165 (3rd Cir. 2018) (same); *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014) (same); *United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2012) (same); *see also People v. Counterman*, 497 P.3d 1039 (Colo. App. 2021) (same), *cert. granted sub nom. Counterman v. Colorado*, 143 S. Ct. 644 (2023). After all, to the victim, such actions are not only life-threatening—they're life-altering, even if they don't eventually result in violence.

## IV.

18 U.S.C. § 922(g)(8) disarms individuals based on civil protective orders—not criminal proceedings. As the court today explains, there is no analogous historical tradition sufficient to support § 922(g)(8) under *Bruen*.

Moreover, there are additional reasons why disarmament based on civil protective orders should give us pause. Scholars and judges have expressed alarm that civil protective orders are too often misused as a tactical device in divorce proceedings—and issued without any actual threat of danger. That makes it difficult to justify § 922(g)(8) as a measure to disarm dangerous individuals.

## A.

"Many divorce lawyers routinely recommend pursuit of civil protection orders for clients in divorce proceedings . . . as a tactical leverage device." Jeannie Suk, *Criminal Law Comes Home*, 116 Yale L.J. 2, 62 n.257 (2006). *See also*, *e.g.*, Randy Frances Kandel, *Squabbling in the Shadows: What the Law Can Learn from the Way Divorcing Couples Use Protective Orders as Bargaining Chips in Domestic Spats and Child Custody Mediation*, 48 S.C. L.

No. 21-11001

Rev. 441, 448 (1997) (civil protective orders are deployed as "an affirmative element of divorce strategy").

That's because civil protective orders can help a party in a divorce proceeding to "secure [favorable] rulings on critical issues such as [marital and child] support, exclusion from marital residence and property disposition." *Murray v. Murray*, 631 A.2d 984, 986 (N.J. Super. Ct. App. Div. 1993). Protective orders can also be "a powerful strategic tool in custody disputes." Suk, *supra*, at 62.

That makes civil protective orders a tempting target for abuse. Judges have expressed "concern[] . . . with the serious policy implications of permitting allegations of . . . domestic violence" to be used in divorce proceedings. *Murray*, 631 A.2d at 986. *See also City of Seattle v. May*, 256 P.3d 1161, 1166 n.1 (Wash. 2011) (Sanders, J., dissenting) (noting "the growing trend to use protection orders as tactical weapons in divorce cases"). And for good reason. "[N]ot all parties to divorce are above using [protective orders] not for their intended purpose but solely to gain advantage in a dissolution." Scott A. Lerner, *Sword or Shield? Combating Orders-of-Protection Abuse in Divorce*, 95 Ill. Bar J. 590, 591 (2007). Anyone who is "willing to commit perjury can spend months or even years . . . planning to file a domestic violence complaint at an opportune moment in order to gain the upper hand in a divorce proceeding." David N. Heleniak, *The New Star Chamber: The New Jersey Family Court and the Prevention of Domestic Violence Act*, 57 Rutgers L. Rev. 1009, 1014 (2005). So "[a] plaintiff willing to exaggerate past incidents or even commit perjury can have access to a responsive support group, a sympathetic court, and a litany of immediate relief." Peter Slocum, *Biting the D.V. Bullet: Are Domestic-Violence Restraining Orders Trampling on Second Amendment Rights?*, 40 Seton Hall L. Rev. 639, 662–63 (2010).

No. 21-11001

Moreover, these concerns are exacerbated by the fact that judges are too often ill-equipped to prevent abuse. Family court judges may face enormous pressure to grant civil protective orders—and no incentive to deny them. For example, family court judges may receive mandatory training in which they're warned about "the unfavorable publicity" that could result if they deny requests for civil protective orders. *Id.* at 668. As one judge has noted, "[a] newspaper headline can be death to a municipal court judge's career." *Id.* at 667 n.213 (quotations omitted). So "the prospect of an unfavorable newspaper headline is a frightening one." *Id.* To quote another judge: "Your job is not to become concerned about all the constitutional rights of the [defendant] you're violating as you grant a restraining order. Throw him out on the street, give him the clothes on his back and tell him, 'See ya' around.'" *Id.* at 668. Yet another judge said: "If there is any doubt in your mind about what to do, you should issue the restraining order." *Id.*

