# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 2, 2023

Lyle W. Cayce
Clerk

No. 21-11001

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

ZACKEY RAHIMI,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CR-83-1

Before JONES, HO, and WILSON, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

The question presented in this case is *not* whether prohibiting the possession of firearms by someone subject to a domestic violence restraining order is a laudable policy goal. The question is whether 18 U.S.C. § 922(g)(8), a specific statute that does so, is constitutional under the Second Amendment of the United States Constitution. In the light of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), it is not.

Zackey Rahimi levies a facial challenge to § 922(g)(8). The district court and a prior panel upheld the statute, applying this court's pre-*Bruen*

precedent. *See United States v. Rahimi*, No. 21-11001, 2022 WL 2070392 at *1 n.1 (5th Cir. June 8, 2022). Rahimi filed a petition for rehearing en banc; while the petition was pending, the Supreme Court decided *Bruen*. The prior panel withdrew its opinion and requested supplemental briefing on the impact of that case on this one. Considering the issue afresh, we conclude that *Bruen* requires us to re-evaluate our Second Amendment jurisprudence and that under *Bruen*, § 922(g)(8) fails to pass constitutional muster. We therefore reverse the district court's ruling to the contrary and vacate Rahimi's conviction.

## I.

Between December 2020 and January 2021, Rahimi was involved in five shootings in and around Arlington, Texas.[1] On December 1, after selling narcotics to an individual, he fired multiple shots into that individual's residence. The following day, Rahimi was involved in a car accident. He exited his vehicle, shot at the other driver, and fled the scene. He returned to the scene in a different vehicle and shot at the other driver's car. On December 22, Rahimi shot at a constable's vehicle. On January 7, Rahimi fired multiple shots in the air after his friend's credit card was declined at a Whataburger restaurant.

Officers in the Arlington Police Department identified Rahimi as a suspect in the shootings and obtained a warrant to search his home. Officers executed the warrant and found a rifle and a pistol. Rahimi admitted that he possessed the firearms. He also admitted that he was subject to an agreed civil protective order entered February 5, 2020, by a Texas state court after Rahimi's alleged assault of his ex-girlfriend. The protective order restrained

---

[1] The facts are drawn from the Pre-Sentence Report, which the district court adopted, and the factual resume, to which Rahimi stipulated.

No. 21-11001

him from harassing, stalking, or threatening his ex-girlfriend and their child. The order also expressly prohibited Rahimi from possessing a firearm.[2]

A federal grand jury indicted Rahimi for possessing a firearm while under a domestic violence restraining order in violation of 18 U.S.C. § 922(g)(8), which provides:

> It shall be unlawful for any person[] who is subject to a court order that[:]  (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . to . . . possess in or affecting commerce, any firearm or ammunition . . . .

Rahimi moved to dismiss the indictment on the ground that § 922(g)(8) is unconstitutional, but he acknowledged that *United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020), foreclosed his argument.[3]  The district court denied Rahimi's motion, and he pled guilty.

---

[2] The validity of the underlying protective order, and Rahimi's breach of it, are not before us.

[3] The Government urged Rahimi's argument was also foreclosed by *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).

No. 21-11001

On appeal, Rahimi renewed his constitutional challenge to § 922(g)(8).[4] Rahimi again acknowledged that his argument was foreclosed, and a prior panel of this court agreed. *See Rahimi*, 2022 WL 2070392 at *1 n.1. But after *Bruen*, the prior panel withdrew its opinion, ordered supplemental briefing, and ordered the clerk to expedite this case for oral argument before another panel of the court. Rahimi now contends that *Bruen* overrules our precedent and that under *Bruen*, § 922(g)(8) is unconstitutional. We agree on both points.

## II.

Under the rule of orderliness, one panel of the Fifth Circuit "'may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.'" *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). The Supreme Court need not expressly overrule our precedent. "Rather, a latter panel must simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law." *Id.* "One situation in which this may naturally occur is where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis." *Id.* (internal quotation marks and alterations omitted). That is the case here, as the Government concedes.