As a result, "[r]estraining orders . . . are granted to virtually all who apply." *May*, 256 P.3d at 1166 n.1 (Sanders, J., dissenting) (quotations omitted). So there's a "tremendous" risk that courts will enter protective orders automatically—despite the absence of any real threat of danger. Heleniak, *supra*, at 1014. *See generally* Slocum, *supra*. In one case, for example, a family court judge granted a restraining order on the ground that the husband told his wife that he did not love her and was no longer attracted to her. *See Murray*, 631 A.2d at 984. "There was no prior history of domestic violence," yet the judge issued the order anyway. *Id.* Another judge issued a restraining order against David Letterman on the ground that his presence on television harassed the plaintiff. *See* Todd Peterson, *David Letterman Fights Restraining Order*, People (Dec. 21, 2005).

These orders were later rescinded. But the defendants were nevertheless prohibited from possessing a firearm while the orders were in effect, as a result of § 922(g)(8).

No. 21-11001

## B.

Moreover, the consequences of disarming citizens under § 922(g)(8) may be especially perverse considering the common practice of "mutual" protective orders.

In any domestic violence dispute, a judge may see no downside in forbidding *both* parties from harming one another. A judge "may think that mutual restraining orders are not substantially different from regular restraining orders—after all, the goal is to keep the parties away from one another so that the violence will not continue." Jacquie Andreano, *The Disproportionate Effect of Mutual Restraining Orders on Same-Sex Domestic Violence Victims*, 108 Cal. L. Rev. 1047, 1054 (2020). "Judges may also feel that issuing a mutual restraining order saves time because they do not have to hear testimony and make a finding regarding which party is a primary aggressor or even that one party has committed domestic violence." *Id.*

But "[t]hese judicial assessments have often led to the issuance of *unmerited* mutual restraining orders, namely in situations where one party is the abuser and the other party is a victim." *Id.* (emphasis added). As a result, "both parties are restrained *even if only one is an abuser*." *Id.* at 1055 (emphasis added). *See also* Elizabeth Topliffe, *Why Civil Protection Orders Are Effective Remedies for Domestic Violence but Mutual Protective Orders Are Not*, 67 Ind. L.J. 1039, 1055–56 (1992) ("[J]udges often issue a mutual protection order without any request from the respondent or his lawyer. . . . [J]udges and lawyers . . . may be tempted to resort to mutual protective orders frequently. However, when they do this in cases where there truly is one victim and one batterer, they ignore some of the real difficulties of mutual protection orders."). *See generally* David Hirschel, Nat'l Criminal Justice Reference Serv., Domestic Violence

No. 21-11001

Cases: What Research Shows About Arrest and Dual
Arrest Rates (2008).

The net result of all this is profoundly perverse, because it means that
§ 922(g)(8) effectively disarms *victims* of domestic violence. What's worse,
victims of domestic violence may even be put in greater danger than before.
Abusers may know or assume that their victims are law-abiding citizens who
will comply with their legal obligation not to arm themselves in self-defense
due to § 922(g)(8). Abusers might even remind their victims of the existence
of § 922(g)(8) and the entry of a mutual protective order to taunt and subdue
their victims. Meanwhile, the abusers are criminals who have already
demonstrated that they have zero propensity to obey the dictates of criminal
statutes. As a result, § 922(g)(8) effectively empowers and enables abusers
by guaranteeing that their victims will be unable to fight back.

* * *

We must protect citizens against domestic violence. And we can do
so without offending the Second Amendment framework set forth in *Bruen*.

Those who commit or criminally threaten domestic violence have
already demonstrated an utter lack of respect for the rights of others and the
rule of law. So merely enacting laws that tell them to disarm is a woefully
inadequate solution. Abusers must be detained, prosecuted, and
incarcerated. And that's what the criminal justice system is for. I concur.