In *Emerson*, we held that the Second Amendment guarantees an individual right to keep and bear arms—the first circuit expressly to do so.

---

[4] Rahimi also asserted that the district court erred when it ordered his federal sentence to run consecutively to sentences for his state crimes because the underlying conduct of the state sentences was relevant conduct for the purposes of U.S.S.G. § 1B1.3. The prior panel affirmed the district court. Because we find § 922(g)(8) unconstitutional and vacate Rahimi's sentence, we do not further address the sentencing issue here.

No. 21-11001

270 F.3d at 260. But we also concluded that § 922(g)(8) was constitutional as applied to the defendant there. *Id.* at 263. "*Emerson* first considered the scope of the Second Amendment right 'as historically understood,' and then determined—presumably by applying some form of means-end scrutiny *sub silentio*—that § 922(g)(8) [wa]s 'narrowly tailored' to the goal of minimizing 'the threat of lawless violence.'" *McGinnis*, 956 F.3d at 755 (quoting *Emerson*, 270 F.3d at 264).

After *D.C. v. Heller*, 554 U.S. 570 (2008), courts coalesced around a similar "two-step inquiry for analyzing laws that might impact the Second Amendment." *McGinnis*, 956 F.3d at 753 (internal quotation marks omitted). First, we "ask[ed] whether the conduct at issue [fell] within the scope of the Second Amendment right." *Id.* at 754 (internal quotation marks omitted). If the conduct fell outside the scope of the Second Amendment right, then the challenged law was constitutional. *Id.* But if the conduct fell within the scope of the right, then we proceeded to the second step of the analysis, which applied either intermediate or strict scrutiny. *Id.* at 754, 757 (expressly applying means-end scrutiny). In *McGinnis*, this court upheld § 922(g)(8) using this two-step framework. The initial panel in this case did likewise, citing *McGinnis*. *Rahimi*, 2022 WL 2070392 at *1 n.1.

Enter *Bruen*. Expounding on *Heller*, the Supreme Court held that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. In that context, the Government bears the burden of "justify[ing] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Put another way, "the [G]overnment must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. In the course of its explication, the Court expressly repudiated the circuit courts' means-end scrutiny—the second step

No. 21-11001

embodied in *Emerson* and applied in *McGinnis*. *Id.* at 2128–30. To the extent that the Court did not overtly overrule *Emerson* and *McGinnis*—it did not cite those cases but discussed other circuits' similar precedent—*Bruen* clearly "fundamentally change[d]" our analysis of laws that implicate the Second Amendment, *Bonvillian Marine*, 19 F.4th at 792, rendering our prior precedent obsolete.

### III.

Our review of Rahimi's facial challenge to § 922(g)(8) is de novo. *See United States v. Bailey*, 115 F.3d 1222, 1225 (5th Cir. 1997). First, the court addresses the Government's argument that Rahimi is not among those citizens entitled to the Second Amendment's protections. Concluding he is, we then turn to whether § 922(g)(8) passes muster under *Bruen*'s standard.[5]

### A.

According to the Government, *Heller* and *Bruen* add a gloss on the Second Amendment that restricts its applicability to only "law-abiding, responsible citizens," *Heller*, 554 U.S. at 635, and "ordinary, law-abiding citizens," *Bruen*, 142 S. Ct. at 2122. Because Rahimi is neither responsible nor law-abiding, as evidenced by his conduct and by the domestic violence restraining order issued against him, he falls outside the ambit of the Second

---

[5] The Government also argues that because *Bruen* endorsed "shall-issue" licensing schemes, and Texas's shall-issue licensing scheme (since modified to allow "constitutional carry," *see* 2021 Tex. Sess. Law Serv. Ch. 809 (West)) included the requirement that an applicant not be under a domestic violence restraining order, it follows that § 922(g)(8) is constitutional. Of course, the *Bruen* Court did not rule on the constitutionality of 43 specific state licensing regimes because that was not the issue before the Court. *See Bruen*, 142 S. Ct. at 2138 n.9. Rather, the Court merely blessed the general concept of shall-issue regimes. *Id.*

No. 21-11001

Amendment. Therefore, argues the Government, § 922(g)(8) is constitutional as applied to Rahimi.

There is some debate on this issue. *Compare Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J. dissenting), *abrogated by Bruen*, 142 S. Ct. 2111, *with Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments). As summarized by now-Justice Barrett, "one [approach] uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away." *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting). The Government's argument that Rahimi falls outside the community covered by the Second Amendment rests on the first approach. But it runs headlong into *Heller* and *Bruen*, which we read to espouse the second one.

Unpacking the issue, the Government's argument fails because (1) it is inconsistent with *Heller*, *Bruen*, and the text of the Second Amendment, (2) it inexplicably treats Second Amendment rights differently than other individually held rights, and (3) it has no limiting principles. We briefly examine each deficiency.

The Second Amendment provides, simply enough:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II. *Heller* explained that the words "the people" in the Second Amendment have been interpreted throughout the Constitution to "unambiguously refer[] to all members of the political community, not an unspecified subset." 554 U.S. at 580. Further, "the people" "refer[] to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of

No. 21-11001

that community." *Id.* (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). For those reasons, the *Heller* Court began its analysis with the "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans," *id.* at 581, and then confirmed that presumption, *id.* at 595. *Heller*'s exposition of "the people" strongly indicates that Rahimi is included in "the people" and thus within the Second Amendment's scope.

To be sure, as the Government argues, *Heller* and *Bruen* also refer to "law-abiding, responsible citizens" in discussing the amendment's reach (*Bruen* adds "ordinary, law-abiding citizens"). But read in context, the Court's phrasing does not add an implied gloss that constricts the Second Amendment's reach. *Heller* simply uses the phrase "law-abiding, responsible citizens" as shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." *Id.* at 626–27; *see also id.* at 627 n.26 ("We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."). In other words, *Heller*'s reference to "law-abiding, responsible" citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights. *Bruen*'s reference to "ordinary, law-abiding" citizens is no different. *See* 142 S. Ct. at 2134.

The Government's reading of *Heller* and *Bruen* also turns the typical way of conceptualizing constitutional rights on its head. "[A] person could be in one day and out the next: the moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status." *Kanter*, 919 F.3d at 452

No. 21-11001

(Barrett, J., dissenting). This is "an unusual way of thinking about rights [because i]n other contexts that involve the loss of a right, the deprivation occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints)." *Id*. "Felon voting rights are a good example: a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected." *Id*. at 453. The Government fails to justify this disparate treatment of the Second Amendment.

Perhaps most importantly, the Government's proffered interpretation lacks any true limiting principle. Under the Government's reading, Congress could remove "unordinary" or "irresponsible" or "non-law abiding" people—however expediently defined—from the scope of the Second Amendment. Could speeders be stripped of their right to keep and bear arms? Political nonconformists? People who do not recycle or drive an electric vehicle? One easily gets the point: Neither *Heller* nor *Bruen* countenances such a malleable scope of the Second Amendment's protections; to the contrary, the Supreme Court has made clear that "the Second Amendment right is exercised individually and belongs to all Americans," *Heller*, 554 U.S. at 581. Rahimi, while hardly a model citizen, is nonetheless part of the political community entitled to the Second Amendment's guarantees, all other things equal.

## B.

Which brings us to the question of whether Rahimi's right to keep and bear arms may be constitutionally restricted by operation of § 922(g)(8). The parties dispute Rahimi's burden necessary to sustain his facial challenge to the statute. The Government contends that Rahimi "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Rahimi contests that assertion,

No. 21-11001

asserting during oral argument that the Government's interpretation of *Salerno* has fallen out of favor, though he contends that in any event, he has satisfied *Salerno*'s standard.

*Bruen* instructs how to proceed. The plaintiffs there levied a facial challenge to New York's public carry licensing regime. 142 S. Ct. at 2122. To evaluate the challenged law, the Supreme Court employed a historical analysis, aimed at "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. Construing *Heller*, the Court flatly rejected any means-end scrutiny as part of this analysis, *id.* at 2129, such that if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances. *Cf. Salerno*, 481 U.S. at 745; *Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019) ("A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." (cleaned up)).

*Bruen* articulated two analytical steps: First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct[.]" 142 S. Ct. at 2129–30. If so, then the "Constitution presumptively protects that conduct," and the Government "must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

To carry its burden, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131–32 (internal quotation marks

No. 21-11001

omitted).  "[W]e are not obliged to sift the historical materials for evidence to sustain [§ 922(g)(8)].  That is [the Government's] burden."  *Id.* at 2150.

The Government need not identify a "historical twin"; rather, a "well-established and representative historical *analogue*" suffices.  *Id.* at 2133.  The Supreme Court distilled two metrics for courts to compare the Government's proffered analogues against the challenged law:  *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right.  *Id.* (citing *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010) and *Heller*, 544 U.S. at 599).  "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry."  *Id.* (internal quotation marks and emphasis omitted).

As to the degree of similarity required, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check."  *Id.*  "[C]ourts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted."  *Id.* (internal quotation marks, alterations, and citations omitted).  On the other hand, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  *Id.*  The core question is whether the challenged law and proffered analogue are "relevantly similar."  *Id.* at 2132.

When the challenged regulation addresses a "general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Id.* at 2131.  Moreover, "if earlier generations addressed the societal problem, but

No. 21-11001

did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

## C.

Rahimi's possession of a pistol and a rifle easily falls within the purview of the Second Amendment. The amendment grants him the right "to keep" firearms, and "possession" is included within the meaning of "keep." *See id.* at 2134–35. And it is undisputed that the types of firearms that Rahimi possessed are "in common use," such that they fall within the scope of the amendment. *See id.* at 2143 ("[T]he Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'") (quoting *Heller*, 554 U.S. at 627)). Thus, *Bruen*'s first step is met, and the Second Amendment presumptively protects Rahimi's right to keep the weapons officers discovered in his home. *See id.* at 2126.

But Rahimi, like any other citizen, may have forfeited his Second Amendment rights if his conduct ran afoul of a "lawful regulatory measure[]" "prohibiting . . . the possession of firearms," *Heller*, 554 U.S. at 626–27 & 627 n.26, that is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127. The question turns on whether § 922(g)(8) falls within that historical tradition, or outside of it.

To reiterate, the statute makes it unlawful

for any person[] who is subject to a court order that[:] (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily

No. 21-11001

injury to the partner or child; and (C)(i) includes a finding that
such person represents a credible threat to the physical safety
of such intimate partner or child; or (ii) by its terms explicitly
prohibits the use, attempted use, or threatened use of physical
force against such intimate partner or child that would
reasonably be expected to cause bodily injury . . . to . . . possess
in or affecting commerce, any firearm or ammunition . . . .

§ 922(g)(8); *see McGinnis*, 956 F.3d at 758 (stating that § 922(g)(8)'s purpose
is to reduce "domestic gun abuse"). Distilled to its essence, the provision
operates to deprive an individual of his right to keep and bear arms once a
court finds, after notice and a hearing, that the individual poses a "credible
threat" to an intimate partner or her child and enters a restraining order to
that effect. The covered individual forfeits his Second Amendment right for
the duration of the court's order. This is so even when the individual has not
been criminally convicted of any offense and when the underlying proceeding
is merely civil in nature.

These characteristics crystallize "how" and "why" § 922(g)(8)
"burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 142
S. Ct. at 2133. In particular, we focus on these key features of the statute:
(1) forfeiture of the right to possess weapons (2) after a civil proceeding[6]
(3) in which a court enters a protective order based on a finding of a "credible
threat" to another specific person, (4) in order to protect that person from

---

[6] The distinction between a criminal and civil proceeding is important because
criminal proceedings have afforded the accused substantial protections throughout our
Nation's history. In crafting the Bill of Rights, the Founders were plainly attuned to
preservation of these protections. *See* U.S. CONST. amend. IV; U.S. CONST. amend. V;
U.S. CONST. amend. VI; U.S. CONST. amend. VIII. It is therefore significant that
§ 922(g)(8) works to eliminate the Second Amendment right of individuals subject merely
to civil process.

No. 21-11001

"domestic gun abuse." The first three aspects go to *how* the statute accomplishes its goal; the fourth is the statute's goal, the *why*.

To sustain § 922(g)(8)'s burden on Rahimi's Second Amendment right, the Government bears the burden of proffering "relevantly similar" historical regulations that imposed "a comparable burden on the right of armed self-defense" that were also "comparably justified." *Id.* at 2132–33. And "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 2136 (internal quotation marks omitted). We thus afford greater weight to historical analogues more contemporaneous to the Second Amendment's ratification.

The Government offers potential historical analogues to § 922(g)(8) that fall generally into three categories: (1) English and American laws (and sundry unadopted proposals to modify the Second Amendment) providing for disarmament of "dangerous" people, (2) English and American "going armed" laws, and (3) colonial and early state surety laws. We discuss in turn why each of these historical regulations falter as "relevantly similar" precursors to § 922(g)(8).

### 1.

The Government relies on laws of varying antiquity as evidence of its "dangerousness" analogues. We sketch these chronologically, mindful that greater weight attaches to laws nearer in time to the Second Amendment's ratification.

Under the English Militia Act of 1662, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." 13 & 14 Car. 2, c.3, § 13 (1662). Citing scholarship, the Government thus posits that "by the time of American independence, England had established a well-practiced tradition

No. 21-11001

of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020).

But the Militia Act's provenance demonstrates that it is not a forerunner of our Nation's historical tradition of firearm regulation. Under Charles I (who reigned 1625–1649), the Crown and Parliament contested for control of the militia. Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 Ga. L. Rev. 1, 8 (1996). After the resulting civil war and Oliver Cromwell's interregnum, the monarchy was restored in 1660 when Charles II took the throne. Charles II began using the militia to disarm his political opponents. *Id.* (citing J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right (1994) 35–38 (1994). The Militia Act of 1662 facilitated this disarmament, which escalated under the Catholic James II once he took the throne in 1685. *Id.*; *see Heller*, 554 U.S. at 593 (noting that the disarmaments "caused Englishmen . . . to be jealous of their arms"). After the Glorious Revolution, which enthroned Protestants William and Mary, the Declaration of Rights, codified as the 1689 English Bill of Rights, qualified the Militia Act by guaranteeing "[t]hat the subjects which are Protestants may have arms for their defence suitable to their Conditions and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. "This right," which *restricted* the Militia Act's reach in order to prevent the kind of politically motivated disarmaments pursued by Charles II and James II, "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. This understanding, and the history behind it, defeats any utility of the Militia Act of 1662 as a historical analogue for § 922(g)(8).

The Government next points to laws in several colonies and states that disarmed classes of people considered to be dangerous, specifically including

No. 21-11001

those unwilling to take an oath of allegiance, slaves, and Native Americans. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157–60 (2007). These laws disarmed people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200–01 (5th Cir. 2012) (discussing relevant scholarship), *abrogated by Bruen*, 142 S. Ct. at 2126–30. "While public safety was a concern, most disarmament efforts were meant to prevent armed rebellions. The early Americans adopted much of that tradition in the colonies." Greenlee, *supra*, at 261.

Despite some facial similarities in *how* these "dangerousness" laws worked—like § 922(g)(8), they operated to disarm covered people—there were also material differences. For one, they disarmed people by class or group, not after individualized findings of "credible threats" to identified potential victims. Even more, *why* they disarmed people was different. The purpose of these "dangerousness" laws was the preservation of political and social order, not the protection of an identified person from the specific threat posed by another. Therefore, laws disarming "dangerous" classes of people are not "relevantly similar" to § 922(g)(8) such that they can serve as historical analogues.

Finally, the Government offers two proposals that emerged in state ratification conventions considering the proposed Constitution. A minority of Pennsylvania's convention authored a report in which they contended that citizens have a right to bear arms "unless for crimes committed, *or real danger of public injury*." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971) (emphasis added). And at the Massachusetts convention, Samuel Adams proposed a qualifier to the

No. 21-11001

Second Amendment that limited the scope of the right to "peaceable citizens." *Id.* at 681.

But these proposed amendments are not reflective of the Nation's early understanding of the scope of the Second Amendment right. While they were influential proposals, *see Heller*, 554 U.S. at 604, neither became part of the Second Amendment as ratified. Thus, the proposals might somewhat illuminate the scope of firearm rights at the time of ratification, but they cannot counter the Second Amendment's text, or serve as an analogue for § 922(g)(8) because, *inter alia*, they were not enacted. *Cf. Bruen*, 142 S. Ct. at 2137 ("[T]o the extent later history contradicts what the text [of the Second Amendment] says, the text controls.").

**2.**

The Government also relies on the ancient criminal offense of "going armed to terrify the King's subjects." *Bruen*, 142 S. Ct. at 2141 (alteration and emphasis omitted). This common law offense persisted in America and was in some cases codified. *Id.* at 2144. The Government offers four exemplars codified in the Massachusetts Bay Colony, the state of Virginia, and the colonies of New Hampshire and North Carolina.

The Massachusetts law provided "[t]hat every justice of the peace . . . may cause to be staid and arrested all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . and upon view of such justice or justices, confession of the party or other legal conviction of any such offence, shall commit the offender to prison . . . and seize and take away his armor or weapons . . . ." 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute) (cleaned up). Similarly, the New Hampshire statute authorized justices of the peace "upon view of such justice, confession of the party, or legal proof of any such offense . . . [to] cause the [offender's] arms

No. 21-11001

or weapons to be taken away . . . ." Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament, 17 (1771) (1701 statute); *see Bruen*, 142 S. Ct. at 2142–43 (noting that Massachusetts and New Hampshire laws "were substantively identical"). Virginia's law differed slightly: "[N]o man . . . [shall] go []or ride armed by night or by day, in fairs or markets, or in other places, in terror of the country, upon pain of being arrested and committed to prison by any justice on his view, or proof of others, there to a time for so long a time as a jury, to be sworn for that purpose by the said justice, shall direct, and in like manner to forfeit his armour to the Commonwealth . . . ." Revised Code of the State of Virginia: Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force, 554 (1819) (1786 statute). North Carolina's colonial law was contained within its constable's oath, which required constables to "arrest all such persons as, in your sight, shall ride or go armed offensively, or shall commit or make any riot, affray, or other breach of his Majesty's peace . . . ." Collection of All of the Public Acts of Assembly of the Province of North-Carolina: Now in Force and Use, 131 (1751) (1741 statute) (cleaned up). While similarly aimed at curbing "going armed offensively," the North Carolina law did not provide for forfeiture.

These proffered analogues fall short for several reasons. An overarching one is that it is dubious these "going armed" laws are reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of firearms. *See Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public carry regulation."). North Carolina's law did not provide for forfeiture, so it quickly falls out of the mix. And fairly early on, Massachusetts and Virginia dropped forfeiture as a penalty, going the way of North Carolina and thereby undercutting the Government's reliance on those laws. Indeed, Massachusetts amended its law to remove the forfeiture provision in 1795,

No. 21-11001

just four years after the ratification of the Second Amendment. 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807, 653 (1807) (statute enacted Jan. 29, 1795). Virginia had done so by 1847, shortly before the Commonwealth re-codified its laws in 1849. *See* Code of Virginia: With the Declaration of Independence and Constitution of the United States and the Declaration of Rights and Constitution of Virginia, 756 (1849).[7] It is unclear how long New Hampshire's "going armed" law preserved its forfeiture provision, but assuming *arguendo* it persisted longer than the others, one outlier is not enough "to show a tradition of public carry regulation." *Bruen*, 142 S. Ct. at 2142.

And on substance, the early "going armed" laws that led to weapons forfeiture are not relevantly similar to § 922(g)(8). First, those laws only disarmed an offender after criminal proceedings and conviction. By contrast, § 922(g)(8) disarms people who have merely been civilly adjudicated to be a threat to another person. Moreover, the "going armed" laws, like the "dangerousness" laws discussed above, appear to have been aimed at curbing terroristic or riotous behavior, i.e., disarming those who had been adjudicated to be a threat to society generally, rather than to identified individuals. Thus, these "going armed" laws are not viable historical analogues for § 922(g)(8).

### 3.

Lastly, the Government points to historical surety laws. At common law, an individual who could show that he had "just cause to fear" that another would injure him or destroy his property could "demand surety of

---

[7] By the 1849 code, Virginia's going armed law had evolved into its anti-riot law (chapter 195) and surety law (chapter 201). *See id.* Neither chapter provided for forfeiture of an offender's weapons.

No. 21-11001

the peace against such person." 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 252 (1769). The surety "was intended merely for prevention, without any crime actually committed by the party; but arising only from probable suspicion, that some crime [wa]s intended or likely to happen." *Id.* at 249. If the party of whom surety was demanded refused to post surety, he would be forbidden from carrying a weapon in public absent special need. *See Bruen*, 142 S. Ct. at 2148–49 (discussing operation of historical surety laws). Many jurisdictions codified this tradition, either before ratification of the Bill of Rights or in early decades thereafter.[8]

The surety laws come closer to being "relevantly similar" to § 922(g)(8) than the "dangerousness" and "going armed" laws discussed *supra*. First, they are more clearly a part of our tradition of firearm regulation. And they were "comparably justified," *id.* at 2133, in that they were meant to protect an identified person (who sought surety) from the risk of harm posed by another identified individual (who had to post surety to carry arms). Put simply, the *why* behind historical surety laws analogously aligns with that underlying § 922(g)(8).[9]

---

[8] *E.g.*, 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New-Hampshire: In New-England; with Sundry Acts of Parliament, 17 (1771) (1701 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801, pg. 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven, pg. 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New-England 91 (1901) (1702 statute); *see also Bruen*, 142 S. Ct. at 2148 (stating that at least ten jurisdictions enacted surety laws between 1836 and 1871).

[9] The parties spar somewhat over the required granularity of the underlying problem in comparing § 922(g)(8) to proffered analogues. Rahimi contends more generally that domestic violence was, and remains, a persistent social ill that society has taken numerous actions against—though not disarmament. The Government counters that

No. 21-11001

Aspects of *how* the surety laws worked resemble certain of the mechanics of § 922(g)(8) as well. The surety laws required only a civil proceeding, not a criminal conviction. The "credible threat" finding required to trigger § 922(g)(8)'s prohibition on possession of weapons echoes the showing that was required to justify posting of surety to avoid forfeiture. But that is where the analogy breaks down: As the Government acknowledges, historical surety laws did not prohibit public carry, much less possession of weapons, so long as the offender posted surety. *See also id.* at 2149 (noting that there is "little evidence that authorities ever enforced surety laws"). Where the surety laws imposed a conditional, partial restriction on the Second Amendment right, § 922(g)(8) works an absolute deprivation of the right, not only publicly to carry, but to *possess* any firearm, upon entry of a sufficient protective order. At bottom, the historical surety laws did not impose "a comparable burden on the right of armed self-defense," *id.* at 2133, as § 922(g)(8).[10]

\*    \*    \*

---

"crime statistics from the founding era are hard to come by," but that "there is reason to doubt that domestic *homicide* was as prevalent at the founding as it is in the modern era." To be sure, historical surety laws were not targeted to domestic violence or even more specifically to domestic homicide. But somewhat abstracting the laws' justifications, as we do above the line, strikes us as consistent with *Bruen*'s instruction that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133.

[10] *Accord* David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (2017) ("[T]here is simply no tradition—from 1791 or 1866—of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders."); Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017) ("Historical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin.").

No. 21-11001

The Government fails to demonstrate that § 922(g)(8)'s restriction of the Second Amendment right fits within our Nation's historical tradition of firearm regulation. The Government's proffered analogues falter under one or both of the metrics the Supreme Court articulated in *Bruen* as the baseline for measuring "relevantly similar" analogues: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* As a result, § 922(g)(8) falls outside the class of firearm regulations countenanced by the Second Amendment.

## IV.

Doubtless, 18 U.S.C. § 922(g)(8) embodies salutary policy goals meant to protect vulnerable people in our society. Weighing those policy goals' merits through the sort of means-end scrutiny our prior precedent indulged, we previously concluded that the societal benefits of § 922(g)(8) outweighed its burden on Rahimi's Second Amendment rights. But *Bruen* forecloses any such analysis in favor of a historical analogical inquiry into the scope of the allowable burden on the Second Amendment right. Through that lens, we conclude that § 922(g)(8)'s ban on possession of firearms is an "outlier[] that our ancestors would never have accepted." *Id.* Therefore, the statute is unconstitutional, and Rahimi's conviction under that statute must be vacated.

REVERSED; CONVICTION VACATED.

No. 21-11001

James C. Ho, *Circuit Judge*, concurring:

The right to keep and bear arms has long been recognized as a fundamental civil right. *See, e.g., Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (describing the First, Second, Fourth, Fifth, and Sixth Amendments as the "civil-rights Amendments"); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 n.10 (1961). Blackstone saw it as essential to "'the natural right'" of Englishmen to "'self-preservation and defence.'" *District of Columbia v. Heller*, 554 U.S. 570, 593–94 (2008) (quoting 1 William Blackstone, Commentaries on the Laws of England 139–40 (1765)).

But the Second Amendment has too often been denigrated as "a second-class right." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). In response, the Supreme Court has called on judges to be more faithful guardians of the text and original meaning of the Second Amendment. *See N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Our court today dutifully follows the framework recently set forth in *N.Y. State Rifle*. It recognizes the absence of relevant historical analogues required to support the Government's position in this case. I am pleased to concur.

I write separately to point out that our Founders firmly believed in the fundamental role of government in protecting citizens against violence, as well as the individual right to keep and bear arms—and that these two principles are not inconsistent but entirely compatible with one another.

Our Founders understood that those who commit or threaten violence against innocent law-abiding citizens may be arrested, convicted, and incarcerated. They knew that arrest and incarceration naturally entails the loss of a wide range of liberties—including the loss of access to arms.[1]

---

[1] *See, e.g., Chimel v. California*, 395 U.S. 752, 762–63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to

No. 21-11001

So when the government detains—and thereby disarms—a member of our community, it must do so consistent with the fundamental protections that our Constitution affords to those accused of a crime. For example, the government may detain dangerous criminals, not just after conviction, but also before trial. Pre-trial detention is expressly contemplated by the Excessive Bail Clause and the Speedy Trial Clause. And it no doubt plays a significant role in protecting innocent citizens against violence. *See*, *e.g.*, *United States v. Salerno*, 481 U.S. 739, 755 (1987) (permitting "the detention prior to trial of arrestees charged with serious felonies who . . . pose a threat to the safety of individuals or to the community").

Our laws also contemplate the incarceration of those who criminally threaten, but have not (yet) committed, violence. After all, to the victim, such actions are not only life-threatening—they're life-altering. *See*, *e.g.*, *United States v. Ackell*, 907 F.3d 67 (1st Cir. 2018) (upholding criminal stalking law); *United States v. Gonzalez*, 905 F.3d 165 (3rd Cir. 2018) (same); *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014) (same); *United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2012) (same); *see also People v. Counterman*, 497 P.3d 1039 (Colo. Ct. App. 2021) (same), *cert. granted*, _ U.S. _ (2023).

In sum, our Founders envisioned a nation in which both citizen and sovereign alike play important roles in protecting the innocent against violent criminals. Our decision today is consistent with that vision. I concur.

---

remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."); *State v. Buzzard*, 4 Ark. 18, 21 (1842) (Ringo, C.J.) ("Persons accused of crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned.").